IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHEILA G. TALTON, on behalf of herself and derivatively on behalf of Unisource Network Services, Inc. ) ) ) ) | **00C 7967** |
| Plaintiff, ) | **JURY TRIAL DEMANDED** |
| v. ) | JUDGE RONALD GUZMAN |
| UNISOURCE NETWORK SERVICES, INC., MAGISTRATE JUDGE ROSEMOND an Illinois corporation, POLESTAR ) CAPITAL, INC., a Delaware corporation, ) POLESTAR CAPITAL FUND II, L.P., ) POLESTAR CAPITAL FUND III, L.P., ) ATLANTIC COASTAL INVESTORS, L.P., ) MICHAEL FIELDS, JERRY EDGERTON, ) DERRICK COLLINS, JOHN DOERER, ) WALTER THREADGILL, WOODY ) CHAMBERLAIN and THURMAN JORDAN, ) ) | |
| Defendants. ) | |

DOCKETED
DEC 2 6 2000

## COMPLAINT

Sheila G. Talton ("Talton"), on behalf of herself and derivatively on behalf of Unisource

Network Services, Inc., through her attorneys Kathleen H. Klaus and Kathryn A. Pyszka, states

as follows for her complaint against Unisource Network Services, Inc. ("Unisource" or

"Company"), Polestar Capital, Inc., a Delaware corporation ("Polestar"), Polestar Capital Fund

II, L.P., Polestar Capital Fund III, L.P., Atlantic Coastal Investors, L.P. ("Atlantic"), Michael

Fields ("Fields"), Jerry Edgerton ("Edgerton"), Derrick Collins ("Collins"), John Doerer

("Doerer"), Walter Threadgill ("Threadgill"), Woody Chamberlain ("Chamberlain") and

Thurman Jordan ("Jordan"):

491854.v4

## INTRODUCTION

1.      Talton is the former President and Chief Executive Officer of Unisource. She began the Company in 1986 and ran it until April 7, 2000, when her employment was terminated without notice or cause. Immediately prior to the termination of her employment at Unisource, Fields, Edgerton, Collins, Doerer, Threadgill and Chamberlain (jointly, the "Directors") induced Talton to invest $350,000 in the Company in exchange for promissory notes ("Series 4 Note") and warrants in Unisource stock and to subordinate her notes to other notes owned by entities in which certain Directors were principals. When the Company sold Talton the Notes and Warrants and asked her to subordinate her debt, the Directors told Talton she would continue to be employed by the Company and failed to inform Talton that they planned to fire her, a material misrepresentation and omission constituting fraud under the federal securities laws. Talton brings this action to redress that fraud, the Directors' mismanagement of the Company and other injuries caused by the Defendants.

## JURISDICTION AND VENUE

2.      Talton's claims arise, in part, under Section 10(b) of the Securities Exchange Act of 1934 and Rule l0b-5 promulgated thereunder. 15 U.S.C. §§ 78j(b); 17 C.F.R. §§ 240.10b-5. Jurisdiction therefore is proper under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. Talton's state law claims are so related to the federal claim that they are part of the same case and controversy as her federal claim. Jurisdiction over the state law claims therefore is conferred by 28 U.S.C. § 1367.

3.      The actions and omissions giving rise to Talton's claims occurred in this District. Venue therefore is appropriate under 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa.

## THE DEFENDANTS

4.      Unisource is an Illinois corporation which assists its clients in establishing and maintaining computer networks.

5.      Polestar is a Delaware investment corporation with its principal place of business in Chicago, Illinois.  Polestar Capital Fund II, L.P. and Polestar Capital Fund III, L.P. are Illinois limited partnerships associated with Polestar.  Collins and Doerer are investors in and principals of Polestar.  Doerer is its president.  Collins and Doerer are directors of Unisource.

6.      Atlantic is a District of Columbia limited partnership engaged in the business of investing venture capital.  Threadgill is an investor in and manager of Atlantic and a director of Unisource.

7.      Chamberlain has a beneficial interest in shares of the Company through his investment company Doerge-Unisource, L.P. ("Doerge"), a shareholder of Unisource.  He is also a director of Unisource.

8.      Fields and Edgerton are directors of Unisource.

9.      Jordan is the Company's Chief Executive Officer.  While Talton was with the Company, he was its Chief Financial Officer.

## FACTS COMMON TO ALL COUNTS

10.     Talton began Unisource in 1986 and, at the time, was its President, Chief Executive Officer and majority shareholder.  For the first fourteen years of its existence, Talton ran and grew Unisource through her many important contacts in the computer industry and government agencies.  Talton began the Company with three employees.  By 1998, the Company employed 100 people and had nearly $9 million in sales.  While Talton was employed by the Company, its customers included the Chicago Public Schools and  McDonald's Corporation.

Under Talton's direction, Unisource also designed and built the telephone system used in the Euro-Tunnel.

### A.   Talton Brings On Investors.

11.     As the Company grew, so did its need for capital. In an effort to raise that capital, Unisource sold its stock through several private placements. The first such stock sale occurred in July 1996, when Unisource sold Doerge 10% of the Company's authorized shares and CI & Associates Software Consulting, Inc. 15% of the Company's authorized shares. As part of that transaction, Chamberlain received his seat on Unisource's board.

12.     In January 1998, the Company executed another major financing transaction that resulted in Talton losing her controlling interest in the Company. Polestar and Atlantic (jointly, the "Venture Capitalists") purchased a total of 3,050,001 shares of Class B, Series 1 preferred stock in Unisource. Small amounts of Class B, Series 1 shares were sold to other shareholders.

13.     As part of the January 1998 private placement, the Venture Capitalists were allowed three seats on the Board and nominated Doerer, Collins and Threadgill as directors. Talton was allowed two seats and nominated herself and Edgerton. Fields was put on the Board by agreement between Polestar and Talton

14.     The shareholders that participated in these transactions, including Talton, were awarded pre-emptive rights with their stock. This meant that each of these shareholders had a right but not the obligation to participate in any future stock offerings on the same terms and conditions as the offering stock purchasers.

15.     In connection with the 1998 stock transaction, Talton and Unisource executed an employment contract ("Employment Contract"), which provided that Talton would be employed as the Company's President and Chief Executive Officer until December 31, 2000. The

Employment Contract provided that Talton could only be terminated for "cause" and that if Unisource wanted to fire her without cause, it had to give her 60 days notice.

**B.     The December/January Interim Financing.**

16.     The Venture Capitalists bought additional stock in a February 1999 private placement. After these sales and prior to the acts giving rise to this suit, Talton owned approximately 26% of stock, the Venture Capitalists owned approximately 31%, Doerge owned 10%, 14% was held by an ESOP and various other shareholders held the remaining stock.

17.     Soon after the 1999 private placement, the Venture Capitalists decided to divest their holdings in Unisource and started seeking a buyer for the Company.

18.     At the same time, Unisource began to experience cash flow problems. Talton therefore sought additional investors or purchasers who could provide a necessary cash infusion for the Company. Talton spoke with several potential purchasers, including SANWA Bank, but none were able to close a deal by the end of 1999. SANWA's initial offering price for the purchase of the Company was $12 million.

19.     Doerer, Collins, Threadgill and Chamberlain wanted to sell the Company and refused to entertain any investment proposal that resulted in the Venture Capitalists losing control of the Company. As directors, they promoted the individual interest of the Venture Capitalists and Doerge, rather than the interests of the Company.

20.     Talton was willing to sell the Company if the terms were right, but believed that the Company should also consider offers from investors interested in purchasing a portion of the Company. These investors' contributions would produce the cash infusion necessary to cure Unisource's chronic cash flow problems and would improve its marketability, a matter that would inure to the benefit of all of the Company's shareholders, not just the Venture Capitalists.

21.     Talton also sought and obtained offers from potential investors, including John
Bank.  In November 1999, Bank indicated that he was willing to invest $500,000 in the
Company on certain terms and conditions, including obtaining a seat on the Board.

22.     Because the Venture Capitalists believed that the Company would be sold at a
price which would yield them a significant return on their investment and because they wanted to
improve their position in the Company in anticipation of such a sale, the Venture Capitalists
made their own offer to provide the $500,000 that the Company needed to temporarily cure its
cash flow problem.

23.     The Venture Capitalists' proposal called for them to invest $500,000 in exchange
for convertible promissory notes totaling $500,000 and warrants in Class B, Series 2 preferred
stock.  The notes were to be due on March 31, 2000 because the Venture Capitalists believed that
the Company would be sold by then.  In addition, the Venture Capitalists demanded as a
precondition to closing that Talton be required to vote with the majority on the issue of change in
control.  Talton objected to this provision and to the Directors' attempts to force her to accept it.

24.     Rather than abstain from the decision between the competing offers, Collins,
Doerer and Threadgill argued against and voted down Bank's proposal on November 29, 1999.
After allowing the Venture Capitalists the opportunity to amend their offer, the entire Board,
including Collins, Doerer and Threadgill, approved the Venture Capitalists' proposal on
December 14, 1999.

25.     Talton wanted to participate in this financing with the same terms and conditions
as the Venture Capitalists and told the Directors that she would exercise her pre-emptive rights.
She also told the Directors that they would have to notify other shareholders of the proposal and
provide them enough time to decide whether to invest.  Doerer, Collins, Chamberlain and

Threadgill balked at the idea of other shareholders participating in the bridge financing, wanting instead to increase their proportionate holdings of Unisource stock vis-a-vis the other shareholders. After much debate and legal counseling, all of the Directors agreed that notice to the other shareholders was necessary.

26.     Sometime before the December 14, 1999 Board meeting, Eclipse Networks, Inc. ("Eclipse") contacted Unisource about acquiring the Company. Talton insisted, over Doerer's, Collins' and Threadgill's objections, that the other shareholders be advised of the status of the Eclipse offer at the same time that they were notified of the proposed bridge financing.

**C.     The Directors Plan to Fire Talton.**

27.     During the wrangling between Talton and the Directors over the potential sale of the Company and Talton's insistence that the Directors adhere to the pre-emptive rights provisions in the previous financing documents, it became apparent to the Directors that Talton would thwart the Venture Capitalists' plan to increase their share in the Company at the expense of the current and potential shareholders.

28.     At some time prior to the closing of the December/January Interim Financing, Doerer, Collins, Threadgill and Chamberlain decided that they would force Talton out of the Company. This would clear the way for Doerer, Collins, Threadgill and Chamberlain to operate the Company in a way that benefited the Venture Capitalists and Doerge, at the expense of the other shareholders.

29.     On information and belief, Doerer, Collins, Threadgill and Chamberlain discussed their plan to termination Talton's employment with Fields and Edgerton. Fields and Edgerton either agreed with or acquiesced in the plan and agreed not to reveal the decision to Talton.

### D. The Directors Put Their Plan in Motion.

30. The Directors took the first step in their plan to force Talton out of the Company and their scheme to defraud her on or about January 17, 2000 during the closing of the December/January Interim Financing. At the closing, where other Directors were present, Doerer informed Talton that the Venture Capitalists would not close unless Talton agreed to resign as President once the Directors located a replacement. Doerer indicated that, with the change, Talton would be able to focus her efforts on sales and marketing the Company. The other Directors agreed with his representations.

31. At this time, Talton was the contact person on the Eclipse transaction. The Directors knew that Eclipse wanted Talton to remain with the Company in the event it purchased Unisource. Although the Directors wished to terminate Talton's employment immediately in retaliation for her actions to protect the Company and the other shareholders, they did not want to spoil the Eclipse deal. At the same time, they wanted to prepare someone to run the Company in the event the Eclipse deal fell through and they fired Talton.

32. Talton expressed concern over the effect her removal from the Company's management would have on Unisource and asked the Directors to clarify her responsibilities. Talton specifically asked whether she would continue to be involved in operating the Company. The Directors assured her that she would be.

33. Talton, not Jordan, had the personal contacts with the Company's major clients. Talton, not Jordan, enjoyed a high profile in the industry and was extensively promoted by the Company as its leader. In addition, because Talton was an owner/operator of Unisource, the Company was able to qualify as a minority business enterprise with the City of Chicago and

491854.v4                                            8

other government bodies and agencies. Finally, Talton believed that a significant change in management would send a bad signal to potential investors.

34.    The Directors falsely assured Talton that she would continue to serve as Chief Executive Officer of the Company but that Jordan, then the Company's Chief Financial Officer, would take over the day-to-day operations. Jordan did not replace Talton until March 24, 2000.

35.    Contrary to their representations to Talton, the replacement of Talton with Jordan was the first step in the Directors' plan to eliminate Talton's role in running the Company.

36.    Based on the Directors' assurances that she would continue to be the Company's CEO, Talton exercised her pre-emptive rights and invested $98,382 at the January 17, 2000 closing. Talton received convertible promissory notes totaling $98,422 and warrants to purchase 246,322 shares of Class B, Series 3 preferred stock (the "Series 3 Notes" and "Series 3 Warrants"). Copies of the Series 3 Notes are attached hereto as Exhibit A; copies of the Series 3 Warrants are attached hereto as Exhibit B.

37.    At around this time, Eclipse sent a revised term sheet for its proposed purchase of Unisource. Included as a condition to the purchase of the Company was Talton's agreement to a three-year employment contract. No other information about the terms of Talton's employment were set forth in the term sheet. Talton indicated at the February 4, 2000 Board meeting that she could not agree to a three-year contract unless more specific terms were included. The Directors were outraged with Talton's reluctance to agree to an unqualified commitment to stay with the new entity for three years because it might impair the Eclipse deal.

38.    In retaliation for Talton's refusal to instantly agree to the employment term of the Eclipse proposal, Collins and Doerer insisted that the Board be the point of contact for any future discussions with Eclipse or its financial backer Thoma Cressy ("Thoma") and instructed Talton

that she was to have no communication with either entity unless another Board member was present.

39.    At a subsequent discussion of Eclipse's request that Talton agree to a three-year contract, Chamberlain angrily told Talton that she needed to make a "personal sacrifice" so that the other shareholders could benefit.

40.    When Talton again refused, the Directors set into motion the second part of their scheme to defraud and force Talton out of the Company and assured that she would make the "personal sacrifice" they demanded.

### E.    The February 2000 Interim Financing.

41.    The December/January financing package did not solve the Company's financial problems and by February 2000, Unisource was unable to meet its payroll.

42.    The Directors knew that, if backed into a corner, Talton would invest in the Company to keep it afloat.

43.    Doerer, Collins and Threadgill therefore told Talton that the Venture Capitalists would not make any further investment.   They also refused to consider any offers from outside investors, demanding instead that the Company be positioned for a sale.

44.    As the Directors planned, Talton agreed to invest personally an additional $100,000 under the same terms as the previous interim financing agreement.  Talton borrowed an additional $150,000 in cash from friends and invested their money in the February 22, 2000 Interim Financing pursuant to a Nominee Agreement executed between Talton and her lenders.

45.    On or about February 22, 2000, Talton purchased 655,300 warrants in Class B, Series 4 preferred stock ("Series 4 Warrants") and was issued a convertible promissory note for $250,000 ("Series 4 Note").  A copy of the February 22, 2000 Interim Financing Agreement is

attached hereto as Exhibit C; a copy of the Series 4 Warrants is attached hereto as Exhibit D; a copy of the Note is attached hereto as Exhibit E.

46.     Both the Series 3 Notes and the Series 4 Note were due on March 31, 2000.

47.     At no time prior to Talton's purchase of the Series 4 Warrants did any of the Directors indicate to Talton that her continued employment with Unisource was in jeopardy or contingent on the Eclipse deal closing.

48.     In fact, subsequent to January 17, 2000, the Directors each had assured her that she was of significant value as an employee of the Company because of her contacts in the industry and relationships with clients. Had Talton known of her precarious employment situation, she would not have invested in the Series 4 Warrants.

F.     **The Subordination Agreement.**

49.     Soon after Talton purchased the Series 4 Warrants, the deal with Eclipse collapsed and the Company again was unable to make payroll. This time, the Venture Capitalists, through Collins, Threadgill and Doerer, offered to invest $300,000 in the Company, in exchange for convertible promissory notes and additional Series 3 warrants.

50.     On information and belief, the new notes were issued to the defendants Polestar Capital, Inc., Polestar Capital Fund II, L.P., Polestar Capital Fund III, L.P., Atlantic Coastal Investors, L.P.

51.     As a condition of this investment, Collins, Threadgill and Doerer demanded that Talton agree to subordinate all of her Notes to all the notes issued to Venture Capitalists.  They told her that, unless she agreed to the subordinate her Notes, they would make no additional investment and the Company would face bankruptcy.

491854.v4

52.     They also assured her that she was valuable to the Company and gave no indication that she was about to be terminated.   In fact, on March 20, 2000 the Board discussed lay-offs the Company needed to make in order to cut costs.  At the meeting, Fields indicated that Unisource needed to get rid of some employees in the upper ranks of the Company.  In response to his concerns, Talton asked Fields whether her job was on the line, and he again stated it was not.  Again, none of the other Directors gave any indication to Talton that her employment was about to be terminated.

53.     Based on the Directors' representations that she would continue to run Company as its CEO, on March 22, 2000 Talton therefore executed a Subordination Letter, a copy of which is attached hereto as Exhibit F.

54.     The Subordination Letter purports to bar Talton from demanding payment on either the Series 3 Notes or the Series 4 Note, until the Venture Capitalists were paid on their notes.

55.     By inducing Talton to sign the Subordination Letter, the Directors took the final step in their plan to deprive Talton of the value of her $350,000 investment. If they had fired Talton without securing the Subordination Letter, Talton would have demanded payment on her notes and the Directors would have had to borrow $350,000 or face bankruptcy.

56.     Among other things, the Directors' scheme deprived Talton of her pre-emptive rights. The Venture Capitalists received valuable demand notes in exchange for their contribution. Talton received subordinated notes that were virtually worthless.

57.     On April 7, 2000, just two weeks after they demanded Talton subordinate her debt, the Directors informed Talton that her employment was terminated. The termination was "without cause" under Talton's Employment Agreement.   As a result of her termination,

491854.v4                                    12

Unisource lost most of its customers, business and status as a minority business enterprise and the value of the Company was greatly diminished.

### G. The Directors Breach Their Fiduciary Duties.

58.     Most of Unisource's customers came to Unisource because of Talton. She had an excellent reputation in the industry and, for all intents and purposes, was the face of Unisource. None of the Directors had any experience in operating a computer network service provider and none had relationships with the Company's clients. At the time they fired her without cause, the Directors did not have a suitable replacement available to take over Talton's role, nor had they begun a search for one.

59.     This was just one example of the Directors' proclivity for putting the interest of the Venture Capitalists over the interest of the Company.

60.     Throughout the time that they were pursuing a sale of the Company, the Directors attempted to arrange a deal that would benefit the Venture Capitalists and Doerge over the other shareholders. For example, during the negotiations with Eclipse, Doerer and Collins flew to San Francisco to meet with John Bonnecour of Eclipse. Rather than talk about Unisource and the pending negotiations, Doerer and Collins told Bonnecour that Polestar was looking to move the Northern California and asked about participating in Thoma Cresse's (Eclipse's investor) other investments.

61.     Fields also made arrangements to perform personal consulting work for Eclipse.

62.     Doerer and Collins' lack of professionalism in their dealings with Bonnecour injured the standing of Unisource with Eclipse and soon after the meeting with Bonnecour, Eclipse stopped taking calls from Unisource.

63.     Despite this set back, Talton continued to pursue potential purchasers for the Company.  In March 2000, Talton had scheduled a meeting with Devine Investitures, a potential investor.  Prior to that meeting, the Directors demanded that Talton lay off employees in an attempt to improve the Company's financial position.  Talton asked the Directors to delay the RIF until after the meeting with Devine.  Talton believed that a reduction in force would weaken the Company's position with potential investors, because it was a strong signal that the Company was in significant financial trouble.  The Directors nonetheless insisted that the Company lay off approximately one-half of its technical staff immediately.

64.     In addition, Collins insisted upon accompanying Talton to the meeting with Devine.  Rather than assist her in the presentation, Collins said nothing.  This sent a negative message concerning Talton's ability to represent the Board in negotiations and impacted on her effectiveness.

65.     Prior to the March meeting, Devine had been ready to fund a deal to purchase the Company.  As Talton anticipated, however, the RIF signaled to Devine that the Company was in trouble, and not worth purchasing.

66.     During the period November 19, 1999 through the present, the other acts and omissions by the Directors constituting a breach of the duty of care and loyalty include the following:

> a.  Terminating Talton before finding a replacement and without allowing an orderly transition. This unnecessarily endangered the Company's relationship with its clients and called into doubt Unisource's certification as a minority business enterprise with the City of Chicago, one of its major customers;
>
> b.  Refusing, without cause, to pay Talton the severance due under her Employment Contract;

c.      Retaining Jordan as the Company's President and Chief Executive Officer, although he had little operational experience, no relationships with the Company's clients and no contacts in the industry;

d.      Refusing to investigate employee complaints about Jordan being intoxicated while he was the Company's President;

e.      Structuring additional investments for the Venture Capitalists in a way that prevented other shareholders from exercising their preemptive rights. Talton repeatedly asked for information about the financial deals between the Company and the Venture Capitalists that followed her termination and no information was provided, other than to notify Talton that her position in the Company had somehow shrunk to around 20% while Polestar's increased to 44%;

f.      Refusing to accept an offer from Comdisco, a former customer, to perform a project that would have brought over $100,000 to the Company. The offer was rejected solely because Talton would have been associated with the project;

g.      Refusing to engage a broker to market the Company or make any other serious effort to sell immediately after terminating Talton's employment. The failure to act caused Unisource to lose a window of opportunity in which the Company could be sold after it lost its top officer;

h.      Refusing to have the Company valued after Talton's termination in order to determine its reasonable value. Instead, the Directors have indicated that they would no consider an offer of less that $12 million, a ridiculous price given the Company's financial condition at the time and fact that no effort was made to maintain relationships with customers after Talton's termination;

i.      Instructing Jordan not to provide Talton with financial and other information about the Company, including information about the negotiations with the Company's bank over a loan Talton had guaranteed;

j.      Operating the Company since Talton's termination through shadow, informal board meetings where the Company's business was discussed without Talton being present;

k.      Ignoring inquiries from potential acquirers that Talton brought to the Company both before and after her termination, including Robert Blackwell;

l.      After hiring Jim Hill in August 2000 to sell new accounts, Unisource fired him in November 2000, costing the Company its relationship with MCI, one of its last significant clients;

m.      Setting a $1 million receivable with the VOLPE/Federal Aviation Administration for around $100,000 rather than allow Talton to assist in the collection of the accounts, although she had experience in negotiating settlement with VOLPE. The Directors permitted other receivables to be settled on the cheap, rather than permit Talton to assist in their collection; and

n.      When the other shareholders were notified of the March financing in order to permit them to exercise their preemptive rights, they were not notified of the Subordination Letter; and

o.      Refusing to provide Talton with information about loans or investments made by the Venture Capitalists after her termination, although she continued to be a director and a shareholder.

67.      These acts and omissions injured Talton both directly as a shareholder and director and derivatively by negatively effecting the Company's operations and its marketability.

## COUNT I -- VIOLATIONS OF SECTION 10-B OF THE SECURITIES EXCHANGE ACT AND RULE 10B-5 (THE DIRECTORS AND COMPANY)

68.      Talton incorporates paragraphs 1 - 67 as paragraph 68 of Count I.

69.      During the period November 1999 through March 2000, the Directors and the Company, in connection with the purchase or sale of securities, directly or indirectly, by the use of interstate commerce, of the mails, or the facilities of a national securities exchange, employed devices, schemes or artifices to defraud made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in acts or practices which operated as a fraud or deceit upon any person.

491854.v4                                    16

70.     During the period January 17, 2000 through March 22, 2000, the Directors continuously represented to Talton that she would continue to be employed as the CEO of Unisource.

71.     None of the Directors disclosed to Talton that they had decided to terminate her employment if the Eclipse deal fell through.

72.     Defendants knew or were reckless in not knowing that their representations and omissions to Talton regarding her continued and employment were false and misleading.

73.     These representations and omissions were material because the removal of Talton from the Company's operations would have and did constitute a dramatic change in the management of the Company to the detriment of the Company. Talton had built Unisource and was the primary contact for most of its clients. Moreover, one of Unisource's major clients was the City of Chicago. Unisource was a certified minority business enterprise for the City of Chicago based on Talton's role as an operating shareholder. There were no other individuals associated with the Company who satisfied the criteria for minority business enterprise certification and no one else had the relationships with the customer. The decision to remove Talton from the Company endangered vital client relationships and the continued viability and operations of the Company.

74.     Talton relied on Defendants' representations that she would continue to be involved in the management of the Company when she made the decision to invest in the Warrants, the Notes and in agreeing to subordinate her Notes. Her reliance was reasonable, given her importance to the Company and the Directors' repeated assurances that she would not be terminated.

75.     Talton would not have invested in the Series 3 and Series 4 Warrants and Notes or signed the Subordination Letter if she had known the true facts of the Director's intent to terminate her employment.

76.     Talton was injured by the Directors' misrepresentations and omissions of material facts regarding her continued employment as Chief Executive Officer. This injury was caused by the Directors' misrepresentations and omissions.

77.     Communications concerning Talton's investments and change in investments were made through the instrumentalities of interstate commerce, including telephones, the Internet and the United States mail.

WHEREFORE, Talton respectfully asks for judgment in her favor and against each of the Directors, for damages in an amount in excess of $350,000, interest and costs in bringing this action. In the alternative, Talton seeks rescission of her investments, including the purchase of the Warrants, the Notes and the Subordination Letter, prejudgment interest and her costs.

## COUNT II -- COMMON LAW FRAUD
## (ALL DEFENDANTS)

78.     Talton incorporates paragraphs 1 - 67 as paragraph 78.

79.     During the period January 17, 2000 through March 22, 2000, the Directors continuously represented to Talton that she would continue to be employed as the CEO of Unisource.

80.     None of the Directors disclosed to Talton that they had decided to terminate her employment if the Eclipse deal fell through.

81.     Defendants knew that their representations and omission to Talton regarding her continued employment were false and misleading.

82.     In investing in the Warrants and Notes and in executing the Subordination Letter, Talton relied on the Directors' representations that she would continue to operate and manage Unisource. This reliance was reasonable because of, among other things, the Directors' prior assurances to her during the January 17, 2000 closing and subsequent thereto that she was a valuable employee.

83.     The Directors intended for Talton to rely on their representations that she would remain with the Company and their concealment of their decision to terminate her if the Eclipse deal did not go through in investing in the Note and Warrants and in signing the Subordination Letter.

84.     Had the Directors informed Talton that she was about to be fired, she would not have invested in the Notes and Warrants or agreed to subordinate her $350,000 debt to that of the entities who sought her termination.

85.     Talton was injured by the Directors' fraudulent misrepresentations and omissions.

WHEREFORE, Talton asks for judgment in her favor against each of the Directors (a) in an amount in excess of $350,000, or, in the alternative, for rescission of the investments she made in the January/December Interim Financing, the February Interim Financing Agreement and of the Subordination Letter; and (b) for punitive damages, interest and costs.

### COUNT III -- BREACH OF FIDUCIARY DUTY
### (UNISOURSE AGAINST THE DIRECTORS)

86.     Talton incorporates paragraphs 1 - 67 as paragraph 86.

87.     Talton was a shareholder of Unisource at the time of the events alleged above.

88.     The actions listed above constitute a breach of the Directors' fiduciary duty to the Company.

89.     Demand on these Directors would be futile in that (a) they are not disinterested; (b) they are biased against Talton; and (c) they have failed to honor Talton's lawful request to inspect the Company's books and records under 805 ILCS 5/7.75.

90.     The Company was injured by these breaches of duty in that it has been grossly mismanaged and its value and marketability has decreased.

WHEREFORE, Talton, on behalf of Unisource Network Services, Inc., seeks judgment in its favor and against each of the Directors in an amount in excess of $ 1 million, prejudgment interest and costs.

### COUNT IV -- BREACH OF FIDUCIARY DUTY
### (TALTON AGAINST THE DIRECTORS,
### POLESTAR AND ATLANTIC)

91.     Talton incorporates paragraphs 1 - 67 as paragraph 91.

92.     Unisource is a close corporation in that its stock is held in a few hands and the controlling shareholders operate the Company through their appointed directors Collins, Doerer, Chamberlain and Threadgill.

93.     Polestar, Atlantic and the Directors, as principals of the controlling shareholders and as Directors, owed Talton a fiduciary duty which required them to treat her fairly and not to put their own interests above that of the other minority shareholders, including Talton.

94.     Contrary to these fiduciary duties, Polestar and Atlantic engaged in actions designed to injure Talton and to promote their own interests.

95.     Talton was directly injured by these breaches of fiduciary duty in that she was induced to invest in the Company and subordinate her notes to those of the Venture Capitalists based on the Directors' representations that she would remain employed by the Company; was terminated from the Company she started in retaliation for her efforts to act in the best interest o

the Company and all of its shareholders; she has been deprived of the value of her investment in the Company; has been prevented from exercising her preemptive rights in financial offerings made after her termination; the percentage of her investment in Unisource has been dissipated; and she is being deprived of the ability to participate in Board meetings and otherwise hindered from properly exercising her responsibilities as a director.

WHEREFORE, Talton seeks judgment in her favor and against the Directors, Polestar and Atlantic, in an amount in excess of $1 million, punitive damages, interest and costs.

## COUNT IV -- RELIEF UNDER 805 ILCS 5/12.56
### (TALTON AGAINST THE DIRECTORS AND UNISOURCE)

96.     Talton incorporates paragraphs 1 - 67 as paragraph 96.

97.     The Directors have and continue to act in a manner that is illegal, oppressive and fraudulent with respect to Talton.   They have deprived her of financial information concerning the Company; refused to provide her with the details concerning the Venture Capitalists investments in the Company; they hold shadow, informal board meetings among themselves in order to prohibit Talton from participating in the management of the Company and have otherwise treated her as a shareholder and director in a heavy handed and oppressive manner.

98.     Talton has been injured by these breaches in that she has been unable to protect and improve the value of her shares in Unisource.

WHEREFORE, Talton asks the Court to enter judgment in her favor in the form of an order (a) removing the Directors; (b) requiring an accounting of all transactions between Unisource and any shareholder that occurred after Talton's termination (c) canceling any loan, stock sale, warrant sale or other transaction between Unisource and a shareholder of which Talton did not notice prior to the consummation of the transaction; (d) damages in an amount in excess of $1 million; (e) prejudgment interest; and (f) costs.

## COUNT VI -- VIOLATION OF 805 ILCS 5/7.75
### (TALTON AGAINST UNISOURCE)

99.     Talton incorporates paragraphs 1 - 67 as paragraph 99.

100.     On November 30, 2000, Talton made a demand to inspect certain of the Company's books and records under 805 ILCS 5/7.75.  A copy of her request is attached hereto as Exhibit G.

101.     Although Unisource indicated that it would provide some records, Talton has yet to be granted access to the information to which she is entitled as a shareholder.

WHEREFORE, Talton seeks judgment in her favor in the form of an order allowing her to inspect the Company's books and records, as set forth in her November 30, 2000 letter.

## COUNT VII -- DEFAMATION
### (TALTON AGAINST JORDAN)

102.     Talton incorporates paragraphs 1 - 67 as paragraph 102.

103.     Throughout the spring and summer of 2000, Jordan accused Talton of falsifying information about the Company on its application to be certified as a minority business enterprise.  Specifically, Jordan told various employees of Unisource that Talton listed Sam Kumar, an Asian American, as a shareholder in order to obtain certification by the City.  Kumar was Chief Operating Officer, but was not a shareholder.

104.     Jordan made these remarks to Unisource employees, including Louise Tillman and Steven John, and others who did not have any role or involvement in the Company's minority business enterprise certification.

105.     Jordan's statement was an untrue statement of fact.  Talton never attempted to use Kumar in the Company's application for certification.

491854.v4

22

## **RULE 23.1 CERTIFICATION**

I, Sheila G. Talton, certify that (a) I was a shareholder of Unisource Network Services, Inc. at the time of the transactions of which I complain; and (b) that this action is not collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

*I declare under penalty of perjury that the foregoing is true and correct.*

Executed on the _18_ day of December, 2000

_Sheila G. Talton_
Sheila G. Talton

106.    Jordan knew the statement to be untrue and made it for the sole purpose of harming Talton's professional reputation.

WHEREFORE, Talton asks for judgment in her favor and against Jordan in the amount of $1 million, punitive damages, interest and costs.

Dated:        December 20, 2000                    Respectfully submitted,

Sheila G. Talton

By:  _____
One of her attorneys

Kathleen H. Klaus (ARDC #62113316)
Kathryn Pyszka (ARDC # 6202224)
D'Ancona & Pflaum, LLC
111 East Wacker Drive
Suite 2800
Chicago, IL  60601
(312) 602-2000

# EXHIBIT   A

# CONVERTIBLE PROMISSORY NOTE

$49,191.00                                                                December 30, 1999

FOR VALUE RECEIVED, UNISOURCE NETWORK SERVICES, INC., an Illinois corporation ("Maker" or "Company"), hereby promises to pay to the order of SHEILA G. TALTON ("Payee") or the holder from time to time of this Note ("holder"), at such place or places as the holder may from time to time in writing designate, or in the absence of such appointment, at 180 N. Michigan Avenue, Suite 1905, Chicago, Illinois 60601, the principal amount of FORTY-NINE THOUSAND ONE HUNDRED NINETY-ONE DOLLARS ($49,191.00), or the unpaid principal balance outstanding from time to time hereunder, plus all accrued unpaid interest thereon, in full on March 31, 2000.

This Note has been issued pursuant to the provisions of that certain Interim Funding Agreement dated December 30, 1999 by and among Maker, Payee and certain other parties (the "Loan Agreement") and is subject to the terms of the Loan Agreement as the same may be amended from time to time.

1.    <u>Interest</u>.   The unpaid principal balance outstanding from time to time under this Convertible Promissory Note ("Note") shall bear interest prior to maturity at the rate of twelve percent (12%) per annum (the "Note Rate") and shall bear interest after maturity at the rate of eighteen percent (18%) per annum or, if less, the maximum rate of interest allowable by law (the "Default Rate"). Accrued interest shall be due and payable at maturity and thereafter on demand.

2.    <u>Payments; Prepayments</u>.   All payments on account of the indebtedness evidenced by this Note shall be applied first to accrued and unpaid interest, if any, and then to principal. Prepayments of principal may be made only upon not less than ten (10) days prior written notice.

3.    <u>Elective Conversion</u>.

(a)    At the election of the holder, the holder shall have the right at any time and from time to time to convert all or any part of the principal and accrued interest of this Note into (i) shares of the Company's Class B Convertible Participating Preferred Stock -- Series 3, or (ii) if the holder so designates in the notice of exercise of conversion rights, shares of the Company's Class A Common Stock. The conversion price shall be $.669 per share, subject to adjustment as provided in the Loan Agreement.

(b)    <u>Exercise of Conversion Right</u>.   Whenever the holder intends to exercise its right of conversion in whole or in part, it shall do so by written notice to the Maker. If the holder intends to exercise its right of conversion only in part, it shall so specify in its notice to Maker.

(c)    <u>Closing</u>.   Closing of the whole or partial conversion of this Note shall occur as soon as reasonably possible after the Maker's receipt of the holder's notice of exercise

of conversion right. The conversion shall be deemed to have occurred on and as of the date the Maker receives the holder's exercise notice, irrespective of when the closing occurs and even though the Maker's stock transfer books might be closed on that date; the Note to the extent being converted shall cease to accrue interest on that date, and the holder shall be recognized and treated for all purposes as the owner and holder of the shares issuable by reason of the conversion as of that date.

This Note shall be surrendered to Maker at the closing. If only a portion of the debt represented by this Note is being converted, then the Maker shall issue to the holder at the closing a new note of like tenor to this Note representing the unconverted balance of principal and accrued interest. The Maker shall deliver to the holder at the closing a certificate for the shares issuable by reason of the conversion of this Note.

No fractional shares shall be issued upon conversion of this Note. In the event the entire remaining principal balance of this Note is being converted, the Maker shall make a cash payment at the closing in lieu of issuing a fractional share.

4.  Use of Proceeds. Maker represents, warrants and covenants that the proceeds of this Note shall only for the purposes permitted under the terms of the Loan Agreement.

5.  Default. It shall be an event of default hereunder if (i) Maker shall fail to pay any amount of unpaid principal or interest hereunder when due (whether by maturity, acceleration or otherwise) and such failure shall continue for a period of five (5) days after notice of nonpayment; or (ii) any proceedings shall be instituted by or against Maker under the provisions of any Federal bankruptcy, reorganization, arrangement of debt, insolvency or receivership laws or similar state or Federal laws providing for the relief of debtors and is not discharged within thirty (30) days thereafter; or (iii) Maker shall make an assignment for the benefit of its creditors; or (iv) any proceedings shall be instituted by or against Maker for its liquidation or dissolution and are not discharged within thirty (30) days thereafter; (v) Maker shall cease to conduct business in the ordinary course as a going concern; (vi) any representation or warranty made by Maker in the Loan Agreement was untrue when made; or (vii) Maker shall fail to keep and perform any covenant of Maker in the Loan Agreement. Upon the occurrence of an event of default hereunder, at the option of the holder, the entire unpaid principal balance hereunder together with interest accrued thereon shall become immediately due and payable and the holder may thereupon exercise all rights of the holder hereunder, under the Loan Agreement and under applicable law, cumulatively and not exclusively.

6.  General Provisions.

(a)  Maker intends and believes that each provision in this Note comports with all applicable local, state and Federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Note is found by a court of law to be in violation of any applicable local, state or Federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Note to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or

2

provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Note shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Maker and the holder or holders hereof under the remainder of this Note shall continue in full force and effect. All agreements herein are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise , shall the amount paid or agreed to be paid to the holders hereof for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable usury laws. If, from any circumstance whatsoever, the fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity proscribed by the law which a court of competent jurisdiction may deem applicable hereto then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity and if from any circumstance the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance hereunder and not to the payment of interest.

(b)     The captions to the various sections hereof are provided only for convenience of reference and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

(c)     This Note and all the provisions hereof shall be binding upon Maker and all persons claiming under or through Maker, and shall inure to the benefit of Payee, together with its successors and assigns, including each owner and holder from time to time of this Note.

(d)     No provision of this Note may be waived, changed, modified or discharged without an agreement in writing signed by the party against whom enforcement of such waiver, change, modification or discharge is sought.

(e)     Time is of the essence as to all dates set forth herein subject to any applicable grace or cure period or notice expressly provided herein; provided, however, that unless otherwise stated, whenever any payment to be made under this Note shall be stated to be due on a day other than a business day, such payment shall be made on the immediately preceding business day.

(f)     Maker agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by the holder.

(g)     Maker hereby waives and renounces for itself, its successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption in homestead laws now provided, or which may hereafter be provided, by the constitution and the laws of the United States and of any state thereof, both as to itself and as to all of its property, real and personal, against the enforcement of the collection of the obligations evidenced by this Note.

(h)     If this Note is placed in the hands of attorneys for collection or is collected through any legal proceedings, Maker promises and agrees to pay, in addition to the principal, interest and other sums due and payable hereon, all costs of collecting or attempting to collect this Note, including reasonable attorneys' fees and disbursements.

(i)     Maker hereby waives presentment for payment, demand, notice of non-payment or dishonor, protest and notice of protest.  No failure to accelerate the indebtedness evidenced hereby, acceptance of a past due installment following the expiration of any cure period provided by this Note or applicable law, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of the holder thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the State of Illinois.

(j)     The remedies of the holder, as provided in this Note, shall be cumulative and concurrent, and may be pursued singly, successively, or together at the sole election of the holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise or delay in exercising any such right or remedy shall in no event be construed as a waiver or release thereof.

(k)     THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW).

(l)     MAKER AGREES TO PAY ON THE DATE HEREOF ALL OF PAYEE'S COSTS AND EXPENSES INCURRED IN CONNECTION WITH THE NEGOTIATION AND PREPARATION OF THIS NOTE, INCLUDING, WITHOUT LIMITATION, THE FEES AND EXPENSES OF PAYEE'S COUNSEL.

(m)     TO THE FURTHEST EXTENT PERMITTED BY LAW, MAKER HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION,

PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY MATTER ARISING IN CONNECTION HEREUNDER.

Maker has executed and delivered this Convertible Promissory Note as of the day and year first set forth above.

**UNISOURCE NETWORK SERVICES, INC.**

By: _____

Its: Sr. V.P. - CFO

Attest: _____

(Assistant) Secretary

Address:

10 North Dearborn Street

Suite 202

Chicago, IL 60602

5

# CONVERTIBLE PROMISSORY NOTE

$49,191.00                                                        January 13, 2000

FOR VALUE RECEIVED, UNISOURCE NETWORK SERVICES, INC., an Illinois corporation ("Maker" or "Company"), hereby promises to pay to the order of SHEILA G. TALTON ("Payee") or the holder from time to time of this Note ("holder"), at such place or places as the holder may from time to time in writing designate, or in the absence of such appointment, at 180 N. Michigan Avenue, Suite 1905, Chicago, Illinois 60601, the principal amount of FORTY-NINE THOUSAND ONE HUNDRED NINETY-ONE DOLLARS ($49,191.00), or the unpaid principal balance outstanding from time to time hereunder, plus all accrued unpaid interest thereon, in full on March 31, 2000.

This Note has been issued pursuant to the provisions of that certain Interim Funding Agreement dated December 30, 1999 by and among Maker, Payee and certain other parties (the "Loan Agreement") and is subject to the terms of the Loan Agreement as the same may be amended from time to time.

1.     <u>Interest</u>. The unpaid principal balance outstanding from time to time under this Convertible Promissory Note ("Note") shall bear interest prior to maturity at the rate of twelve percent (12%) per annum (the "Note Rate") and shall bear interest after maturity at the rate of eighteen percent (18%) per annum or, if less, the maximum rate of interest allowable by law (the "Default Rate"). Accrued interest shall be due and payable at maturity and thereafter on demand.

2.     <u>Payments; Prepayments</u>. All payments on account of the indebtedness evidenced by this Note shall be applied first to accrued and unpaid interest, if any, and then to principal. Prepayments of principal may be made only upon not less than ten (10) days prior written notice.

3.     <u>Elective Conversion</u>.

(a)     At the election of the holder, the holder shall have the right at any time and from time to time to convert all or any part of the principal and accrued interest of this Note into (i) shares of the Company's Class B Convertible Participating Preferred Stock -- Series 3, or (ii) if the holder so designates in the notice of exercise of conversion rights, shares of the Company's Class A Common Stock. The conversion price shall be $.669 per share, subject to adjustment as provided in the Loan Agreement.

(b)     <u>Exercise of Conversion Right</u>. Whenever the holder intends to exercise its right of conversion in whole or in part, it shall do so by written notice to the Maker. If the holder intends to exercise its right of conversion only in part, it shall so specify in its notice to Maker.

(c)     <u>Closing</u>. Closing of the whole or partial conversion of this Note shall occur as soon as reasonably possible after the Maker's receipt of the holder's notice of exercise

of conversion right. The conversion shall be deemed to have occurred on and as of the date the Maker receives the holder's exercise notice, irrespective of when the closing occurs and even though the Maker's stock transfer books might be closed on that date; the Note to the extent being converted shall cease to accrue interest on that date, and the holder shall be recognized and treated for all purposes as the owner and holder of the shares issuable by reason of the conversion as of that date.

This Note shall be surrendered to Maker at the closing. If only a portion of the debt represented by this Note is being converted, then the Maker shall issue to the holder at the closing a new note of like tenor to this Note representing the unconverted balance of principal and accrued interest. The Maker shall deliver to the holder at the closing a certificate for the shares issuable by reason of the conversion of this Note.

No fractional shares shall be issued upon conversion of this Note. In the event the entire remaining principal balance of this Note is being converted, the Maker shall make a cash payment at the closing in lieu of issuing a fractional share.

4.      Use of Proceeds. Maker represents, warrants and covenants that the proceeds of this Note shall only for the purposes permitted under the terms of the Loan Agreement.

5.      Default. It shall be an event of default hereunder if (i) Maker shall fail to pay any amount of unpaid principal or interest hereunder when due (whether by maturity, acceleration or otherwise) and such failure shall continue for a period of five (5) days after notice of nonpayment; or (ii) any proceedings shall be instituted by or against Maker under the provisions of any Federal bankruptcy, reorganization, arrangement of debt, insolvency or receivership laws or similar state or Federal laws providing for the relief of debtors and is not discharged within thirty (30) days thereafter; or (iii) Maker shall make an assignment for the benefit of its creditors; or (iv) any proceedings shall be instituted by or against Maker for its liquidation or dissolution and are not discharged within thirty (30) days thereafter; (v) Maker shall cease to conduct business in the ordinary course as a going concern; (vi) any representation or warranty made by Maker in the Loan Agreement was untrue when made; or (vii) Maker shall fail to keep and perform any covenant of Maker in the Loan Agreement. Upon the occurrence of an event of default hereunder, at the option of the holder, the entire unpaid principal balance hereunder together with interest accrued thereon shall become immediately due and payable and the holder may thereupon exercise all rights of the holder hereunder, under the Loan Agreement and under applicable law, cumulatively and not exclusively.

6.      General Provisions.

(a)      Maker intends and believes that each provision in this Note comports with all applicable local, state and Federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Note is found by a court of law to be in violation of any applicable local, state or Federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Note to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or

2

provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Note shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Maker and the holder or holders hereof under the remainder of this Note shall continue in full force and effect. All agreements herein are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise , shall the amount paid or agreed to be paid to the holders hereof for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable usury laws. If, from any circumstance whatsoever, the fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity proscribed by the law which a court of competent jurisdiction may deem applicable hereto then, ipso facto, the obligation to be fulfilled shall be reduced to the limit of such validity and if from any circumstance the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance hereunder and not to the payment of interest.

(b)     The captions to the various sections hereof are provided only for convenience of reference and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

(c)     This Note and all the provisions hereof shall be binding upon Maker and all persons claiming under or through Maker, and shall inure to the benefit of Payee, together with its successors and assigns, including each owner and holder from time to time of this Note.

(d)     No provision of this Note may be waived, changed, modified or discharged without an agreement in writing signed by the party against whom enforcement of such waiver, change, modification or discharge is sought.

(e)     Time is of the essence as to all dates set forth herein subject to any applicable grace or cure period or notice expressly provided herein; provided, however, that unless otherwise stated, whenever any payment to be made under this Note shall be stated to be due on a day other than a business day, such payment shall be made on the immediately preceding business day.

(f)     Maker agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by the holder.

(g)     Maker hereby waives and renounces for itself, its successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption in homestead laws now provided, or which may hereafter be provided, by the constitution and the laws of the United States and of any state thereof, both as to itself and as to all of its property, real and personal, against the enforcement of the collection of the obligations evidenced by this Note.

(h)    If this Note is placed in the hands of attorneys for collection or is collected through any legal proceedings, Maker promises and agrees to pay, in addition to the principal, interest and other sums due and payable hereon, all costs of collecting or attempting to collect this Note, including reasonable attorneys' fees and disbursements.

(i)    Maker hereby waives presentment for payment, demand, notice of non-payment or dishonor, protest and notice of protest.  No failure to accelerate the indebtedness evidenced hereby, acceptance of a past due installment following the expiration of any cure period provided by this Note or applicable law, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of the holder thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the State of Illinois.

(j)    The remedies of the holder, as provided in this Note, shall be cumulative and concurrent, and may be pursued singly, successively, or together at the sole election of the holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise or delay in exercising any such right or remedy shall in no event be construed as a waiver or release thereof.

(k)    THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW).

(l)    MAKER AGREES TO PAY ON THE DATE HEREOF ALL OF PAYEE'S COSTS AND EXPENSES INCURRED IN CONNECTION WITH THE NEGOTIATION AND PREPARATION OF THIS NOTE, INCLUDING, WITHOUT LIMITATION, THE FEES AND EXPENSES OF PAYEE'S COUNSEL.

(m)    TO THE FURTHEST EXTENT PERMITTED BY LAW, MAKER HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION,

# EXHIBIT  B

NEITHER THIS WARRANT NOR THE SHARES OF STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND THUS MAY NOT BE OFFERED FOR SALE, SOLD OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ALL APPLICABLE STATE SECURITIES LAWS, OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

WARRANT

No. B3-9                                        Warrant to Purchase
                                                123,161 Shares of
                                                Series 3, Class B Preferred Stock

UNISOURCE NETWORK SERVICES, INC.

Incorporated Under the Laws of the State of Illinois

This certifies that, for value received, Sheila G. Talton, or her assign (the "Holder"), is entitled to subscribe for and purchase, in the manner and during the period specified in this Warrant, One Hundred Twenty-Three Thousand One Hundred Sixty-One (123,161) shares (subject to adjustment pursuant to Section 4 below) of duly authorized, validly issued, fully paid and non-assessable Class B Convertible Participating Preferred Stock, Series 3, no par value ("Series 3 Stock") (or at Holder's election Class A Common Stock of the Company ("Common Stock") as provided in Section 1 below) of Unisource Network Services, Inc., an Illinois corporation (the "Company"), at the Exercise Price (as hereinafter defined), subject to the provisions and upon the terms and conditions hereinafter set forth.

This Warrant ("Warrant") expires on March 31, 2009. The following provisions shall apply to this Warrant.

1.    Exercise of Rights.  The Holder hereof shall have the right to exercise this Warrant, in whole or in part, at any time and from time to time, for the purchase of Series 3 Stock at any time on or before March 31, 2009. The exercise price for the exercise of this Warrant (the "Exercise Price") shall be One Cent ($.01) per share of Series 3 Stock. The Exercise Price shall be payable in cash.

At the election of the Holder, the Holder may exercise this Warrant to purchase Common Stock rather than Series 3 Stock. The number of shares issuable upon exercise of this Warrant to purchase Common Stock shall be the number of shares of Series 3 Stock for which this Warrant is exercisable, multiplied by the number of shares of Common Stock into which one share of Series 3 Stock is then convertible.

2.    When and How Exercise Effective.  Exercise of the rights under this Warrant shall be deemed to have been effected immediately prior to the close of business on the date that

the Company receives the Holder's request therefor and the Holder surrenders this Warrant and cash payment to the Company as provided in <u>Section 1</u> above.

In the event of a partial exercise of this Warrant, the Company shall issue a new warrant certificate of like tenor representing the unexercised balance of this Warrant.

3.     <u>Issuance of Certificates</u>.  As soon as practicable after the surrender of this Warrant for exercise and the delivery of such other documents as are required by <u>Section 1</u> above, but in no event later than five (5) business days thereafter, the Company, at its expense (including the payment by it of any applicable issue taxes), shall cause to be issued in the name of, and shall deliver or cause to be delivered to, the Holder hereof, subject to <u>Section 14</u> below, as such Holder (upon payment by such Holder of any applicable transfer taxes) shall direct, a certificate or certificates for that number of duly authorized, validly issued, fully paid and nonassessable shares of Series 3 Stock (or Common Stock if the Holder so elected) as may be required pursuant to <u>Section 4</u> hereof.

4.     <u>Anti-Dilution Provisions</u>.  If the Company, at any time while this Warrant is outstanding, shall subdivide or combine its Series 3 Stock, the number of shares for which this Warrant is exercisable shall be proportionately increased (in case of a subdivision of Series 3 Stock) or reduced (in case of a combination of Series 3 Stock) as of the earlier of (a) the effective date of such subdivision or combination, or (b) the date the Company takes a record of its warrantholders for the purpose of the subdivision or combination.

If the Company, at any time while this Warrant is outstanding, shall pay a dividend in, effect a split-up of, or make any other distribution of Series 3 Stock, the number of shares for which this Warrant is exercisable shall be adjusted by multiplying the number of shares for which this Warrant was exercisable immediately before such event by a fraction (x) the numerator of which is the total number of shares of Series 3 Stock outstanding immediately after such event, and (y) the denominator of which is the number of shares of Series 3 Stock outstanding immediately before such event.

If the Company shall make a distribution of property to the holders of Series 3 Stock as a dividend in liquidation or partial liquidation of the Company or by way of return of capital or in any manner other than a dividend paid out of funds legally available for the payment of dividends under the laws of the State of Illinois, the Holder of this Warrant, upon exercise hereof, shall be entitled to receive, in addition to the number of shares of Series 3 Stock provided for in this Warrant, and without payment of any additional consideration therefor, a sum equal to the amount of property that would have been distributed to the Holder as a holder of Series 3 Stock had the Holder exercised this Warrant and been the holder of record of the Series 3 Stock thereby obtained immediately prior to such distribution; and appropriate provision therefor shall be made a part of any such distribution to the holders of Series 3 Stock.

5.     <u>Retained Discretion</u>.  No reference herein to the possible future issuance of any shares, options, warrants or convertible securities shall be deemed to deprive the Company's Board of Directors of its lawful discretion to determine whether and on what terms any such securities shall be issued, except to the extent binding contracts for the issuance thereof already exist.

6.    No Dilution or Impairment.    The Company shall not, by amendment of its certificate of incorporation or through any consolidation, merger, reorganization, transfer of assets, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder hereof against dilution or other impairment.

7.    Accountants' Report as to Adjustments.    In the case of each event requiring an adjustment or readjustment pursuant to Section 4 above, to the number of shares issuable upon exercise of this Warrant, the Company, at its expense, shall promptly compute such adjustment or readjustment in accordance with the terms of this Warrant and shall prepare a report setting forth such adjustment or readjustment, showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment or readjustment is based.  The Company will forthwith mail a copy of each such report to the Holder.  The Company will also keep copies of all such reports at the Company offices, and will cause the same to be available for inspection at the Company offices during normal business hours by the Holder or any prospective purchaser of this Warrant designated by the Holder.  Upon the written request at any time of the Holder, the Company at the Company's expense will cause an independent certified public accountant of recognized national standing (which may be the regular auditors of the Company) who are reasonably acceptable to the Holder, to verify the Company's computations of any such adjustment or readjustment, including any related reports with respect thereto.

8.    Duty to Reserve and Issue Shares.    The Company covenants that it will at all times reserve and keep available out of its authorized Series 3 Stock, free from preemptive rights or rights of first refusal in any other party, solely for the purpose of issuance upon exercise of this Warrant, such number of shares of Series 3 Stock as shall then be issuable upon exercise of this Warrant.  If the Holder elects to exercise this Warrant to acquire any other class or series of stock, the Company will promptly take all actions, if any, that might be necessary in order to authorize and issue such stock.

The Company covenants that all shares issued upon exercise of this Warrant shall be duly and validly issued, fully paid and nonassessable, and free from all liens and charges of every nature and rights of first refusal.

The issuance of certificates for shares upon the exercise of this Warrant shall be made without charge to the Holder for any tax, fee or charge in respect of such issuance, which tax, fee or charge shall be paid by the Company, provided, however, that the Holder shall pay any and all transfer taxes in connection therewith.

9.    Replacement of Warrant.    Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, and upon reimbursement to the Company of all reasonable expenses incidental thereto, and upon surrender and cancellation of this Warrant, if mutilated, the Company will make and deliver in lieu of this Warrant a new Warrant of like tenor.

10.     Registry of Warrants. The Company or its duly appointed agent shall maintain an official register of this Warrant, and the name and address of the registered holder thereof. The Company shall be required to record any such transfer only upon receipt of the Warrant being transferred, accompanied by an appropriate endorsement or a written instrument of transfer signed by the registered holder and reasonably satisfactory in form to the Company. The Company and any agent of the Company may treat the person in whose name this Warrant is registered on the Company's official register as the owner hereof for all purposes hereof, provided, however, that, if and when this Warrant is properly assigned in blank, the Company may (but shall not be obligated to) treat the bearer thereof as the owner of this Warrant for all purposes, notwithstanding any notice to the contrary.

11.     Investment Representations. The Holder hereof, by acceptance of this Warrant, represents and warrants to the Company that it is acquiring this Warrant, and will acquire any shares issued upon exercise of this Warrant, for its own account, for investment purposes only, and not with a view to the distribution or public offering thereof nor with any present intention of reselling or distributing the same at any particular future time.

12.     Non-Registration of Warrants and Stock. The Holder acknowledges that this Warrant, and the stock with respect to which it is exercisable, are being issued pursuant to a private offering exemption under the Securities Act and are not being registered thereunder or under the securities laws of any state or foreign jurisdiction; that such securities must be held indefinitely unless they are subsequently registered under the Securities Act and such other applicable laws, or unless an exemption from registration is available thereunder; and that the Company has no obligation to register such securities, except as provided in the Company's Certificate of Incorporation.

13. Restrictions on Transfer.

(a)     Restrictive Legend. This Warrant (including any and all Warrants issued in substitution or upon transfer of this Warrant) shall be stamped or otherwise imprinted with a legend in substantially the following form:

"This Warrant and any shares acquired upon the exercise of this Warrant have not been registered under the Securities Act of 1933, as amended, and may not be transferred, sold or otherwise disposed of except while such a registration is in effect or pursuant to an exemption from registration under such Act."

Each certificate for stock issued upon the exercise of this Warrant, and each certificate issued upon the transfer of any such stock, shall be stamped or otherwise imprinted with a legend in substantially the following form:

"The shares represented by this certificate have not been registered under the Securities Act of 1933 and may not be transferred, sold or otherwise disposed of in the absence of such registration or an exemption therefrom under such Act."

4

(b)     Termination of Restrictions. The restrictions on transferability imposed by this Section 13 cease and terminate (i) when such securities shall have been effectively sold in a registered public offering, or (ii) when, in the opinion of counsel to the Company, such restrictions are no longer required in order to ensure compliance with the Securities Act. Whenever such restrictions shall cease and terminate, the Holder shall be entitled to receive from the Company, without expense (other than applicable transfer taxes, if any), new securities of like tenor not bearing the legends required by this Section 13.

14.  Remedies. The Company stipulates that the remedies at law of the Holder upon any violation by the Company of any of the terms of this Warrant, are not and will not be adequate, and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

15.  No Rights or Liabilities as Stockholder. Nothing contained in this Warrant shall be construed as conferring upon the Holder any rights as a stockholder of the Company or as imposing any obligation on such Holder to purchase any securities or as imposing any liabilities on such Holder as a stockholder of the Company, whether such obligation or liabilities are asserted by the Company or by creditors of the Company.

16.    Notices. All notices, consents, demands, requests, waivers, approvals and other communications required or permitted to be given pursuant to this Warrant shall be in writing, properly executed and shall be deemed to have been duly given (i) upon receipt if delivered personally, (ii) when received by facsimile or similar device, if subsequently confirmed by a properly executed writing sent within twenty-four (24) hours after the giving of such notice in such manner, or (iii) upon the date receipt thereof is acknowledged as delivered by certified or registered mail, courier, overnight delivery or other form of delivery requiring acknowledgment of receipt, as the case may be, addressed (a) if to the Holder, at the registered address of such Holder as set forth in the register kept at the Company offices, or (b) if to the Company, to the attention of its President at the Company offices; provided, however, that the exercise of the rights under this Warrant shall be effective in the manner provided in Section 1 hereof.

17.    Miscellaneous. This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought. This Warrant shall be construed and enforced in accordance with and governed by the laws of the State of Illinois. All titles to articles and sections of this Warrant are for reference purposes only and are not intended to limit, restrict, expand or otherwise affect the meaning or interpretation of the provisions of this

Warrant. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the context requires.

IN WITNESS WHEREOF, Unisource Network Services, Inc. has caused this Warrant to be duly executed as of the 30th day of December, 1999.

UNISOURCE NETWORK SERVICES, INC.

By: _____

Its: _____

6

## SUBSCRIPTION

UNISOURCE NETWORK SERVICES, INC.

The undersigned _____, pursuant to the provisions of the within Warrant, hereby elects to exercise such Warrant to purchase _____ (___) shares of (Class B Convertible Participating Preferred Stock, Series 3) (_____ Stock) covered by the within Warrant, at an exercise price of One Cent ($.01) per share.

Dated:_____     Signature_____

                              Address _____

                                      _____

## ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the within Warrant and all rights evidenced thereby and does irrevocably constitute and appoint _____, attorney, to transfer said Warrant on the books of the within named Company.

_____

Dated: _____


FOR USE BY THE COMPANY ONLY:

This Warrant No. _____ cancelled (or transferred or exchanged) this _____ day of _____, ____, _____ shares of (Class B Convertible Participating Preferred Stock, Series 3) (_____ Stock) issued therefor in the name of _____, Warrant No. _____ issued for shares of Class B Convertible Participating Preferred Stock, Series 3 in the name of _____.

NEITHER THIS WARRANT NOR THE SHARES OF STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND THUS MAY NOT BE OFFERED FOR SALE, SOLD OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ALL APPLICABLE STATE SECURITIES LAWS, OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

## WARRANT

No. B3-12

Warrant to Purchase
123,161 Shares of
Series 3, Class B Preferred Stock

## UNISOURCE NETWORK SERVICES, INC.

### Incorporated Under the Laws of the State of Illinois

This certifies that, for value received, Sheila G. Talton, or her assign (the "Holder"), is entitled to subscribe for and purchase, in the manner and during the period specified in this Warrant, One Hundred Twenty-Three Thousand One Hundred Sixty-One (123,161) shares (subject to adjustment pursuant to Section 4 below) of duly authorized, validly issued, fully paid and non-assessable Class B Convertible Participating Preferred Stock, Series 3, no par value ("Series 3 Stock") (or at Holder's election Class A Common Stock of the Company ("Common Stock") as provided in Section 1 below) of Unisource Network Services, Inc., an Illinois corporation (the "Company"), at the Exercise Price (as hereinafter defined), subject to the provisions and upon the terms and conditions hereinafter set forth.

This Warrant ("Warrant") expires on March 31, 2009. The following provisions shall apply to this Warrant.

1.  Exercise of Rights. The Holder hereof shall have the right to exercise this Warrant, in whole or in part, at any time and from time to time, for the purchase of Series 3 Stock at any time on or before March 31, 2009. The exercise price for the exercise of this Warrant (the "Exercise Price") shall be One Cent ($.01) per share of Series 3 Stock. The Exercise Price shall be payable in cash.

At the election of the Holder, the Holder may exercise this Warrant to purchase Common Stock rather than Series 3 Stock. The number of shares issuable upon exercise of this Warrant to purchase Common Stock shall be the number of shares of Series 3 Stock for which this Warrant is exercisable, multiplied by the number of shares of Common Stock into which one share of Series 3 Stock is then convertible.

2.  When and How Exercise Effective. Exercise of the rights under this Warrant shall be deemed to have been effected immediately prior to the close of business on the date that

the Company receives the Holder's request therefor and the Holder surrenders this Warrant and cash payment to the Company as provided in Section 1 above.

In the event of a partial exercise of this Warrant, the Company shall issue a new warrant certificate of like tenor representing the unexercised balance of this Warrant.

3.    Issuance of Certificates.  As soon as practicable after the surrender of this Warrant for exercise and the delivery of such other documents as are required by Section 1 above, but in no event later than five (5) business days thereafter, the Company, at its expense (including the payment by it of any applicable issue taxes), shall cause to be issued in the name of, and shall deliver or cause to be delivered to, the Holder hereof, subject to Section 14 below, as such Holder (upon payment by such Holder of any applicable transfer taxes) shall direct, a certificate or certificates for that number of duly authorized, validly issued, fully paid and nonassessable shares of Series 3 Stock (or Common Stock if the Holder so elected) as may be required pursuant to Section 4 hereof.

4.    Anti-Dilution Provisions.  If the Company, at any time while this Warrant is outstanding, shall subdivide or combine its Series 3 Stock, the number of shares for which this Warrant is exercisable shall be proportionately increased (in case of a subdivision of Series 3 Stock) or reduced (in case of a combination of Series 3 Stock) as of the earlier of (a) the effective date of such subdivision or combination, or (b) the date the Company takes a record of its warrantholders for the purpose of the subdivision or combination.

If the Company, at any time while this Warrant is outstanding, shall pay a dividend in, effect a split-up of, or make any other distribution of Series 3 Stock, the number of shares for which this Warrant is exercisable shall be adjusted by multiplying the number of shares for which this Warrant was exercisable immediately before such event by a fraction (x) the numerator of which is the total number of shares of Series 3 Stock outstanding immediately after such event, and (y) the denominator of which is the number of shares of Series 3 Stock outstanding immediately before such event.

If the Company shall make a distribution of property to the holders of Series 3 Stock as a dividend in liquidation or partial liquidation of the Company or by way of return of capital or in any manner other than a dividend paid out of funds legally available for the payment of dividends under the laws of the State of Illinois, the Holder of this Warrant, upon exercise hereof, shall be entitled to receive, in addition to the number of shares of Series 3 Stock provided for in this Warrant, and without payment of any additional consideration therefor, a sum equal to the amount of property that would have been distributed to the Holder as a holder of Series 3 Stock had the Holder exercised this Warrant and been the holder of record of the Series 3 Stock thereby obtained immediately prior to such distribution; and appropriate provision therefor shall be made a part of any such distribution to the holders of Series 3 Stock.

5.    Retained Discretion.  No reference herein to the possible future issuance of any shares, options, warrants or convertible securities shall be deemed to deprive the Company's Board of Directors of its lawful discretion to determine whether and on what terms any such securities shall be issued, except to the extent binding contracts for the issuance thereof already exist.

2

6. <u>No Dilution or Impairment</u>. The Company shall not, by amendment of its certificate of incorporation or through any consolidation, merger, reorganization, transfer of assets, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder hereof against dilution or other impairment.

7. <u>Accountants' Report as to Adjustments</u>. In the case of each event requiring an adjustment or readjustment pursuant to <u>Section 4</u> above, to the number of shares issuable upon exercise of this Warrant, the Company, at its expense, shall promptly compute such adjustment or readjustment in accordance with the terms of this Warrant and shall prepare a report setting forth such adjustment or readjustment, showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment or readjustment is based. The Company will forthwith mail a copy of each such report to the Holder. The Company will also keep copies of all such reports at the Company offices, and will cause the same to be available for inspection at the Company offices during normal business hours by the Holder or any prospective purchaser of this Warrant designated by the Holder. Upon the written request at any time of the Holder, the Company at the Company's expense will cause an independent certified public accountant of recognized national standing (which may be the regular auditors of the Company) who are reasonably acceptable to the Holder, to verify the Company's computations of any such adjustment or readjustment, including any related reports with respect thereto.

8. <u>Duty to Reserve and Issue Shares</u>. The Company covenants that it will at all times reserve and keep available out of its authorized Series 3 Stock, free from preemptive rights or rights of first refusal in any other party, solely for the purpose of issuance upon exercise of this Warrant, such number of shares of Series 3 Stock as shall then be issuable upon exercise of this Warrant. If the Holder elects to exercise this Warrant to acquire any other class or series of stock, the Company will promptly take all actions, if any, that might be necessary in order to authorize and issue such stock.

The Company covenants that all shares issued upon exercise of this Warrant shall be duly and validly issued, fully paid and nonassessable, and free from all liens and charges of every nature and rights of first refusal.

The issuance of certificates for shares upon the exercise of this Warrant shall be made without charge to the Holder for any tax, fee or charge in respect of such issuance, which tax, fee or charge shall be paid by the Company, <u>provided</u>, <u>however</u>, that the Holder shall pay any and all transfer taxes in connection therewith.

9. <u>Replacement of Warrant</u>. Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, and upon reimbursement to the Company of all reasonable expenses incidental thereto, and upon surrender and cancellation of this Warrant, if mutilated, the Company will make and deliver in lieu of this Warrant a new Warrant of like tenor.

3

(b)    Termination of Restrictions. The restrictions on transferability imposed by this Section 13 cease and terminate (i) when such securities shall have been effectively sold in a registered public offering, or (ii) when, in the opinion of counsel to the Company, such restrictions are no longer required in order to ensure compliance with the Securities Act. Whenever such restrictions shall cease and terminate, the Holder shall be entitled to receive from the Company, without expense (other than applicable transfer taxes, if any), new securities of like tenor not bearing the legends required by this Section 13.

14.    Remedies.    The Company stipulates that the remedies at law of the Holder upon any violation by the Company of any of the terms of this Warrant, are not and will not be adequate, and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

15.    No Rights or Liabilities as Stockholder.    Nothing contained in this Warrant shall be construed as conferring upon the Holder any rights as a stockholder of the Company or as imposing any obligation on such Holder to purchase any securities or as imposing any liabilities on such Holder as a stockholder of the Company, whether such obligation or liabilities are asserted by the Company or by creditors of the Company.

16.    Notices.    All notices, consents, demands, requests, waivers, approvals and other communications required or permitted to be given pursuant to this Warrant shall be in writing, properly executed and shall be deemed to have been duly given (i) upon receipt if delivered personally, (ii) when received by facsimile or similar device, if subsequently confirmed by a properly executed writing sent within twenty-four (24) hours after the giving of such notice in such manner, or (iii) upon the date receipt thereof is acknowledged as delivered by certified or registered mail, courier, overnight delivery or other form of delivery requiring acknowledgment of receipt, as the case may be, addressed (a) if to the Holder, at the registered address of such Holder as set forth in the register kept at the Company offices, or (b) if to the Company, to the attention of its President at the Company offices; provided, however, that the exercise of the rights under this Warrant shall be effective in the manner provided in Section 1 hereof.

17.    Miscellaneous.    This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought. This Warrant shall be construed and enforced in accordance with and governed by the laws of the State of Illinois. All titles to articles and sections of this Warrant are for reference purposes only and are not intended to limit, restrict, expand or otherwise affect the meaning or interpretation of the provisions of this

Warrant. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the context requires.

IN WITNESS WHEREOF, Unisource Network Services, Inc. has caused this Warrant to be duly executed as of the 13th day of January, 2000.

UNISOURCE NETWORK SERVICES, INC.

By: _____

Its: _____

## SUBSCRIPTION

UNISOURCE NETWORK SERVICES, INC.

The undersigned _____, pursuant to the provisions of the within Warrant, hereby elects to exercise such Warrant to purchase _____ (___) shares of (Class B Convertible Participating Preferred Stock, Series 3) (_____ Stock) covered by the within Warrant, at an exercise price of One Cent ($.01) per share.

Dated:_____       Signature_____

                                      Address _____

                                              _____

7

## ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the within Warrant and all rights evidenced thereby and does irrevocably constitute and appoint _____, attorney, to transfer said Warrant on the books of the within named Company.

_____

Dated: _____

FOR USE BY THE COMPANY ONLY:

This Warrant No. _____ cancelled (or transferred or exchanged) this _____ day of _____, _____, _____ shares of (Class B Convertible Participating Preferred Stock, Series 3) (_____ Stock) issued therefor in the name of _____, Warrant No. _____ issued for shares of Class B Convertible Participating Preferred Stock, Series 3 in the name of _____.

8

# EXHIBIT  C

INTERIM FUNDING AGREEMENT

This Interim Funding Agreement ("Agreement") is entered into this 22nd day of February, 2000, by and among Unisource Network Services, Inc., an Illinois corporation ("Borrower") and Sheila G. Talton (the "Lender").

RECITALS

Borrower has requested financing in the aggregate amount of $250,000 for certain short-term working capital needs and other uses as permitted by this Agreement. Lender is willing to provide such financing on the terms and conditions and subject to the provisions set forth in this Agreement.

AGREEMENTS

In consideration of the Recitals and of the parties' respective undertakings and agreements set forth herein, Borrower and Lender hereby agree as follows:

1.      Commitment to Provide Financing.

Lender hereby agrees to lend to Borrower the aggregate sum of $250,000, or such lesser sum as the Borrower may request to be funded on the date of this Agreement.

2.      Financing Terms.

The interest rate, maturity date, payment terms and other provisions concerning the repayment of the sums advanced by the Lender are set forth in the Convertible Promissory Note attached as Exhibit 2 (the "Note"), which is the form of note to be executed and delivered by Borrower to Lender.

3.      Issuance of New Warrant.

In further consideration of the benefits to Borrower provided in this Agreement, and for the additional aggregate purchase price of Five Dollars ($5.00) payable by the Lender, the Borrower shall issue to the Lender at the time of the initial funding a warrant in the form of Exhibit 3 ("Warrant") entitling the holders to purchase in the aggregate 655,300 shares of Class B Convertible Participating Preferred Stock, Series 4 (or, at the warrantholder's election, Class A Common Stock).

4.      Borrower Representations and Warranties.

Borrower makes the following representations and warranties to Lender, on and as of the date of this Agreement (upon which the Lender is relying in advancing the funds under this Agreement). Lender has been advised that the representations and warranties in

subsections (b) and (d) below may not be fully accurate on the date of this Agreement, but Borrower covenants that the same will be fully accurate by March 1, 2000.

(a)    The Borrower is in full compliance with all of its covenants set forth in Article V, Sections 5.1 through 5.24 of that certain Unisource Network Services, Inc. Stock Purchase Agreement Class B Convertible Participating Preferred Stock - Series 2 dated as of February 8, 1999 by and among the Borrower, Polestar Capital Fund II, L.P., Polestar Capital Fund III, L.P., Atlantic Coastal Ventures, L.P., Pacific Venture Capital, Ltd. and Milestone Growth Fund, Inc. (the "Series 2 Purchase Agreement").

(b)    The Borrower will duly file with the Secretary of State of the State of Illinois all documents necessary to create and designate, out of Borrower's authorized, unissued and previously undesignated Class B Preferred Stock, a Series 4 (the "Series 4 Shares") consisting of a sufficient number of shares of Class B Preferred Stock to provide for the full exercise of the conversion rights under the Note and the full exercise of the Warrant; the Series 4 Shares having rights, privileges, limitations, preferences and other features identical to those of shares of the Borrower's Series 1, Series 2 and Series 3 Class B Preferred Stock, except that the liquidation preference for Series 4 Shares is $0.6425 per share, the annual dividend rate for Series 4 Shares is 8% of $0.6425, to wit, $0.0514 per share, the Convertible Value (within the meaning of Section 5 of Article 4, Paragraph 2 of the Borrower's Articles of Incorporation, as amended, by filing with the Illinois Secretary of State after the date hereof (the "Articles of Amendment")) for Series 4 Shares is $0.6425 per share, and the Conversion Price (within the meaning of Section 5 of Article 4, Paragraph 2 of the Articles of Amendment) is $0.6425 subject to adjustment as provided in the Articles of Amendment; provided, however, that the Series 4 Shares shall have no right to vote or otherwise participate in the designation and election of "Series 1 and 2 Preferred Designees" or "Additional Directors" as set forth in Article 4, Paragraph 2(I), Section 7(A) of the Company's Articles of Incorporation, such rights being reserved exclusively to the Series 1, Series 2 and Series 3 Shares, respectively, as set forth in said Section.

(c)    The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Illinois and has all requisite corporate power and authority to own its property and to carry on its business as currently conducted and to carry out the transactions contemplated by this Agreement. Borrower is qualified to do business in each jurisdiction in which the character of its property or the nature of its activities makes such qualification necessary, except where the failure so to qualify would not have a material adverse effect on Borrower or its business. Borrower has no subsidiaries.

(d)    This Agreement and the consummation of the transactions hereby contemplated have been duly authorized by all requisite action of the Borrower, including approval by the Borrower's Board of Directors and, if applicable, shareholders. This Agreement, the Note, the Warrant and each other document executed and delivered by the Borrower pursuant to this Agreement will, upon execution and delivery by the Borrower, be legal, valid and binding obligations of the Borrower, enforceable in accordance with their

205745/0001/309068

financing contemplated by this Agreement of the opportunity to exercise such rights, and the Borrower shall accommodate the exercise of any such rights in this financing under the terms of such rights.

(v)     The Borrower shall make appropriate filings with the Illinois Secretary of State reflecting the designation of Series 4 Shares in accordance with Section 4(b) of this Agreement, and a certified copy thereof shall be delivered to the Lender.

(vi)     Upon (A) consummation of any sale of all of the issued and outstanding shares of the Borrower's capital stock or a sale of all or substantially all of the assets of the Borrower to Eclipse Networks, Inc. (the "Eclipse Sale") or (B) a final determination that the Eclipse Sale will not be consummated, the Borrower shall become obligated to (1) reimburse the Lender up to an amount not exceeding $25,000 and (2) reimburse Polestar Inc., Polestar Capital Fund II, L.P., Polestar Capital Fund III, L.P. and Atlantic Coastal Ventures, L.P. (the "Polestar Group") up to an amount not exceeding $25,000, in the aggregate, for legal fees incurred by the Lender and the Polestar Group in connection with the Eclipse Sale, including, but not limited to, legal fees incurred by the Lender in connection with the negotiation and execution of the Lender's employment arrangement with Eclipse Networks, Inc.

(vii)     The Borrower shall reimburse Lender for all legal fees incurred in connection with the transactions contemplated by this Agreement.

(c)     To the extent that any precondition to closing set forth in Section 5 of this Agreement has not been satisfied as of the closing date, the Borrower covenants to use its best efforts in good faith to satisfy the condition as promptly as possible after the closing, and to do so notwithstanding that the Lender may have known of and waived the precondition and funded loans notwithstanding the precondition's non-satisfaction.

8.     Adjustment of Conversion Price in the Note.

The conversion price set forth in the Note for the conversion of Note to shares of Borrower (the "Note Conversion Price") is initially $0.6425 per share. The "Conversion Price" for the conversion of Series 4 Shares to Class A Common Stock, as set forth in the Resolution Fixing Terms for the Series 4 Shares (the "Series 4 Conversion Price") is also initially $0.6425 per share. Whenever and so often as the Series 4 Conversion Price is adjusted, the Note Conversion Price shall also be adjusted in like amount, such that the Note Conversion Price at any time shall always equal the Series 4 Conversion Price at that time.

9.     Certain Additional Rights and Obligations.

The following provisions of the Series 2 Purchase Agreement shall apply to shares of Borrower issued upon conversion of the Note, exercise of Warrant or conversion of Series 4 Shares to Common Stock ("Lender's Shares"):

5

205745/0001/309068

SIGNATURE PAGE FOR
UNISOURCE NETWORK SERVICES, INC.
INTERIM FUNDING AGREEMENT

UNISOURCE NETWORK SERVICES, INC.

By: _____
   Thurman Jordan
   Senior Vice President and Chief Financial Officer

Date of signature: _____

_Sheila G. Talton_
Sheila G. Talton

Date of Signature: 2/22/00

7       20S74S:0001L309066/Version 6.1

# EXHIBIT  D

NEITHER THIS WARRANT NOR THE SHARES OF STOCK ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND THUS MAY NOT BE OFFERED FOR SALE, SOLD OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ALL APPLICABLE STATE SECURITIES LAWS, OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

## WARRANT

No. B4-1                                                      Warrant to Purchase 655,300 Shares of
                                                             Series 4, Class B Preferred Stock

### UNISOURCE NETWORK SERVICES, INC.
Incorporated Under the Laws of the State of Illinois

This certifies that, for value received, Sheila G. Talton, or her assigns (the "Holder"), is entitled to subscribe for and purchase, in the manner and during the period specified in this Warrant, Six Hundred Fifty Five Thousand Three Hundred (655,300) shares (subject to adjustment pursuant to Section 4 below) of duly authorized, validly issued, fully paid and non-assessable Class B Convertible Participating Preferred Stock, Series 4, no par value ("Series 4 Stock") (or at Holder's election Class A Common Stock of the Company ("Common Stock") as provided in Section 1 below) of Unisource Network Services, Inc., an Illinois corporation (the "Company"), at the Exercise Price (as hereinafter defined), subject to the provisions and upon the terms and conditions hereinafter set forth.

This Warrant ("Warrant") expires on March 31, 2009. The following provisions shall apply to this Warrant.

1.    Exercise of Rights.    The Holder hereof shall have the right to exercise this Warrant, in whole or in part, at any time and from time to time, for the purchase of Series 4 Stock at any time on or before March 31, 2009. The exercise price for the exercise of this Warrant (the "Exercise Price") shall be One Cent ($.01) per share of Series 4 Stock. The Exercise Price shall be payable in cash.

At the election of the Holder, the Holder may exercise this Warrant to purchase Common Stock rather than Series 4 Stock. The number of shares issuable upon exercise of this Warrant to purchase Common Stock shall be the number of shares of Series 4 Stock for which this Warrant is exercisable, multiplied by the number of shares of Common Stock into which one share of Series 4 Stock is then convertible.

2.    When and How Exercise Effective.    Exercise of the rights under this Warrant shall be deemed to have been effected immediately prior to the close of business on the date that the Company receives the Holder's request therefor and the Holder surrenders this Warrant and cash payment to the Company as provided in Section 1 above.

In the event of a partial exercise of this Warrant, the Company shall issue a new warrant certificate of like tenor representing the unexercised balance of this Warrant.

3.    <u>Issuance of Certificates</u>.  As soon as practicable after the surrender of this Warrant for exercise and the delivery of such other documents as are required by <u>Section 1</u> above, but in no event later than five (5) business days thereafter, the Company, at its expense (including the payment by it of any applicable issue taxes), shall cause to be issued in the name of, and shall deliver or cause to be delivered to, the Holder hereof, subject to <u>Section 14</u> below, as such Holder (upon payment by such Holder of any applicable transfer taxes) shall direct, a certificate or certificates for that number of duly authorized, validly issued, fully paid and nonassessable shares of Series 4 Stock (or Common Stock if the Holder so elected) as may be required pursuant to <u>Section 4</u> hereof.

4.    <u>Anti-Dilution Provisions</u>.  If the Company, at any time while this Warrant is outstanding, shall subdivide or combine its Series 4 Stock, the number of shares for which this Warrant is exercisable shall be proportionately increased (in case of a subdivision of Series 4 Stock) or reduced (in case of a combination of Series 4 Stock) as of the earlier of (a) the effective date of such subdivision or combination, or (b) the date the Company takes a record of its warrantholders for the purpose of the subdivision or combination.

If the Company, at any time while this Warrant is outstanding, shall pay a dividend in, effect a split-up of, or make any other distribution of Series 4 Stock, the number of shares for which this Warrant is exercisable shall be adjusted by multiplying the number of shares for which this Warrant was exercisable immediately before such event by a fraction (x) the numerator of which is the total number of shares of Series 4 Stock outstanding immediately after such event, and (y) the denominator of which is the number of shares of Series 4 Stock outstanding immediately before such event.

If the Company shall make a distribution of property to the holders of Series 4 Stock as a dividend in liquidation or partial liquidation of the Company or by way of return of capital or in any manner other than a dividend paid out of funds legally available for the payment of dividends under the laws of the State of Illinois, the Holder of this Warrant, upon exercise hereof, shall be entitled to receive, in addition to the number of shares of Series 4 Stock provided for in this Warrant, and without payment of any additional consideration therefor, a sum equal to the amount of property that would have been distributed to the Holder as a holder of Series 4 Stock had the Holder exercised this Warrant and been the holder of record of the Series 4 Stock thereby obtained immediately prior to such distribution; and appropriate provision therefor shall be made a part of any such distribution to the holders of Series 4 Stock.

5.    <u>Retained Discretion</u>.  No reference herein to the possible future issuance of any shares, options, warrants or convertible securities shall be deemed to deprive the Company's Board of Directors of its lawful discretion to determine whether and on what terms any such securities shall be issued, except to the extent binding contracts for the issuance thereof already exist.

6.    <u>No Dilution or Impairment</u>.  The Company shall not, by amendment of its certificate of incorporation or through any consolidation, merger, reorganization, transfer of

2

assets, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder hereof against dilution or other impairment.

7. <u>Accountants' Report as to Adjustments</u>. In the case of each event requiring an adjustment or readjustment pursuant to <u>Section 4</u> above, to the number of shares issuable upon exercise of this Warrant, the Company, at its expense, shall promptly compute such adjustment or readjustment in accordance with the terms of this Warrant and shall prepare a report setting forth such adjustment or readjustment, showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment or readjustment is based. The Company will forthwith mail a copy of each such report to the Holder. The Company will also keep copies of all such reports at the Company offices, and will cause the same to be available for inspection at the Company offices during normal business hours by the Holder or any prospective purchaser of this Warrant designated by the Holder. Upon the written request at any time of the Holder, the Company at the Company's expense will cause an independent certified public accountant of recognized national standing (which may be the regular auditors of the Company) who are reasonably acceptable to the Holder, to verify the Company's computations of any such adjustment or readjustment, including any related reports with respect thereto.

8. <u>Duty to Reserve and Issue Shares</u>. The Company covenants that it will at all times reserve and keep available out of its authorized Series 4 Stock, free from preemptive rights or rights of first refusal in any other party, solely for the purpose of issuance upon exercise of this Warrant, such number of shares of Series 4 Stock as shall then be issuable upon exercise of this Warrant. If the Holder elects to exercise this Warrant to acquire any other class or series of stock, the Company will promptly take all actions, if any, that might be necessary in order to authorize and issue such stock.

The Company covenants that all shares issued upon exercise of this Warrant shall be duly and validly issued, fully paid and nonassessable, and free from all liens and charges of every nature and rights of first refusal.

The issuance of certificates for shares upon the exercise of this Warrant shall be made without charge to the Holder for any tax, fee or charge in respect of such issuance, which tax, fee or charge shall be paid by the Company, <u>provided, however</u>, that the Holder shall pay any and all transfer taxes in connection therewith.

9. <u>Replacement of Warrant</u>. Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, and upon reimbursement to the Company of all reasonable expenses incidental thereto, and upon surrender and cancellation of this Warrant, if mutilated, the Company will make and deliver in lieu of this Warrant a new Warrant of like tenor.

10. <u>Registry of Warrants</u>. The Company or its duly appointed agent shall maintain an official register of this Warrant, and the name and address of the registered holder thereof. The Company shall be required to record any such transfer only upon receipt of the Warrant being

transferred, accompanied by an appropriate endorsement or a written instrument of transfer signed by the registered holder and reasonably satisfactory in form to the Company. The Company and any agent of the Company may treat the person in whose name this Warrant is registered on the Company's official register as the owner hereof for all purposes hereof, provided, however, that, if and when this Warrant is properly assigned in blank, the Company may (but shall not be obligated to) treat the bearer thereof as the owner of this Warrant for all purposes, notwithstanding any notice to the contrary.

11. <u>Investment Representations</u>. The Holder hereof, by acceptance of this Warrant, represents and warrants to the Company that it is acquiring this Warrant, and will acquire any shares issued upon exercise of this Warrant, for its own account, for investment purposes only, and not with a view to the distribution or public offering thereof nor with any present intention of reselling or distributing the same at any particular future time.

12. <u>Non-Registration of Warrants and Stock</u>. The Holder acknowledges that this Warrant, and the stock with respect to which it is exercisable, are being issued pursuant to a private offering exemption under the Securities Act and are not being registered thereunder or under the securities laws of any state or foreign jurisdiction; that such securities must be held indefinitely unless they are subsequently registered under the Securities Act and such other applicable laws, or unless an exemption from registration is available thereunder; and that the Company has no obligation to register such securities, except as provided in the Company's Certificate of Incorporation.

13. <u>Restrictions on Transfer</u>.

(a)     <u>Restrictive Legend</u>. This Warrant (including any and all Warrants issued in substitution or upon transfer of this Warrant) shall be stamped or otherwise imprinted with a legend in substantially the following form:

> "This Warrant and any shares acquired upon the exercise of this Warrant have not been registered under the Securities Act of 1933, as amended, and may not be transferred, sold or otherwise disposed of except while such a registration is in effect or pursuant to an exemption from registration under such Act."

Each certificate for stock issued upon the exercise of this Warrant, and each certificate issued upon the transfer of any such stock, shall be stamped or otherwise imprinted with a legend in substantially the following form:

> "The shares represented by this certificate have not been registered under the Securities Act of 1933 and may not be transferred, sold or otherwise disposed of in the absence of such registration or an exemption therefrom under such Act."

(b)     <u>Termination of Restrictions</u>. The restrictions on transferability imposed by this <u>Section 13</u> cease and terminate (i) when such securities shall have been effectively sold in a registered public offering, or (ii) when, in the opinion of counsel to the Company, such restrictions are no longer required in order to ensure compliance with the

4

## SUBSCRIPTION

UNISOURCE NETWORK SERVICES, INC.

The undersigned _____, pursuant to the provisions of the within Warrant, hereby elects to exercise such Warrant to purchase _____ (___) shares of (Class B Convertible Participating Preferred Stock, Series 4) (_____ Stock) covered by the within Warrant, at an exercise price of One Cent ($.01) per share.

Dated:_____        Signature_____

                                Address  _____

                                         _____

6

## ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the within Warrant and all rights evidenced thereby and does irrevocably constitute and appoint _____, attorney, to transfer said Warrant on the books of the within named Company.

_____

Dated: _____

FOR USE BY THE COMPANY ONLY:

This Warrant No. _____ cancelled (or transferred or exchanged) this _____ day of _____, _____, _____ shares of (Class B Convertible Participating Preferred Stock, Series 4) (_____ Stock) issued therefor in the name of _____, Warrant No. _____ issued for shares of Class B Convertible Participating Preferred Stock, Series 4 in the name of _____.

7

# EXHIBIT   E

# CONVERTIBLE PROMISSORY NOTE

$250,000.00                                                        February 22, 2000

FOR VALUE RECEIVED, UNISOURCE NETWORK SERVICES, INC., an Illinois corporation ("Maker" or "Company"), hereby promises to pay to the order of SHEILA G. TALTON ("Payee") or the holder from time to time of this Note ("holder"), at such place or places as the holder may from time to time in writing designate, or in the absence of such appointment, at 180 N. Michigan Avenue, Suite 1905, Chicago, IL 60601, the principal amount of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), or the unpaid principal balance outstanding from time to time hereunder, plus all accrued unpaid interest thereon, in full on March 31, 2000.

This Note has been issued pursuant to the provisions of that certain Interim Funding Agreement dated February 22, 2000 by and among Maker and Payee (the "Loan Agreement") and is subject to the terms of the Loan Agreement as the same may be amended from time to time.

1.    _Interest_.  The unpaid principal balance outstanding from time to time under this Convertible Promissory Note ("Note") shall bear interest prior to maturity at the rate of twelve percent (12%) per annum (the "Note Rate") and shall bear interest after maturity at the rate of eighteen percent (18%) per annum or, if less, the maximum rate of interest allowable by law (the "Default Rate").  Accrued interest shall be due and payable at maturity and thereafter on demand.

2.    _Payments; Prepayments_.  All payments on account of the indebtedness evidenced by this Note shall be applied first to accrued and unpaid interest, if any, and then to principal.  Prepayments of principal may be made only upon not less than ten (10) days prior written notice.

3.    _Elective Conversion_.

(a)    At the election of the holder, the holder shall have the right at any time and from time to time to convert all or any part of the principal and accrued interest of this Note into (i) shares of the Company's Class B Convertible Participating Preferred Stock -- Series 4, or (ii) if the holder so designates in the notice of exercise of conversion rights, shares of the Company's Class A Common Stock. The conversion price shall be $0.6425 per share, subject to adjustment as provided in the Loan Agreement.

(b)    _Exercise of Conversion Right_.  Whenever the holder intends to exercise its right of conversion in whole or in part, it shall do so by written notice to the Maker.  If the holder intends to exercise its right of conversion only in part, it shall so specify in its notice to Maker.

(c)    _Closing_.  Closing of the whole or partial conversion of this Note shall occur as soon as reasonably possible after the Maker's receipt of the holder's notice of exercise

of conversion right. The conversion shall be deemed to have occurred on and as of the date the Maker receives the holder's exercise notice, irrespective of when the closing occurs and even though the Maker's stock transfer books might be closed on that date; the Note to the extent being converted shall cease to accrue interest on that date, and the holder shall be recognized and treated for all purposes as the owner and holder of the shares issuable by reason of the conversion as of that date.

This Note shall be surrendered to the Maker at the closing. If only a portion of the debt represented by this Note is being converted, then the Maker shall issue to the holder at the closing a new note of like tenor to this Note representing the unconverted balance of principal and accrued interest. The Maker shall deliver to the holder at the closing a certificate for the shares issuable by reason of the conversion of this Note.

No fractional shares shall be issued upon conversion of this Note. In the event the entire remaining principal balance of this Note is being converted, the Maker shall make a cash payment at the closing in lieu of issuing a fractional share.

4.    Use of Proceeds. Maker represents, warrants and covenants that the proceeds of this Note shall only for the purposes permitted under the terms of the Loan Agreement.

5.    Default. It shall be an event of default hereunder if (i) Maker shall fail to pay any amount of unpaid principal or interest hereunder when due (whether by maturity, acceleration or otherwise) and such failure shall continue for a period of five (5) days after notice of nonpayment; or (ii) any proceedings shall be instituted by or against Maker under the provisions of any Federal bankruptcy, reorganization, arrangement of debt, insolvency or receivership laws or similar state or Federal laws providing for the relief of debtors and is not discharged within thirty (30) days thereafter; or (iii) Maker shall make an assignment for the benefit of its creditors; or (iv) any proceedings shall be instituted by or against Maker for its liquidation or dissolution and are not discharged within thirty (30) days thereafter; (v) Maker shall cease to conduct business in the ordinary course as a going concern; (vi) any representation or warranty made by Maker in the Loan Agreement was untrue when made; or (vii) Maker shall fail to keep and perform any covenant of Maker in the Loan Agreement. Upon the occurrence of an event of default hereunder, at the option of the holder, the entire unpaid principal balance hereunder together with interest accrued thereon shall become immediately due and payable and the holder may thereupon exercise all rights of the holder hereunder, under the Loan Agreement and under applicable law, cumulatively and not exclusively.

6.    General Provisions.

(a)    Maker intends and believes that each provision in this Note comports with all applicable local, state and Federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Note is found by a court of law to be in violation of any applicable local, state or Federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Note to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision or

2

provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Note shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of Maker and the holder or holders hereof under the remainder of this Note shall continue in full force and effect. All agreements herein are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise , shall the amount paid or agreed to be paid to the holders hereof for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable usury laws. If, from any circumstance whatsoever, the fulfillment of any provision hereof, at the time performance of such provision shall be due, shall involve transcending the limit of validity proscribed by the law which a court of competent jurisdiction may deem applicable hereto then, *ipso facto*, the obligation to be fulfilled shall be reduced to the limit of such validity and if from any circumstance the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance hereunder and not to the payment of interest.

(b)     The captions to the various sections hereof are provided only for convenience of reference and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

(c)     This Note and all the provisions hereof shall be binding upon Maker and all persons claiming under or through Maker, and shall inure to the benefit of Payee, together with its successors and assigns, including each owner and holder from time to time of this Note.

(d)     No provision of this Note may be waived, changed, modified or discharged without an agreement in writing signed by the party against whom enforcement of such waiver, change, modification or discharge is sought.

(e)     Time is of the essence as to all dates set forth herein subject to any applicable grace or cure period or notice expressly provided herein; provided, however, that unless otherwise stated, whenever any payment to be made under this Note shall be stated to be due on a day other than a business day, such payment shall be made on the immediately preceding business day.

(f)     Maker agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by the holder.

(g)     Maker hereby waives and renounces for itself, its successors and assigns, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, or exemption in homestead laws now provided, or which may hereafter be provided, by the constitution and the laws of the United States and of any state thereof, both as to itself and as to all of its property, real and personal, against the enforcement of the collection of the obligations evidenced by this Note.

3

(h)     If this Note is placed in the hands of attorneys for collection or is collected through any legal proceedings, Maker promises and agrees to pay, in addition to the principal, interest and other sums due and payable hereon, all costs of collecting or attempting to collect this Note, including reasonable attorneys' fees and disbursements.

(i)     Maker hereby waives presentment for payment, demand, notice of non-payment or dishonor, protest and notice of protest.  No failure to accelerate the indebtedness evidenced hereby, acceptance of a past due installment following the expiration of any cure period provided by this Note or applicable law, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of the holder thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by the laws of the State of Illinois.

(j)     The remedies of the holder, as provided in this Note, shall be cumulative and concurrent, and may be pursued singly, successively, or together at the sole election of the holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise or delay in exercising any such right or remedy shall in no event be construed as a waiver or release thereof.

(k)     THIS NOTE AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW).

(l)     MAKER AGREES TO PAY ON THE DATE HEREOF ALL OF PAYEE'S COSTS AND EXPENSES INCURRED IN CONNECTION WITH THE NEGOTIATION AND PREPARATION OF THIS NOTE, INCLUDING, WITHOUT LIMITATION, THE FEES AND EXPENSES OF PAYEE'S COUNSEL.

(m)     TO THE FURTHEST EXTENT PERMITTED BY LAW, MAKER HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION,

PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY MATTER ARISING IN CONNECTION HEREUNDER.

Maker has executed and delivered this Convertible Promissory Note as of the day and year first set forth above.

**UNISOURCE NETWORK SERVICES, INC.**

By: _____

Thurman Jordan
Senior Vice President and Chief Financial Officer

Attest: _____

(Assistant) Secretary

Address:

10 North Dearborn Street
Suite 202
Chicago, IL 60602

# EXHIBIT F

NOV-02-00  13:54    FROM NORWOOD, MARCUS & BERK               TO 13720009200      T      P.04      693

# UNISOURCE NETWORK SERVICES, INC.

### INTERIM FUNDING AGREEMENT
### PREEMPTIVE RIGHTS ELECTION/WAIVER

Unisource Network Services, Inc. (the "Company") wishes to enter into an Interim Funding Agreement among the Company and certain investors. Pursuant to the Interim Funding Agreement, the investors will receive notes convertible into and warrants exercisable for shares of the Company's Class B Convertible Preferred Stock – Series 3 ("B-3 Stock").

As a shareholder of the Company, you are entitled to exercise your preemptive rights to participate in the Interim Funding Agreement and the corresponding issuance of warrants exercisable for and notes convertible into B-3 Stock, pursuant to Section 7.1 of the Stock Purchase Agreement-Class B Convertible Participating Preferred Stock – Series 2 dated as of February 8, 1999, Section 7.1 of the Stock Purchase Agreement-Class B Convertible Participating Preferred Stock – Series 1 dated as of January 29, 1998, Section 7.13 of the Class A Securities Purchase Agreement dated as of July 29, 1996, or Article 4 of the Company's Articles of Incorporation, as amended (collectively, the "Agreements"), as applicable.

Initial one of the two following paragraphs to indicate whether you elect to exercise or waive your preemptive rights with respect to the Interim Funding Agreement and the corresponding issuance of warrants exercisable for and notes convertible into B-3 Stock:

A.    **Election**
_____    The undersigned hereby elects to exercise its rights under the Agreements to participate in the Interim Funding Agreement and the corresponding issuance of warrants exercisable for and notes convertible into B-3 Stock.

B.    **Waiver**
SGT X    The undersigned hereby elects to waive its rights under the Agreements to participate in the Interim Funding Agreement and the corresponding issuance of warrants exercisable for and notes convertible into B-3 Stock.

Dated as of this 23rd day of March, 2000.

_Sheila G. Talton_
Shareholder's Signature

_Sheila G. Talton_
Printed Name

MAR 24 2000 16:43                           3125163818        PAGE.03

# EXHIBIT G

November 30, 2000

Kathleen H. Klaus

312.602.2016
Fax: 312.602.3016
kklaus@dancona.com
www.dancona.com

**VIA FACSIMILE**

Jeffrey L. London
Sachnoff & Weaver, Ltd.
30 South Wacker Drive
29th Floor
Chicago, IL 60606-7484

Dear Jeff:

Pursuant to 805 ILCS 5/7.75 and on behalf of our client Sheila Talton, we hereby request to inspect the following records concerning Unisource Network Services, Inc. ("Unisource" or "Company"):

1. All records relating to shares, stock warrants and stock options issued or granted in Unisource. This request includes but is not limited to board minutes, by-laws, agreements, charts and amendments to the articles of incorporation that reflect or refer to shares of Unisource stock or warrants or options issued or granted in Unisource stock.

2. All documents relating to loans made to the Company by any shareholder. This request includes all minutes of meetings concerning any loan, in addition to the loan documents.

3. The corporate minute book for the Company.

4. The balance sheet and profit and loss statement for the last fiscal year.

5. All documents provided to potential purchasers of Unisource and a list of persons or entities to whom or which such documents were provided.

6. All documents relating to loans taken by the Company.

Ms. Talton is requesting this information to determine the extent and value of her ownership interest in the Company and to protect the value of her ownership interest.

489372.v1

Jeffrey L. London
November 30, 2000
Page 2

       If you do not have the authority to accept this request on behalf of Unisource, please notify us immediately and we will make this request directly to the Company.

              Very truly yours,

              */s/ Kathleen H. Klaus*

/kk

cc:    Sheila G. Talton
       Unisource Board of Directors

489372.v1

Civil Cover Sheet

http://www.ilnd.uscourts.gov/_vti_bin/shtml.dll/PUBLIC/Forms/cvcover.h

Cat 2

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

## 00C 7967

# Civil Cover Sheet

JUDGE RONALD GUZMAN

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

MAGISTRATE JUDGE ROSEMOND

**Plaintiff(s):** Sheila G. Talton

**Defendant(s): Unisource Network Services, Inc., Polestar Capital, Inc., Polestar Capital Fund II, L.P.; Polestar Capital Fund III, L.P., Atlantic Coastal Investors, L.P., Michael Fields, Jerry Edgerton, Derrick Collins, John Doerer, Walter Threadgill, Woody Chamberlain and Thurman Jordan**

County of Residence: LAKE

Plaintiff's Atty:  Kathleen H. Klaus
D'Ancona & Pflaum, LLC
111 East Wacker Drive, Suite 2800, Chicago, IL 60601
312-602-2000

County of Residence:

Defendant's Atty:

00 DEC 20 PM 2: CLERK U.S. DISTRICT COURT  FILED-ED4

DOCKETED
DEC 2 6 2000

----

II. Basis of Jurisdiction:  **3. Federal Question (U.S. not a party)**

III. Citizenship of Principle Parties **(Diversity Cases Only)**

        Plaintiff:- **1 Citizen of This State**
        Defendant:- **N/A**

IV. Origin :  **1. Original Proceeding**

V. Nature of Suit:  **850 Securities / Commodities / Exchange**

VI.Cause of Action:  **15 U.S.C. 78j(b); 17 C.F.R. 240.10b-5 Securities Fraud**

VII. Requested in Complaint
        Class Action: **No**
        Dollar Demand: **1,000,000.00 +**
        Jury Demand: **Yes**

VIII. This case **Is NOT** a refiling of a previously dismissed case. (If yes case number __ by Judge __)

----

Signature:

Civil Cover Sheet

http://www.ilnd.uscourts.gov/_vti_bin/shtml.dll/PUBLIC/Forms/cvcover.h

Date: 12·20·60

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**        Revised: 06/28/00

NOTE: When the print dialogue box appears, be sure to uncheck the Annotations option.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### Eastern Division



Double click on question mark for appearance form instructions

In the Matter of

Sheila G. Talton

v.

Unisource Network Services, Inc., et al.

Case Number: **00C 7967**

JUDGE RONALD GUZMAN

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

MAGISTRATE JUDGE ROSEMOND

Sheila G. Talton - Plaintiff

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Kathleen H. Klaus | NAME Kathryn Pyszka |
| FIRM D'Ancona & Pflaum, LLC | FIRM D'Ancona & Pflaum, LLC |
| STREET ADDRESS 111 East Wacker Drive, Suite 2800 | STREET ADDRESS 111 Easr Wacker Drive, Suite 2800 |
| CITY/STATE/ZIP Chicago, IL 60601 | CITY/STATE/ZIP Chicago, IL 60601 |
| TELEPHONE NUMBER (312) 602-2000 | TELEPHONE NUMBER (312) 602-2000 |
| IDENTIFICATION NUMBER 62113316 | IDENTIFICATION NUMBER 6202224 |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES ✔ NO |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES ✔ NO |
| | DESIGNATED AS LOCAL COUNSEL? YES NO |

DEC 2 6 2000

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER | IDENTIFICATION NUMBER |
| MEMBER OF TRIAL BAR? YES NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES NO | TRIAL ATTORNEY? YES NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO | DESIGNATED AS LOCAL COUNSEL? YES NO |