# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7967 | **DATE** | 9/6/2001 |
| **CASE TITLE** | SHEILA G. TALTON vs. UNISOURCE NETWORK SERVICES, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 9/14/01 at 9:30A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21'  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: the Unisource defendants' motion to dismiss [15-1] is granted as to Count I and that count is dismissed without prejudice. The Court strikes as moot the remainder of the Unisource defendants' motoin to dismiss as well as the Polestar defendants' motion to dismiss [12-1] until plaintiff cures the deficiencies in Count I. If no amended complaint is filed on or before ten days after the date of this Memorandum Opinion and Order, the Court shall: (1) dismiss Count I with prejudice; (2) dismiss the remaining supplemental state law claims without prejudice; and (3) terminate this case.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | SEP 10 2001 date docketed | | 36 |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| TBK | courtroom deputy's initials | 01 SEP -7 AM 8:44 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHEILA G. TALTON, on behalf of herself and on behalf of Unisource Network Services, Inc., | ) ) ) ) |
| Plaintiff, | ) 00 C 7967 ) |
| v. | ) Judge Ronald A. Guzmán ) |
| UNISOURCE NETWORK SERVICES, INC., an Illinois corporation, POLESTAR CAPITAL, INC., a Delaware corporation, POLESTAR CAPITAL FUND II, L.P., POLESTAR CAPITAL FUND III, L.P., ATLANTIC COASTAL INVESTORS, L.P., MICHAEL FIELDS, JERRY EDGERTON, DERRICK COLLINS, JOHN DOERER, WALTER THREADGILL, WOODY CHAMBERLAIN, and THURMAN JORDAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

DOCKETED
SEP 1 0 2001

## MEMORANDUM OPINION AND ORDER

Before the Court is defendant Unisource Network System ("Unisource" or "the Company"), Michael Fields, Jerry Edgerton, Derrick Collins, John Doerer, Walter Threadgill, Woody Chamberlain, and Thurman Jordan's (collectively the "Unisource defendants") motion to dismiss Count I of plaintiff Sheila Talton's complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). FED. R. CIV. P. 12(b)(6). The Unisource defendants contend that the pleadings do not satisfy the degree of particularity mandated by both the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) and ask the Court, upon dismissal of Count I, to decline to exercise supplemental jurisdiction over the state law claims in Counts II through VII pursuant to 28 U.S.C. § 1367(c)(3). Also before the Court is Polestar Capital Fund Inc., Polestar Capital II, Polestar Capital Fund III, and Atlantic Coastal Investors' (collectively the "Polestar defendants")

motion to dismiss Counts II and IV. For the reasons set forth herein, the Court (1) grants the Unisource defendants' motion in part and dismisses Count I without prejudice; and (2) strikes the remaining part of the Unisource defendants' motion as well as the Polestar defendants' motion as moot until plaintiff files an amended complaint curing the deficiencies of Count I.

## Background

### A. Parties and Claims

Sheila Talton founded and is the former President and Chief Executive Officer of Unisource, an Illinois corporation that assists clients in establishing and maintaining computer networks. (Compl. ¶ 10.) Talton was employed by Unisource from 1986, when the company was founded, until April 7, 2000, when she was terminated. (*Id.* ¶ 1.) She brings this action on behalf of herself and derivatively on behalf of Unisource. (*Id.*) Thurman Jordan was Unisource's Chief Financial Officer under Talton and is currently president. (*Id.* ¶ 9.) Michael Fields and Jerry Edgerton are currently directors of Unisource. (*Id.* ¶ 8.) Polestar is a Delaware investment corporation with its principal place of business in Chicago, Illinois. (*Id.* ¶ 5.) Polestar Capital Fund II, L.P. and Polestar Capital Fund III, L.P. are Illinois limited partnerships associated with Polestar. (*Id.*) Derrick Collins and John Doerer are investors in and principals of Polestar and Doerer is also its president. (*Id.*) Atlantic Coastal Investors, L.P. is a District of Colombia limited partnership engaged in the business of investing venture capital; Walter Threadgill is an investor in and manager of Atlantic.[1] (*Id.* ¶ 6.) Woody Chamberlain has a beneficial interest in shares of Unisource through his investment company Doerge-Unisource, L.P. ("Doerge"), a shareholder of Unisource. (*Id.* ¶ 7.) Collins, Doerer, Threadgill, and Chamberlain are also directors of Unisource. (*Id.* ¶¶ 5-7.)

---

[1]. Defendants Polestar, Polestar Capital Fund II, Polestar Capital Fund III, and Atlantic Coastal Investors are herein referred to collectively as "Venture Capitalists."

2

## B. Facts

Talton served as President and CEO of Unisource from 1986. (*Id.* ¶ 10.) For the first fourteen years of its existence, she ran the company and established contacts with both the computer industry and various government agencies. (*Id.*) In July 1996, Unisource sold 10% of the company's authorized shares to Doerge and 15% to CI & Associates Software Consulting. (*Id.* ¶ 11.) In January 1998, Unisource sold to Venture Capitalists 3,050,001 shares of Class B, Series 1 preferred stock in Unisource. (*Id.* ¶ 12.) Small amounts of Class B, Series 1 shares were also sold to other shareholders. (*Id.*) As part of the deal, the Venture Capitalists were allowed three seats on the Board and named Doerer, Collins, and Threadgill as directors. (*Id.* ¶ 13.) Talton was allowed two seats and nominated herself and Edgerton. (*Id.*) Field was put on the board by agreement between Polestar and Talton. (*Id.*)

The shareholders who participated in these transactions, including Talton, were awarded preemptive rights with their stock. (*Id.* ¶ 14.) This meant that each of these shareholders had a right but not an obligation to participate in any future stock offerings on the same terms and conditions as the offering stock purchasers. (*Id.*) In connection with this agreement, Talton and Unisource entered into an employment contract ("Contract"), which provided that Talton would be employed as the Company's President and CEO until December 31, 2000. (*Id.* ¶ 15.) The Contract provided that if Unisource wanted to terminate her without cause, it would have to provide her with sixty days notice. (*Id.*) The Venture Capitalists bought additional stock in a February 1999 private placement. (*Id.* ¶ 16.) At this point, Talton owned approximately 26% of stock, the Venture Capitalists owned about 31%, and Doerge owned 10%. *Id.* Around the same time, Unisource began to experience cash flow problems. (*Id.* ¶ 18.) There was disagreement over whether the Company should be sold or whether new investment should be sought. Talton alleges that while Doerer, Collins, Threadgill, and Chamberlain wanted only to sell, she was willing to consider the possibility of additional investment. (*Id.* ¶ 20.) She sought offers from potential investors and in November 1999, investor John Bank ("Bank") made an offer of $500,000 in exchange for certain conditions and a seat on the board. (*Id.* ¶ 21.)

3

The Venture Capitalists made their own offer to provide the $500,000 the company needed, in exchange for convertible promissory notes totaling $500,000 and warrants in Class B, Series 2 preferred stock. (*Id.* ¶ 23.) The notes would be due on March 31, 2000, because the Venture Capitalists demanded as a precondition to closing that Talton be required to vote with the majority on the issue of change in control. (*Id.*) Talton objected to this provision and to the Directors' alleged attempts to force her to accept it. (*Id.*) Collins, Doerer, and Threadgill argued against and voted down Bank's proposal on November 29, 1999. (*Id.* ¶ 24.) The entire Board, including Collins, Doerer, and Threadgill, approved the Venture Capitalists' proposal on December 14, 1999. (*Id.*)

Talton contends that she wanted to participate in the financing on the same terms as the Venture Capitalists and told the Directors that she would exercise her preemptive rights. (*Id.* ¶ 25.) She also told the Directors that they would have to notify other shareholders of the proposal and provide them enough time to decide whether to invest. (*Id.*) Doerer, Collins, Threadgill, and Chamberlain balked at the idea of other shareholders participating in the bridge financing. (*Id.*) After much debate and legal counseling, all of the Directors agreed that notice to the other shareholders was necessary. (*Id.*) Sometime before the December 14, 1999 Board meeting, Eclipse Networks, Inc. ("Eclipse") contacted Unisource about acquiring the Company. (*Id.* ¶ 26.) Allegedly, Talton insisted over Doerer, Collins, and Threadgill's objections that the other shareholders be advised of the status of the Eclipse offer at the same time that they were notified of the proposed bridge financing. (*Id.* ¶ 27.) According to her, due to the wrangling between Talton and the Directors over the potential sale of Unisource and Talton's insistence that the Directors adhere to the preemptive rights provisions in the previous financing documents, it became apparent to the Directors that she would thwart the Venture Capitalists' plan to increase their share in the Company at the expense of the current and potential shareholders. (*Id.*)

Talton further alleges that at some point prior to the closing of the December/January bridge financing, Doerer, Collins, Threadgill, and Chamberlain decided that they would force Talton out of the Company. (*Id.* ¶ 28.) Apparently, this would clear the way for Doerer, Collins, Threadgill, and

4

Chamberlain to operate the Company in a way that benefited the Venture Capitalists and Doerge, at the expense of the other shareholders. *Id.* On information and belief, Doerer, Collins, Threadgill, and Chamberlain discussed their plan to terminate Talton's employment with Fields and Edgerton. (*Id.* ¶ 29.) Fields and Edgerton either agreed with or acquiesced in the plan and agreed not to reveal the decision to Talton. (*Id.*)

The first step in the alleged plot was the Directors' insistence that Talton resign as President once they located a replacement, on or about January 17, 2000. (*Id.* ¶ 30.) At the closing of the January bridge financing, with other Directors present, Doerer allegedly informed Talton that the Venture Capitalists would not close unless she agreed to resign, indicating that with the change she would be able to focus her efforts on sales and marketing the Company. (*Id.*) The other Directors agreed with his representations. (*Id.*) At this time, Talton was the contact person on the Eclipse transaction. (*Id.* ¶ 31.) Talton alleges that although Directors wanted to terminate her immediately in retaliation, they did not want to spoil the Eclipse deal, knowing Eclipse wanted Talton to remain with the company. (*Id.*) At the same time, they wanted to prepare someone to run the Company in the event the Eclipse deal fell through. (*Id.*) Talton says she expressed concern over the effect that her removal from the Company's management would have on Unisource and asked the Directors to clarify her responsibilities. (*Id.* ¶ 32.) Apparently, Directors assured her that she would continue to be involved with the Company. (*Id.*)

Talton alleges that the Directors falsely assured Talton that she would continue as Chief Executive Officer of the Company but that Jordan, then the Company's Chief Financial Officer, would take over the day-to-day operations. (*Id.* ¶ 34.) Jordan did not replace Talton until March 24, 2000. (*Id.*) Plaintiff also alleges that the replacement of Talton with Jordan was the first step in the Directors' plan to eliminate Talton's role in running the Company. (*Id.* ¶ 35.) Based on the Directors' assurances that she would continue to be the Company's CEO, Talton exercised her preemptive rights and invested $98,382 at the January 17, 2000 closing. (*Id.* ¶ 36.) Talton received convertible promissory notes

totaling $98,382 and warrants to purchase 246,322 shares of Class B, Series 3 preferred stock (the "Series 3 Notes" and "Series 3 Warrants"). (*Id.*)

Around this time, Eclipse sent a revised term sheet for its proposed purchase of Unisource. (*Id.* ¶ 37.) Included as a condition to the purchase of the Company was Talton's agreement to a three-year employment contract. (*Id.*) No other information about the terms of Talton's employment were set forth in the term sheet. (*Id.*) Talton indicated at the February 4, 2000 Board meeting that she could not agree to a three-year contract unless more specific terms were included. (*Id.*) Allegedly, the Directors were outraged with Talton's reluctance to agree to an unqualified commitment to stay with the new entity for three years because it might impair the Eclipse deal. (*Id.*) Plaintiff contends that in retaliation for Talton's refusal to instantly agree to the employment term of the Eclipse proposal, Collins and Doerer insisted that the Board be the point of contact for any future discussions with Eclipse or its financial backer Mr. Cressy and they instructed Talton that she was to have no communication with either entity unless another Board member was present. (*Id.* ¶ 38.) At a subsequent discussion of Eclipse's request that Talton agree to a three-year contract, Chamberlain angrily told Talton that she needed to make a "personal sacrifice" so that the other shareholders could benefit. (*Id.* ¶ 39.) Talton alleges that when she refused, the Directors set into motion the second part of their scheme to defraud and force her out of the Company and assured she would make the "personal sacrifice" they demanded. (*Id.* ¶ 40.)

The December/January financing package did not solve the Company's financial problems and by February 2000, Unisource was unable to meet its payroll. (*Id.* ¶ 41.) Talton alleges that the Directors knew that if backed into a corner she would invest to keep the company afloat. (*Id.* ¶ 42.) Doerer, Collins, and Threadgill therefore told Talton that the Venture Capitalists would not make any further investment. (*Id.* ¶ 43.) They also refused to consider any offers from outside investors, demanding instead that the Company be positioned for sale. (*Id.*) As the Directors planned, Talton agreed to invest personally an additional $100,000 under the same terms as the previous bridge

6

financing agreement. (*Id.* ¶ 44.) Talton borrowed an additional $150,000 in cash from friends and invested their money in the February 22, 2000 bridge financing pursuant to a Nominee Agreement executed between Talton and her lenders. (*Id.*)

On or about February 22, 2000, Talton purchased 655,300 warrants in Class B, Series 4 preferred stock ("Series 4 Warrants") and was issued a convertible promissory note for $250,000 ("Series Note"). (*Id.* ¶ 45.) Both the Series 3 Notes and the Series 4 Notes were due on March 31, 2000. (*Id.* ¶ 46.) At no time prior to Talton's purchase of the Series 4 Warrants did any of the Directors indicate to Talton that her continued employment with Unisource was in jeopardy or contingent on the Eclipse deal closing. (*Id.* ¶ 47.) Talton alleges that subsequent to January 17, 2000, the Directors each had assured her that she was of significant value as an employee of the Company because of her contacts in the industry and relationships with clients. (*Id.* ¶ 48.) Apparently, had Talton known of her precarious employment situation, she would not have invested in the Series 4 Warrants. (*Id.*)

Soon after Talton purchased the Series 4 Warrants, the deal with Eclipse collapsed and the Company again was unable to make payroll. (*Id.* ¶ 49.) This time, the Venture Capitalists, through Collins, Threadgill, and Doerer, offered to invest $30,000 in the Company, in exchange for convertible promissory notes and additional Series 3 warrants. (*Id.*) On information and belief, the new notes were issued to defendants Polestar Capital, Inc., Polestar Capital Fund II, L.P., Polestar Capital Fund III, L.P., Atlantic Coastal Investor, L.P. (*Id.* ¶ 50.) As a condition of investment, Collins, Threadgill, and Doerer demanded that Talton subordinate all of her Notes to all the notes issued to Venture Capitalists. (*Id.* ¶ 51.) They told her that, unless she agreed to subordinate her Notes, they would make no additional investment and the Company would face bankruptcy. (*Id.*) Talton alleges that Directors also assured her that she was valuable to the Company and gave no indication that she was about to be terminated. (*Id.* ¶ 52.) On March 20, 2000, the Board discussed lay-offs the Company needed to make in order to cut costs. (*Id.*) At the meeting, Fields indicated that Unisource needed to get rid of some employees in

7

the upper ranks of the Company. (*Id.*) In response to his concerns, Talton asked Fields whether her job was on the line, and he again stated it was not. (*Id.*) Based on the representations that she would continue to run the Company as CEO, on March 22, 2000 she executed a Subordination Letter. (*Id.* ¶ 53.) It purports to bar Talton from demanding payment on either the Series 3 Notes or the Series 4 Notes, until the Venture Capitalists were paid on their notes. (*Id.* ¶ 54.) Talton further alleges that by inducing her to sign the Subordination Letter, the Directors took the final step in their plan to deprive her of the value of her $350,000 investment. (*Id.* ¶ 55.) Had they fired her without the Subordination Letter, Talton alleges that she would have demanded payment on her notes and the Directors would have had to borrow $350,000 or face bankruptcy. (*Id.*)

The alleged scheme deprived her of preemptive rights. (*Id.* ¶ 56.) The Venture Capitalists received valuable demand notes in exchange for their contribution. Talton received subordinated notes which were worth significantly less. (*Id.*)

On April 17, 2000, two weeks after they demanded she subordinate her debt, the Directors informed Talton that her employment was terminated. (*Id.* ¶ 57.) The termination was "without cause" under Talton's Employment Agreement. (*Id.*) As a result of her termination, she contends, Unisource lost most of its customers, business, and status as a minority business enterprise, which she says greatly lowered the value of the company. (*Id.*)

## Discussion

The Court may dismiss a complaint for failure to state a claim upon which relief may be granted only if it appears that the plaintiffs can prove no set of facts entitling them to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The Court must accept all pleaded allegations of the complaint as true, and must view those allegations in the light most favorable to the plaintiffs. *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987);

8

*Vaden v. Village of Maywood*, 809 F.2d 361, 363 (7th Cir. 1987). However, the Court need not accept as true legal conclusions alleged in the complaint. *Vaden*, 809 F.3d at 363.

### A. Count I: Securities Fraud

In Count I, Talton seeks relief under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission. To state such a claim, one must allege that the defendant: (1) made a misstatement or omission, (2) of a material fact, (3) with scienter, (4) in connection with the purchase and sale of securities, (5) upon which the plaintiff relied and (6) that reliance proximately caused plaintiff's injuries. *In re Allied Prods. Corp. Sec. Litig.*, No. 99 C 3597, 2000 WL 1721042, at *2 (N.D. Ill. Nov. 15, 2000).

Normally any allegation of fraud is subject to the heightened pleading standards of Rule 9(b). FED. R. CIV. P. 9(b). Plaintiffs must state the circumstances constituting fraud with particularity. *Id.* In this circuit, this has been interpreted as the "...who, what, when, where, why, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *see also Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir. 1991) ("[P]arties pleading fraud in federal court . . . 'must state the time, place and content' of the alleged communications perpetrating the fraud.") (quoting *U.S. Textiles Inc. v. Anheuser Busch Cos.*, 911 F.2d 1261, 1268 n.6 (7th Cir. 1990) (internal quotations omitted). "The purpose . . . of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In addition, when pleading securities fraud, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires a plaintiff to go one step further and allege, with particularity, each statement alleged to have been misleading and the reasons why they were misleading. 15 U.S.C. § 78u-4(b)(1)

(West 2000). Further, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendants acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). If these requirements are not met, the Court shall dismiss the complaint. 15 U.S.C. 78u-4(b)(3).

When taken together, Rule 9(b) and the PSLRA make it clear that a plaintiff must aver which defendants said what, to whom, and when. *Ackerman*, 172 F.3d at 171; *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). Where a plaintiff alleges that a group of individuals is part of a fraudulent scheme, he or she must put each defendant on notice of his or her alleged role. *See Vicom, Inc., v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994).

Talton's complaint, however, falls short. Courts, both in this circuit and others, have held that a plaintiff may not vaguely attribute a fraudulent statement to a group of defendants. *Sears*, 912 F.2d at 893; *see also Mills*, 12 F.3d at 1175 ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'") (quoting *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)). In her complaint, Talton alleges that the Directors conspired to fire her in order to advance their own interests in the company. (Compl. ¶ 27-29.) Moreover, at various points in her complaint, she alleges that Directors either repeatedly assured her that her position as Chief Executive Officer was secure, or remained silent, knowing that she was proceeding under such an assumption. (Compl. ¶¶ 30, 34, 47, 48, 51, 52.) Yet at no point does she specify what was said, by whom, or when. Nor does she allege what role each defendant played in the alleged agreement. Rather, Talton attributes the allegedly fraudulent statements to an entire group of defendants, the Directors. Talton argues that the information necessary to plead sufficiently is within defendants' control, and thus she is not required to plead with the same level of specificity. True, there is some wiggle room for plaintiffs alleging fraud to group plead where the information necessary is within the exclusive control of the defendants. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992); *see also Banowitz v. State*

10

*Exchange Bank,* 600 F. Supp. 1466, 1469 (N.D. Ill. 1985). However, in each of those cases, the information in question was within the exclusive control of the defendant. The policy set forth in those cases would not be served here because Talton alleges that defendants made certain statements to her at meetings that she was attending.

## Conclusion

For the foregoing reasons, the Unisource defendants' motion to dismiss [doc. no. 15-1] is granted as to Count I and that count is dismissed without prejudice. The Court strikes as moot the remainder of the Unisource defendants' motion to dismiss [doc. no. 15-1] as well as the Polestar defendants' motion to dismiss [docket no. 12-1] until plaintiff cures the deficiencies in Count I. If no amended complaint is filed on or before ten days after the date of this Memorandum Opinion and Order, the Court shall: (1) dismiss Count I with prejudice; (2) dismiss the remaining supplemental state law claims without prejudice; and (3) terminate this case.

**IT IS SO ORDERED** 9/6/01         **ENTERED:**

**HON. RONALD A. GUZMAN**
**United States Judge**