# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | *Guzman* | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7967 | **DATE** | 9/5/2002 |
| **CASE TITLE** | *TALTON -V- UNISOURCE NETWORK SERVICES, ET AL* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: the Unisource Defendants' (Unisource Network, Fields, Edgerton, Collins. Doerer, Threadgill, Chamberlain, and Jordan) and Venture Capitalists' (Polestar Capital Inc., Polestar Capital II, Polestar Capital III, and Atlantic Coastal Investors) motions to dismiss [doc. Nos. 44-1 and 45-1] are denied. Defendants are given to and including ten days from the date of this Memorandum Opinion and Order to answer.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | date docketed | |
| | Notified counsel by telephone. | | | 58 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK 02 SEP -5 AM 11:29 | date mailed notice | |
| TBK | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

SEP 0 9 2002

| | | |
|---|---|---|
| SHEILA G. TALTON, on behalf of herself and on behalf of Unisource Network Services, Inc. | ) ) ) | |
| | ) | |
| Plaintiff, | ) | 00 C 7967 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| UNISOURCE NETWORK SERVICES, INC., an Illinois corporation, POLESTAR CAPITAL, INC., a Delaware corporation, POLESTAR CAPITAL FUND II, L.P., POLESTAR CAPITAL FUND III, L.P., ATLANTIC COASTAL INVESTORS, L.P., MICHAEL FIELDS, JERRY EDGERTON, DERRICK COLLINS, JOHN DOERER, WALTER THREADGILL, WOODY CHAMBERLAIN, and THURMAN JORDAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendant Unisource Network System ("Unisource" or "the Company"), Michael Fields, Jerry Edgerton, Derrick Collins, John Doerer, Walter Threadgill, Woody Chamberlain, and Thurman Jordan's (collectively the "Unisource defendants") motion to dismiss Count I of plaintiff Sheila Talton's first amended complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). FED. R. CIV. P. 12(b)(6). The Unisource defendants contend that the pleadings do not satisfy the

1



degree of particularity mandated by both the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) and ask the Court, upon dismissal of Count I, to decline to exercise supplemental jurisdiction over the state law claims in Counts II through Counts VII pursuant to 28 U.S.C. § 1367(c)(3). Also before the Court is Polestar Capital Fund Inc., Polestar Capital II, Polestar Capital Fund III, and Atlantic Coastal Investors' (collectively the "Venture Capitalists") motion to dismiss Counts II and IV. For the reasons set forth herein, the Court denies both the Unisource defendants' and the Venture Capitalists' motions.

## Background

### A. Parties and Claims

Sheila Talton ("Talton") founded and is the former President and Chief Executive Officer of Unisource Network Services, Inc. ("Unisource"), an Illinois corporation that assists clients in establishing and maintaining computer networking systems. (First Am. Compl. ¶¶ 4, 10.) Talton was employed by Unisource from 1986, when the company was founded, until April 7, 2000, when she was terminated. (*Id.* ¶ 1.) She brings this action on behalf of herself and derivatively on behalf of Unisource. (*Id.*) Thurman Jordan was Unisource's Chief Financial Officer under Talton and is currently president. (*Id.* ¶ 9.) Michael Fields and Jerry Edgerton are currently directors of Unisource. (*Id.* ¶ 8.) Polestar Inc. is a Delaware investment corporation with its principal place of business in Chicago, Illinois. (*Id.* ¶ 5.) Polestar Capital Fund II, L.P. and Polestar Capital Fund III, L.P. are Illinois limited partnerships associated with Polestar Inc. (*Id.*) Derrick Collins and John Doerer are investors in and principals of Polestar and Doerer is

also its president. (*Id.*) Atlantic Coastal Investors, L.P. is a District of Columbia limited partnership engaged in the business of investing venture capital; Walter Threadgill is an investor in and manager of Atlantic.[1] (*Id.* ¶ 6.) Woody Chamberlain has a beneficial interest in shares of Unisource through his investment company Doerge-Unisource, L.P. ("Doerge"), a shareholder of Unisource. (*Id.* ¶ 7.) Collins, Doerge, Threadgill, and Chamberlain are also directors of Unisource. (*Id.* ¶¶ 5-7.) Michael Fields is also a director of Unisource. (Id. ¶ 8.)

### B. Facts

Talton served as President and CEO of Unisource from 1986. (*Id.* ¶ 10.) For the first fourteen years of its existence, she ran the company and established contacts with both the computer industry and various government agencies. (*Id.*) In July 1996, Unisource sold 10% of the company's authorized shares to Doerge and 15% to CI & Associates Software Consulting. (*Id.* ¶ 11.) In January 1998, Unisource sold to Venture Capitalists 3,050,001 shares of Class B, Series 1 preferred stock in Unisource. (*Id.* ¶ 12.) Small amounts of Class B, Series 1 shares were also sold to other shareholders. (*Id.*) As part of the deal, the Venture Capitalists were allowed three seats on the Board and named Doerer, Collins, and Threadgill as directors. (*Id.* ¶ 13.) Talton was allowed two seats and nominated herself and Edgerton. (*Id.*) Fields was put on the board by agreement between the Venture Capitalists, namely Polestar, and Talton. (*Id.*)

The shareholders who participated in these transactions, including Talton, were awarded preemptive rights with their stock. (*Id.* ¶ 14.) This meant that each of these shareholders had a

---

[1] Defendants Polestar, Polestar Capital Fund II, Polestar Capital Fund III, and Atlantic Coastal Investors are herein referred to collectively as "Venture Capitalists."

right but not an obligation to participate in any future stock offerings on the same terms and conditions as the offering stock purchasers. (*Id.*) In connection with this agreement, Talton and Unisource entered into an employment contract ("Contract"), which provided that Talton would be employed as the Company's President and CEO until December 31, 2000. (*Id.* ¶ 15.) The Contract provided that if Unisource wanted to terminate her without cause, it would have to provider her with sixty days notice. (*Id.*) The Venture Capitalists bought additional stock in a February 1999 private placement. (*Id.* ¶ 16.) At this point, Talton owned approximately 26% of stock, the Venture Capitalists owned about 31%, and Doerge owned 10%. (*Id.*) Around the same time, Unisource began to experience cash flow problems. (*Id.* ¶ 18.) There was disagreement over whether the Company should be sold or whether new investment should be sought. Talton alleges that while Doerer, Collins, Threadgill, and Chamberlain wanted only to sell, she was willing to consider the possibility of additional investment. (*Id.* ¶ 20.) She sought offers from potential investors and in November 1999, investor John Bank ("Bank") made an offer of $500,000 in exchange for certain conditions and a seat on the board. (*Id.* ¶ 21.)

The Venture Capitalists made their own offer to provide the $500,000 the company needed, in exchange for convertible promissory notes totaling $500,000 and warrants in Class B, Series 2 preferred stock. (*Id.* ¶ 23.) The notes would be due on March 31, 2000, because the Venture Capitalists demanded as a precondition to closing that Talton be required to vote with the majority on the issue of change in control. (*Id.*) Talton objected to this provision and to the Directors' alleged attempts to force her to accept it. (*Id.*) Collins, Doerer, and Threadgill argued against and voted down Bank's proposal on November 29, 1999. (*Id.* ¶ 24.) The entire board,

including Collins, Doerer, and Threadgill, approved the Venture Capitalists' proposal on December 14, 1999. (*Id.*)

Talton contends that she wanted to participate in the financing on the same terms as the Venture Capitalists and told the Directors that she would exercise her preemptive rights. (*Id.* ¶ 25.) She also told the Directors that they would have to notify other shareholders of the proposal and provide them enough time to decide whether to invest. (*Id.*) Doerer, Collins, Threadgill, and Chamberlain balked at the idea of other shareholders participating in the bridge financing. (*Id.*) After much debate and legal counseling, all of the Directors agreed that notice to the other shareholders was necessary. (*Id.*) Sometime before the December 14, 1999 Board meetings, Eclipse Networks, Inc. ("Eclipse") contacted Unisource about acquiring the Company. (*Id.* ¶ 24.) According to Talton, due to the wrangling between Talton and the Directors over the potential sale of Unisource and Talton's insistence that the Directors adhere to the preemptive rights provisions in the previous financing documents, it became apparent to the Directors that she would thwart the Venture Capitalists' plan to increase their share in the Company at the expense of the current and potential shareholders. (*Id.* ¶ 26.)

Talton further alleges that at some point prior to the closing of the December/January bridge financing, Doerer, Collins, Threadgill, and Chamberlain decided that they would force Talton out of the Company. (*Id.* ¶ 27.) Apparently, this would clear the way for Doerer, Collins, Threadgill, and Chamberlain to operate the Company in a way that benefited the Venture Capitalists and Doerge, at the expense of the other shareholders. (*Id.*) On information and belief, Doerer, Collins, Threadgill, and Chamberlain discussed their plan to terminate Talton's

5

employment with Fields and Edgerton. (*Id.* ¶ 28.) Fields and Edgerton either agreed with or acquiesced in the plan and agreed not to reveal the decision to Talton. (*Id.*)

The first step in the alleged plot occurred on or about January 17, 2000 at the closing of December/January Interim Financing. (*Id.* ¶ 29.) At the closing, Collins and Doerer allegedly informed Talton that Polestar sought to amend the closing documents to remove Polestar's put rights upon Talton's termination. (*Id.*) Talton then asked Collins and Doerer about a change in her position and they indicated that the amendment to the closing documents was precautionary and that Talton would continue to function as CEO and also in an executive role with the Company. (*Id.*) Talton alleges that this representation was false and that Collins and Doerer knew it to be false at the time they made it. (*Id.* ¶ 30.) At this time, Talton was the contact person on the Eclipse transaction. (*Id.* ¶ 31.) Talton alleges that although the Directors wanted to terminate her immediately in retaliation for her perceived attempts to prevent the Directors from obtaining larger shares in the company, they did not want to spoil the Eclipse deal, knowing that Eclipse wanted Talton to remain with the company. (*Id.*) At the same time, however, the Directors wanted to prepare someone to run the Company in the event that the Eclipse deal fell through. (*Id.*) Talton says she expressed concern over the effect that her removal from the Company's management would have on Unisource and asked the Directors to clarify her responsibilities. (*Id.* ¶ 32.) Apparently, the Directors assured her that she would continue to be involved in operating the Company. (*Id.*)

Talton alleges that based on Collins and Doerer's assurances that she would continue to be the Company's CEO, she exercised her preemptive rights and invested $98,382 at the January

17, 2000 closing. (*Id.* ¶ 34.) Talton received convertible promissory notes totaling $98,422 and warrants to purchase 246,322 shares of Class B, Series 3 preferred stock (the "Series 3 Notes" and "Series 3 Warrants"). (*Id.*)

Around this time, Eclipse sent a revised term sheet for its proposed purchase of Unisource. (*Id.* ¶ 35.) Included as a condition to the purchase of the Company was Talton's agreement to a three-year employment contract. (*Id.*) No other information about the terms of Talton's employment was set forth in the term sheet. (*Id.*) Talton indicated at the February 4, 2000 Board meeting that she could not agree to a three-year contract unless more specific terms were included. (*Id.*) Allegedly, the Directors were outraged with Talton's reluctance to agree to an unqualified commitment to stay with the new entity for three years because it might impair the Eclipse deal. (*Id.*) Plaintiff contends that in retaliation for Talton's refusal to instantly agree to the employment term of the Eclipse proposal, Collins and Doerer insisted that the Board be the point of contact for any future discussions with Eclipse or its financial backer Mr. Cressy and they instructed Talton that she was to have no communication with either entity unless another Board member was present. (*Id.* ¶ 36.) At a subsequent discussion of Eclipse's request that Talton agree to a three-year contract, Chamberlain angrily told Talton that she needed to make a "personal sacrifice" so that the other shareholders could benefit. (*Id.* ¶ 37.) Talton alleges that when she refused, the Directors set into motion the second part of their scheme to defraud and force her out of the Company and assured she would make the "personal sacrifice" they demanded. (*Id.* ¶ 38.)

The December/January financing package did not solve the Company's financial problems and by February 2000, Unisource was unable to make its payroll. (*Id.* ¶ 39.) Sometime after the January 17, 2000 closing, Talton met with Collins, Doerer and Bank to discuss additional capital into the Company. (*Id.* ¶ 40.) Bank allegedly indicated that in order for the Company to remain viable Talton would have to retain an executive management role. (*Id.*) Collins and Doerer allegedly agreed with Bank and indicated that Talton's role as CEO was crucial to the success of the Company. (*Id.* ¶ 40.) Although the Company was severely undercapitalized, the Venture Capitalists did not pursue funding from any outside source after the initial meeting with Bank. (*Id.* ¶ 41.) Talton alleges that the Directors knew that if backed into a corner she would invest to keep the company afloat. (*Id.* ¶ 42.) Doerer, Collins, and Threadgill therefore told Talton that the Venture Capitalists would not make any further investment. (*Id.*) Talton's employment was discussed at Board meetings and informally among Board members. (*Id.* ¶ 43.) At a Board Meeting conducted by telephone on February 4, 2000, for example, the Board discussed Talton's employment with Unisource in light of the pending proposal from Eclipse. (*Id.*) Collins, Doerer, Threadgill, and Edgerton were present. (*Id.*) Though they allegedly knew they intended to terminate Talton if the Eclipse deal did not close, none of the Directors revealed this fact to Talton. (*Id.*)

As the Directors planned, Talton agreed to invest personally an additional $100,000 under the same terms as the previous bridge financing agreement. (*Id.* ¶ 45.) Talton borrowed an additional $150,000 in cash from friends and invested their money in the February 22, 2000 bridge financing pursuant to a Nominee Agreement executed between Talton and her lenders.

(*Id.*) Talton alleges that each of the Directors knew that she would not have made any additional investment in the Company if she had known that she was about to be fired. (*Id.* ¶ 44.)

On or about February 22, 2000, Talton purchased 655,300 warrants in Class B, Series 4 preferred stock ("Series 4 Warrants") and was issued a convertible promissory note for $250,000 ("Series Note"). (*Id.* ¶ 46.) At no time prior to Talton's purchase of the Series 4 Warrants did any of the Directors indicate to Talton that her continued employment with Unisource was in jeopardy or contingent on the Eclipse deal closing. (*Id.* ¶ 48.) Talton alleges that subsequent to January 17, 2000 the Directors each had assured her that she was of significant value as an employee of the Company because of her contacts in the industry and relationships with clients. (*Id.* ¶ 49.) Apparently, had Talton known of her precarious employment situation, she would not have invested in the Series 4 Warrants. (*Id.*)

Soon after Talton purchased the Series 4 Warrants, the deal with Eclipse collapsed and the Company was again unable to make payroll. (*Id.* ¶ 50.) This time, the Venture Capitalists, through Collins, Threadgill, and Doerer, offered to invest $300,000 in the Company, in exchange for convertible promissory notes and additional Series 3 Warrants. (*Id.*) On information and belief, the new notes were issued to defendants Polestar Capital, Inc., Polestar Capital Fund II, L.P., Polestar Capital Fund III, L.P., Atlantic Coastal Investor, L.P. (*Id.* ¶ 51.) As a condition of investment, Collins, Threadgill, and Doerer demanded that Talton subordinate all of her Notes to all the notes issued to Venture Capitalists. (*Id.* ¶ 52.) They told her that, unless she agreed to subordinate her Notes, they would make no additional investment and the Company would face bankruptcy. (*Id.*) Talton alleges that Directors also assured her that she was valuable to the

Company and gave no indication that she was about to be terminated. (*Id.* ¶ 53.) On March 20, 2000, the Board discussed lay-offs the Company needed to make in order to cut costs. (*Id.*) Fields indicated that Unisource needed to get rid of some employees in the upper ranks of the Company. (*Id.*) In response to his concerns, Talton asked Fields whether her job was on the line, and he again stated it was not. (*Id.*) Based on the representations that she would continue to run the Company as its CEO, on March 22, 2000, she executed a Subordination Letter. (*Id.* ¶ 54.) Talton alleges that, if she were terminated, the Directors knew that she would call her Note, which was due on March 31, 2000. (*Id.*) The Subordination Letter was, as a result, necessary in order to ensure that the Venture Capitalists March investment would not be used simply to pay Talton's debt. (*Id.*) The Subordination Letter purports to bar Talton from demanding payment on either the Series 3 Notes or the Series 4 Notes until the Venture Capitalists were paid on their notes. (*Id.* ¶ 55.) Talton further alleges that by inducing her to sign the Subordination Letter, the Directors took the final step in their plan to deprive her of the value of her $350,000 investment. (*Id.* ¶ 56.) Had they fired her without the Subordination Letter, Talton alleges that she would have demanded payment on her notes and the Directors would have had to borrow $350,000 or face bankruptcy. (*Id.*)

The alleged scheme deprived Talton of her preemptive rights. (*Id.* ¶ 57.) The Venture Capitalists received valuable demand notes in exchange for their contribution. Talton received subordinated notes which were worth significantly less. (*Id.*)

On April 7, 2000, two weeks after they demanded she subordinate her debt, the Directors informed Talton that her employment was terminated. (*Id.* ¶ 58.) The termination was "without

10

cause" under Talton's Employment Agreement. (*Id.*) As a result of her termination, she contends, Unisource lost most of its customers, business, and status as a minority business enterprise, which she says greatly lowered the value of the company. (*Id.*)

Talton further alleges that most of Unisource's customers came to the company because of her. (*Id.* ¶ 59.) Talton alleges she had an excellent reputation in the industry and was the face of Unisource. (*Id.*) At the time that the directors fired Talton, they did so without cause and had not yet found a suitable replacement. (*Id.*)

## Discussion

The Court may dismiss a complaint for failure to state a claim upon which relief may be granted only if it appears that the plaintiff can prove no set of facts entitling them to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The Court must accept all pleaded allegations of the complaint as true, and must view those allegations in the light most favorable to the plaintiffs. *Vaden v. Village of Maywood*, 809 F.2d 361, 363 (7th Cir. 1987).

### A.    Count I: Unisource Defendants

In Count I, Talton seeks relief under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission. To state such a claim, one must allege that the defendant: (1) made a misstatement or omission, (2) of a material fact, (3) with scienter, (4) in connection with the purchase and sale of securities, (5) upon which the

11

plaintiff relied and (6) that reliance proximately caused plaintiff's injuries. *In re Allied Prods. Corp. Inc. Sec. Litig.*, No. 99 C 3597, 2000 WL 1721042, at *2 (N.D. Ill. Nov. 15, 2000).

Normally any allegation of fraud is subject to the heightened pleading standards of Rule 9(b). FED. R. CIV. P. 9(b). Plaintiffs must state the circumstances constituting fraud with particularity. *Id*. In this circuit, this has been interpreted as the "who, what, when, where, why, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *see also Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir. 1991) ("[P]arties pleading fraud in federal court . . . must state the time, place, and content of the alleged communications perpetrating the fraud.") (internal quotations omitted). "The purpose . . . of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In addition, when pleading securities fraud, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires a plaintiff to go one step further and allege, with particularity, each statement alleged to have been misleading and the reasons why they were misleading. 15 U.S.C. § 78u-4(b)(1) (West 2000). Further, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendants acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). If these requirements are not met, the Court shall dismiss the complaint. 15 U.S.C. 78u-4(b)(3).

When taken together, Rule 9(b) and the PSLRA make it clear that a plaintiff must aver which defendants said what, to whom, and when. *Ackerman*, 172 F.3d at 171; *see also Mills v.*

12

*Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990).  Where a plaintiff alleges that a group of individuals is part of a fraudulent scheme, he or she must put each defendant on notice of his or her alleged role.  *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994).

The Unisource defendants argue that Talton has failed to state adequately a claim under the PSLRA, specifically arguing that the first amended complaint does not plead with sufficient particularity the necessary elements of a fraud claim against each of the Unisource defendants. The Unisource defendants also argue that Talton's group allegations should be ignored, that her purported injury did not occur in connection with the purchase and sale of securities, that she has failed to allege scienter, that she did not reasonably rely on the alleged statements regarding her continued employment, and that she has failed to allege causation.

In response to the Unisource Defendants' motion to dismiss, Talton argues that the first amended complaint does indeed plead 1) the allegations against each of the directors with sufficient particularity, 2) facts that create a strong inference of the defendants' intent, 3) that her reliance was reasonable, and 4) facts that satisfy the causation element.

Talton's first amended complaint satisfies the necessary standard.  In the first amended complaint, Talton alleges that the Directors conspired to fire her in order to advance their own interests in the Company.  Courts, both in this circuit and others, have held that a plaintiff may not vaguely attribute a fraudulent statement to a group of defendants.  *Sears*, 912 F.2d at 893; *see also Mills*, 12 F.3d at 1175 ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'") (quoting *Luce v. Edelstein*, 802

F.2d 49, 54 (2d Cir. 1986)). However, she has now provided detail of sufficient specificity regarding the securities fraud allegations to allow her complaint to withstand the defendants' motion. For example, she alleges that Collins and Doerer assured her that she would remain the CEO of Unisource at the January 17, 2000 closing of the interim financing. (First Am. Compl. ¶¶ 29-30.) Collins and Doerer likewise agreed and represented to Talton that her continued position as an executive with Unisource was critical to the Company's success in a meeting that occurred between January 17, 2000 and February 22, 2000. (*Id.* ¶ 40.) Fields allegedly assured Talton on March 20, 2000 that she would not be fired from her position as CEO of the Company. (*Id.* ¶ 53.) The remaining directors, Chamberlain, Edgerton, and Threadgill all allegedly remained silent at meetings at which they and Talton were present when the Directors named above made affirmative statements assuring Talton that she would remain with the Company in either an executive position or as CEO. (*Id.* ¶¶ 30, 32, 48.) Thus, in the first amended complaint, Talton specifies what was said (or, by omission, what was not said), by whom, and when. She alleges what role each of the defendants played in the alleged agreement.

Furthermore, Talton has now alleged that the defendants each made a misstatement or omission of a material fact with scienter in connection with the purchase and sale of securities, upon which she relied, and that reliance proximately caused her injuries. The Unisource defendants argue on page thirteen of their memorandum in support of their motion that Talton could not have reasonably relied on the oral statements allegedly either made or not refuted regarding the security of her job, citing *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000). The *Rissman* holding provides that a plaintiff cannot reasonably rely on oral representations made to

14

modify terms of a written agreement. *Id.* at 383. As the Unisource defendants point out, the Seventh Circuit has elaborated on this doctrine stating, "if a literate, competent adult is given documents that in readable and comprehensible prose says X (X might be, 'this is a risky investment'), and the person who hands it to him tells him orally, not-X ('this is a safe investment'), a literate and competent adult cannot maintain an action for fraud against the issuer of the document." *Carr v. Cigna Sec., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996). In this case, the Unisource defendants admit that none of the written documentation pertaining to the purchase and sale of securities makes any representation about Talton's employment (Unisource Defs.' Mem. Supp. Mot. Dismiss Pl.'s First Am. Compl. at 12-13.) Therefore, this is a situation where the oral representation states "X" and the written document says nothing, and this issue, therefore, is not reached by the *Rissman* holding.

Talton further alleges that reliance on the misstatements caused her injuries. According to her first amended complaint, Talton's reliance on the misstatements caused her promissory notes to be "virtually worthless." (First Am. Compl. ¶ 57.) Therefore, Talton has properly pleaded facts alleging the elements of her Count I claims. Because the Court denies the Unisource defendants' motion to dismiss Count I, the Court consequently denies their motion to dismiss the remaining supplemental state law claims because supplemental jurisdiction over those claims, at least at this point in the litigation, is proper.

## B. Counts II and IV:  The Venture Capitalists

The Venture Capitalists argue that the Court should decline to exercise supplemental jurisdiction over Talton's Count IV state law claim against the Venture Capitalists because the federal and Count IV (breach of fiduciary duty) claims are based upon different factual allegations.  As the Venture Capitalists raise no arguments about supplemental jurisdiction of the other state law claims, only Count IV will be addressed in that respect.  Further, the Venture Capitalists argue that Count II (common law fraud) should be dismissed because Talton seeks no judgment against the Venture Capitalists.  Finally, the Venture Capitalists argue dismissal of Count IV stating that they do not control Unisource and, therefore, owe no fiduciary duty to other shareholders.  In response to the Venture Capitalists' motion to dismiss, Talton argues that the state law claims, Counts II and IV, share a common nucleus with the federal claims and that both Counts state a proper cause of action.

### 1. Motion to Dismiss Count IV for Lack of Supplemental Jurisdiction

The United States Code provides supplemental jurisdiction over state claims when the state claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367.  In the seminal case *United Mine Workers of America v. Gibbs*, the Supreme Court of the United States interpreted the doctrine of supplemental jurisdiction, then pendent jurisdiction, to mean that the state and federal claims "must derive from a common nucleus of operative fact."  383 U.S. 715, 725 (1966).  The Supreme Court further added that if "a

16

plaintiff's claims are such that [s]he would ordinarily be expected to try [the federal and state claims] all in one judicial proceeding . . . there is power in federal courts to hear the whole." *Id.* Lastly, Seventh Circuit case precedent provides that "a loose factual connection" will generally suffice. *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995).

In this case, both the federal and state claims pertain to similar and sometimes the same set of facts. The difference between the federal claim, Count I, and the state claim, Count IV, lies merely in the amount of facts to which each claim cites. For example, Count I specifically incorporates the actions of the defendants from November 1999 through March 2000, paying special attention to the period of January 17, 2000 through March 22, 2000. (First Am. Compl. ¶¶ 69, 70.) Talton incorporates all facts that allege her resistance to the actions of the directors as well as alleged false representations that culminated in the plan to terminate Talton as chief executive officer. (*Id.* ¶¶ 68-78.) With respect to Count IV, Talton alleges the same facts that led to her termination but specifically uses them to demonstrate the breach of a fiduciary duty. (*Id.* ¶¶ 92-96.) As the first amended complaint demonstrates, Talton uses the same "common nucleus of operative facts" for both the federal and state claims, but merely alludes to more facts in order to prove her state law claim of breach of fiduciary duty. Therefore, supplemental jurisdiction over Talton's Count IV state claims, at least at this point in the litigation, is proper.

### 2. Motion to Dismiss Counts II and IV for Failure to State a Claim Upon Which Relief May Be Granted

The Venture Capitalists argue that Counts II and IV of the first amended complaint should be dismissed for failure to state a claim. Regarding Count II, the common law fraud count, Collins, Doerer, and Threadgill were appointed directors by the Venture Capitalists. As such, the entities that they represented may be held liable for the alleged fraud committed by them. Regarding Count IV, the breach of fiduciary duty count, Talton has alleged that the Venture Capitalists held actual control of the company and, as a result, owed her a duty not to promote their own interests over that of the entire company. The allegations as plead in the first amended complaint are sufficient for Counts II and IV to withstand the Venture Capitalists' motions to dismiss for the reasons stated below.

### a.  Count II:  Common Law Fraud Claim

With respect to the Count II claim of common law fraud, the Venture Capitalists argue that since there is no specific request for a remedy against them, the count should be dismissed for failure to state a cause of action. Talton, on the other hand, argues that the Venture Capitalists are mentioned in the request for remedy first, as the principals of the agents/directors, and second, directly through the subordination agreement.

The Venture Capitalists argue that since Talton only asks for judgment in her favor against "each of the Directors," the count fails to state a claim upon which relief can be granted with respect to them specifically. However, Talton argues that the Venture Capitalists are liable to her through the theory of agent and principal liability. The principal-agent doctrine exists as a

18

fiduciary relationship between two parties. *Knapp v. Hill*, 657 N.E.2d 1068, 1071 (Ill. App. Ct. 1995). To determine whether a principal-agency relationship exists, courts examine whether the principal had the right to control the activities of the agent. *Id.* (citations omitted). Generally, a principal may be liable to third persons for the "tortious acts committed by his agent at his direction or while acting within the scope of [the agent's] authority." *City of Chicago v. Roppolo*, 447 N.E.2d 870, 878 (Ill. App. Ct. 1983). Specifically, when an agent acts within the scope of his apparent authority, the principal is liable for the agent's misrepresentations that cause pecuniary loss to a third party. *Am. Soc'y of Mech. Eng'rs, Inc., v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982).

As Talton alleges in her first amended complaint, the Venture Capitalists elected three people, Doerer, Collins, and Threadgill, to the board of directors and a fourth, Fields, with the cooperation of Talton. (First Am. Compl. ¶ 13.) At certain times during the November 1999 - March 22, 2000 period, the directors made alleged misrepresentations to Talton which culminated in her signing the subordination agreement. Specifically, the first amended complaint alleges that the directors 1) falsely explained why certain "put rights" were changed in contracts concerning Unisource, 2) alleged that the Venture Capitalists were out of money and would not invest additional capital as a way to get Talton to invest her money, and 3) misrepresented to Talton that her job was secure with Unisource on numerous occasions. (*Id.* ¶¶ 29-30, 42, 32, 48-49, 53.) The first amended complaint further alleges that the Venture Capitalists allowed the directors to speak for them with respect to certain issues, including the subordination agreement in question in Count II. (*Id.* ¶ 50.) It is this subordination agreement,

19

among other things, that Talton alleges cost her money as it subordinated her promissory notes in the company to those of the Venture Capitalists, making her notes "virtually worthless." (*Id.* ¶ 57.) Therefore, the directors, acting within the scope of their apparent authority, are alleged to have made misrepresentations upon which Talton relied and which caused her pecuniary loss. In sum, Talton alleges that the Venture Capitalists are liable to her as principals.

Talton, in her alternative requests for remedy with respect to Count II, asks the Court to rescind her investments from the January/December and February Interim Financing as well as the subordination agreement. (*Id.* ¶ 86.) As Talton alleges in the first amended complaint, she personally invested more money during the February interim because the Venture Capitalists failed to procure outside funding and because the Venture Capitalists stated that they would not make any further investments in Unisource. (*Id.* ¶¶ 41-42.) Furthermore, Talton alleges that 1) "the Venture Capitalists, through Collins, Threadgill and Doerer, offered to invest $300,000 in the company in exchange from convertible promissory notes," 2) the Venture Capitalists were issued the notes, and 3) as a condition of the investment, Talton subordinated all of her notes to those of the Venture Capitalists. (*Id.* ¶¶ 50-52.) These facts work to establish the reasonable inference that the subordination agreement came about through the actions of the Venture Capitalists and that they would *only* agree to their proposed investment if Talton promised to subordinate her notes to them through the agreement. Therefore, the Venture Capitalists are alleged to be inherently linked to the requested rescission of the agreement that their actions manifested, and the rescission request thus gives them notice of the claims against them in Count II of Talton's first amended complaint. However, the complaint does not specifically request

any relief or remedy against the Venture Capitalists. Talton is, therefore, given leave to amend her prayer for relief in Count II to include her request regarding the Venture Capitalists.

Therefore, Talton has pleaded two separate sets of facts which, if proven, would allow her to hold the Venture Capitalists liable with respect to the common law fraud claim. Accordingly, the Venture Capitalists' motion to dismiss for failure to state a claim with respect to Count II is denied.

### b. Count IV: Breach of Fiduciary Duty Claim

With respect to Count IV, Talton has alleged that the Venture Capitalists are liable to her because they breached a fiduciary duty – a duty the Venture Capitalists maintain they do not have. Illinois case law provides that "the law is uncontroverted that the individuals who control corporations owe fiduciary duties to their corporation and its shareholders." *Jaffe Commercial Fin. Co. v. Harris*, 456 N.E.2d 224, 230 (Ill. App. Ct. 1983). The fiduciary duties owed prohibit those controlling individuals from enhancing their personal interests over those of the corporation. *Id.*

As Talton properly alleges in her first amended complaint, the Venture Capitalists purchased a total of 3,050,001 shares of Class B stock in Unisource and were allowed to nominate three directors to the board on their own – Doerer, Collins, and Threadgill – and one in conjunction with the Plaintiff – Fields. (First Am. Compl. ¶¶ 12-13.) Furthermore, the first amended complaint alleges that as early as February 1999, the Venture Capitalists, through

21

private placement, bought additional stock that gave them a 31% interest in Unisource.[2] (*Id.* ¶ 16.) As compared with the other stock apportionments alleged in the first amended complaint, including Talton's ownership of approximately 26% of the stock, the Venture Capitalists owned a majority and controlling share of the corporation. (*Id.* ¶ 16.) Since it is alleged that the Venture Capitalists owned a majority share of the stock and controlled three of the directors directly and a fourth indirectly, they controlled the corporation and owed Talton fiduciary duties. (*Id.* ¶¶ 13, 16.)

The first amended complaint alleges the Venture Capitalists breached their fiduciary duties when they attempted to enhance their personal interests over those of Unisource as well as other alleged breaches. (*Id.* ¶¶ 66, 95.) Talton alleges that the Venture Capitalists provided $500,000 to cure the cash flow problem of Unisource so as to improve their position in the event of a sale of the corporation. (*Id.* ¶ 22.) Additionally, Talton alleges that though they knew Unisource was severely undercapitalized, they pursued no outside source to obtain financing. (*Id.* ¶ 41.) Talton also alleges that the Venture Capitalists participated in a plan to force her to contribute capital to keep the company afloat. (*Id.* ¶ 42.) Lastly, Talton alleges that the Venture Capitalists contracted for the subordination agreement so that their investment in the corporation would be protected. (*Id.* ¶¶ 53-54.) She adds they did not want it used to pay Talton the money she was owed on her investment, even though they knew Unisource was facing bankruptcy. (*Id.* ¶¶ 54-55.) In the end, the Venture Capitalists were allegedly paid on notes while those of Talton were worthless because of the subordination agreement. (*Id.* ¶ 57.) Taken together, all the facts

---

[2] See also ¶ 66(e) of the First Amended Complaint in which Talton alleges that the Venture Capitalists owned 44% of the shares in November 1999.

asserted in conjunction with Count IV state a claim that the Venture Capitalists owed Talton a fiduciary duty of good faith and fair dealing, a duty which she alleges they breached.

Additionally, in this motion to dismiss, the Court accepts as true the properly plead allegation that Unisource is a close corporation in which the corporate stock is held in a few hands. (First Am. Compl. ¶ 93.) Plaintiff therefore asserts that the Venture Capitalists are liable to her since holders of stock in a closely held corporation owe each other fiduciary duties to deal "fairly, honestly, and openly with their fellow stockholders and to make disclosure of all essential information." *Hagshenas v. Gaylord*, 557 N.E.2d 316, 323 (Ill. App. Ct. 1990) (citing *Helms v. Duckworth*, 249 F.2d 482, at 486-87 (D.C. Cir 1957)). Asserting the same facts as above, Talton has alleged that the Venture Capitalists are also liable for breach of fiduciary duties under the approach that those duties are owed as a closely held corporation. Therefore, dismissal of Count IV with respect to the Venture Capitalists would be improper and their motion is denied.

## Conclusion

For the above reasons, the Unisource defendants' (Unisource Network, Fields, Edgerton, Collins, Doerer, Threadgill, Chamberlain, and Jordan) and Venture Capitalists' (Polestar Capital Inc., Polestar Capital II, Polestar Capital III, and Atlantic Coastal Investors) motions to dismiss [doc. nos. 44-1 and 45-1] are denied. Defendants are given ten days from the date of this Memorandum Opinion and Order to answer.

**IT IS SO ORDERED**                                 ENTERED:  *9-5-02*

**HON. RONALD A. GUZMAN**
**United States Judge**