## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SHEILA G. TALTON,         )
                               )
                Plaintiff,     )
                               )
      v.                    )    No. OO C 7967
                               )
UNISOURCE NETWORK SERVICES,   )    Judge Guzman
INC., et al.,                )
                               )
              Defendants.   )

**FILED**

OCT 0 7 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**

OCT 0 8 2002

## NOTICE OF FILING AND CERTIFICATE OF SERVICE

**TO:**    Kathleen H. Klaus               Howard M. Hoffman
        D'Ancona & Pflaum, LLC       Trent P. Cornell
        111 East Wacker Drive        Duane Morris LLC
        Suite 2800                 227 W. Monroe Street
        Chicago, IL 60601           Suite 3400
        Fax (312) 602-3000         Chicago, IL 60606
                                    Fax (312) 499-6701

**PLEASE TAKE NOTICE** that on October 7, 2002, we filed with the Clerk of the United States District Court, for the Northern District of Illinois, Eastern Division, *Answer to First Amended Complaint, Affirmative Defenses and Counterclaim*, a copy of which is enclosed and hereby served upon you.

## CERTIFICATE OF SERVICE

Catherine E. Lamsens, an attorney, certifies that on October 7, 2002, she caused the foregoing *Answer to First Amended Complaint, Affirmative Defenses and Counterclaim* to be served on the attorneys named above via messenger.

POLESTAR CAPITAL, INC., POLESTAR CAPITAL FUND II, L.P., POLESTAR CAPITAL FUND III, L.P. and ATLANTIC COASTAL VENTURES, L.P.

By: _____
        One of Their Attorneys

David I. Herbst
Catherine E. Lamsens
BUTLER RUBIN SALTARELLI & BOYD
Three First National Plaza
70 W. Madison St., Suite 1800
Chicago, IL 60602
(312) 444-9660

W:\P\Polestar\Talton\Pleadings\NOF-COS.cel-021007.doc

IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHEILA G. TALTON, on behalf of herself and )
derivatively on behalf of Unisource Network Services, Inc., )
                                              )

Plaintiff, )
                                              )

v.                                              )     No. 00 C 7967
                                              )     Judge Guzman

UNISOURCE NETWORK SERVICES, INC., an Illinois )
corporation, POLESTAR CAPITAL, INC., a Delaware )
corporation, POLESTAR CAPITAL FUND II, L.P., )
POLESTAR CAPITAL FUND III, L.P., ATLANTIC )
COASTAL INVESTORS, L.P., MICHAEL FIELDS, )
JERRY EDGERTON, DERRICK COLLINS, JOHN )
DOERER, WALTER THREADGILL, WOODY )
CHAMBERLAIN and THURMAN JORDAN, )
                                              )

                        Defendants. )

## ANSWER TO FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendants Polestar Capital, Inc., Polestar Capital Fund II, L.P., and Polestar Capital

Fund III, L.P. (collectively "Polestar") and Defendant Atlantic Coastal Ventures, L.P., sued as

Atlantic Coastal Investors, L.P., ("Atlantic Coastal") (collectively "the Shareholder Defendants")

answer the First Amended Complaint as follows:

### INTRODUCTION

1.    Talton is the former President and Chief Executive Officer of Unisource. She began the
Company in 1986 and ran it until April 7, 2000, when her employment was terminated
without notice or cause. Immediately prior to the termination of her employment at
Unisource, Fields, Edgerton, Collins, Doerer, Threadgill and Chamberlain (jointly, the
"Directors") induced Talton to invest $350,000 in the Company in exchange for
promissory notes ("Series 4 Note") and warrants in Unisource stock and to subordinate
her notes to other notes owned by entities in which certain Directors were principals.
When the Company sold Talton the Notes and Warrants and asked her to subordinate her
debt, the Directors told Talton she would continue to be employed by the Company and
failed to inform Talton that they planned to fire her, a material misrepresentation and
omission constituting fraud under the federal securities laws. Talton brings this action to
redress that fraud, the Directors' mismanagement of the Company and other injuries
caused by the Defendants.

**ANSWER:** The Shareholder Defendants admit that Talton is the former President and Chief Executive Officer of Unisource, that Talton's employment was terminated on April 7, 2000, that Talton invested $350,000 in the Company in exchange for promissory notes and warrants in Unisource stock, and that Talton subordinated her notes to other notes. The Shareholder Defendants deny the remaining allegations of Paragraph 1.

## JURISDICTION AND VENUE

2. Talton's claims arise, in part, under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. 15 U.S.C. §§ 78j(b); 17 C.F.R. §§ 240.10b-5. Jurisdiction therefore is proper under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. Talton's state law claims are so related to the federal claim that they are part of the same case and controversy as her federal claim. Jurisdiction over the state law claims therefore is conferred by 28 U.S.C. § 1367.

**ANSWER:** The Shareholder Defendants deny that Talton's state law claims are so related to the federal claim that they are part of the same case and controversy as her federal claim and deny that the Court has jurisdiction over the state law claims. The Shareholder Defendants admit the remaining allegations of Paragraph 2.

3. The actions and omissions giving rise to Talton's claims occurred in this District. Venue therefore is appropriate under 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa.

**ANSWER:** The Shareholder Defendants admit that, if the Court has jurisdiction over Talton's state law claims, this Court would be the proper venue for Talton's claims. The Shareholder Defendants deny the remaining allegations of Paragraph 3.

## THE DEFENDANTS

4. Unisource is an Illinois corporation which assists its clients in establishing and maintaining computer networks.

2

**ANSWER:** The Shareholder Defendants admit that Unisource was an Illinois corporation that assisted its clients in establishing and maintaining computer networks. The Shareholder Defendants deny that Unisource is now engaged in any business or now has any clients.

5. Polestar is a Delaware investment corporation with its principal place of business in Chicago, Illinois. Polestar Capital Fund II, L.P. and Polestar Capital Fund III, L.P. are Illinois limited partnerships associated with Polestar. Collins and Doerer are investors in and principals of Polestar. Doerer is its president. Collins and Doerer are directors of Unisource.

**ANSWER:** The Shareholder Defendants admit that Polestar Capital, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois, that Polestar Capital Fund II, L.P. and Polestar Capital Fund III, L.P. are Illinois limited partnerships, that Doerer is an investor in and president of Polestar Capital, Inc., and that Collins and Doerer were directors of Unisource. The Shareholder Defendants deny the remaining allegations of Paragraph 5.

6. Atlantic is a District of Columbia limited partnership engaged in the business of investing venture capital. Threadgill is an investor in and manager of Atlantic and a director of Unisource.

**ANSWER:** The Shareholder Defendants admit that Threadgill was a director of Unisource. The Shareholder Defendants deny the remaining allegations of Paragraph 6.

7. Chamberlain has a beneficial interest in shares of the Company through his investment company Doerge-Unisource, L.P. ("Doerge"), a shareholder of Unisource. He is also a director of Unisource.

**ANSWER:** The Shareholder Defendants admit that Doerge-Unisource, L.P. was a shareholder of Unisource and that Chamberlain was a director of Unisource. The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 7 and therefore deny those allegations.

8. Fields and Edgerton are directors of Unisource.

3

**ANSWER:** The Shareholder Defendants admit that Fields and Edgerton were directors of Unisource.

9.  Jordan is the Company's Chief Executive Officer. While Talton was with the Company, he was its Chief Financial Officer.

**ANSWER:** The Shareholder Defendants admit that Jordan was the Company's Chief Executive Officer and that while Talton was employed by the Company, Jordan was its Chief Financial Officer.

## FACTS COMMON TO ALL COUNTS

10. Talton began Unisource in 1986 and, at the time, was its President, Chief Executive Officer and majority shareholder. For the first fourteen years of its existence, Talton ran and grew Unisource through her many important contacts in the computer industry and government agencies. Talton began the Company with three employees. By 1998, the Company employed 70 people and had nearly $7 million in sales. While Talton was employed by the Company, its customers included the Chicago Public Schools and McDonald's Corporation. Under Talton's direction, Unisource also designed and built the telephone system used in the Euro-Tunnel.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 10 relating to the time prior to 1998 and therefore deny those allegations. The Shareholder Defendants admit that the Company had 70 employees and that its customers included the Chicago Public Schools and McDonald's Corporation. The remaining allegations of Paragraph 10 are denied.

### A.    Talton Brings On Investors.

11. As the Company grew, so did its need for capital. In an effort to raise that capital, Unisource sold its stock through several private placements. The first such stock sale occurred in July 1996, when Unisource sold Doerge 10% of the Company's authorized shares and CI & Associates Software Consulting, Inc. 15% of the Company's authorized shares. As part of that transaction, Chamberlain received his seat on Unisource's board.

**ANSWER:** The Shareholder Defendants deny that there was a single Doerge transaction by which Chamberlain received his seat on Unisource's board, that CI & Associates Software Consulting, Inc. acquired its 15% of the Company's authorized shares in July 1996, and that Chamberlain received his seat on Unisource's board as part of that July 1996 transaction. The Shareholder Defendants admit the remaining allegations of Paragraph 11.

12. In January 1998, the Company executed another major financing transaction that resulted in Talton losing her controlling interest in the Company. Polestar and Atlantic (jointly, the "Venture Capitalists") purchased a total of 3,050,001 shares of Class B, Series I preferred stock in Unisource. Small amounts of Class B, Series 1 shares were sold to other shareholders by a conversion of those shareholders' common stock or debt.

**ANSWER:** The Shareholder Defendants admit that they purchased shares in the Company in January, 1998, and that after the purchase Talton did not have control. They deny that they purchased 3,050,001 shares of Class B, Series I preferred stock as alleged in Paragraph 12.

13. As part of the January 1998 private placement, the Venture Capitalists were allowed three seats on the Board and nominated Doerer, Collins and Threadgill as directors. Talton was allowed two seats and nominated herself and Edgerton. Fields was put on the Board by agreement between Polestar and Talton.

**ANSWER:** The Shareholder Defendants admit that as part of the January 1998 private placement the Shareholder Defendants, as holders of preferred stock, were allowed to select three of the directors on Unisource's Board of Directors and nominated Doerer, Collins and Threadgill as directors. The Shareholder Defendants further admit that holders of common stock, including Talton, Doerge and CI & Associates, were allowed to select three of the directors on Unisource's Board of Directors and that the common stockholders nominated Talton, Edgerton and Chamberlain as directors. The Shareholder Defendants further admit that Fields was put on Unisource's Board of Directors by agreement between the preferred stockholders and the

common stockholders. The Shareholder Defendants deny the remaining allegations of Paragraph 13.

14.     The shareholders that participated in these transactions, including Talton, were awarded pre-emptive rights with their stock. This meant that each of these shareholders had a right but not the obligation to participate in any future stock offerings on the same terms and conditions as the offering stock purchasers.

**ANSWER:** The Shareholder Defendants admit that the shareholders had preemptive rights. The Shareholder Defendants deny the paraphrase contained in Paragraph 14 to the extent that it varies from Paragraph 7.1 of the January 29, 1998 Stock Purchase Agreement.

15.     In connection with the 1998 stock transaction, Talton and Unisource executed an employment contract ("Employment Contract"), which provided that Talton would be employed as the Company's President and Chief Executive Officer until December 31, 2000. The Employment Contract provided that Talton could only be terminated for "cause" and that if Unisource wanted to fire her without cause, it had to give her 60 days notice.

**ANSWER:** The Shareholder Defendants admit that, on February 5, 1998, Talton and Unisource entered into an employment contract that pursuant to which Talton would be employed by the Company until December 31, 2000, unless earlier terminated pursuant to Section 7 of the Employment Contract, and would carry the titles of Chairman of the Board of Directors, President and Chief Executive Officer of the Company. The Shareholder Defendants further admit that the Employment Contract provided that Talton's employment could be terminated with cause at any time upon written notice and without cause upon 60 days written notice. The Shareholder Defendants deny the remaining allegations of paragraph 15.

**B.     The December/January Interim Financing.**

16.     The Venture Capitalists bought additional stock in a February 1999 private placement. After these sales and prior to the acts giving rise to this suit, Talton owned approximately

26% of stock, the Venture Capitalists owned approximately 31%, Doerge owned 10%, 14% was held by an ESOP and various other shareholders held the remaining stock.

**ANSWER:** The Shareholder Defendants admit that after the February 1999 private placement Talton and the shareholders listed above, other than the Shareholder Defendants, owned common stock and the Shareholder Defendants owned convertible preferred participating stock which, on an as-converted basis, constituted the percentages of total fully-diluted shares of Unisource as alleged, except that the Shareholder Defendants owned approximately 33%.

17.     Soon after the 1999 private placement, the Venture Capitalists decided to divest their holdings in Unisource and started seeking a buyer for the Company.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 17.

18.     At the same time, Unisource began to experience cash flow problems. Talton therefore sought additional investors or purchasers who could provide a necessary cash infusion for the Company. Talton spoke with several potential purchasers and investors, including SANWA Bank, but none were able to close a deal by the end of 1999. SANWA's initial valuation for investing in the Company was $12 million.

**ANSWER:** The Shareholder Defendants deny that Unisource's cash flow problems began soon after the 1999 private placement. The Shareholder Defendants admit the remaining allegations of Paragraph 18.

19.     Doerer, Collins, Threadgill and Chamberlain wanted to sell the Company and refused to entertain any investment proposal that resulted in the Venture Capitalists losing control of the Company. As directors, they promoted their individual interest of the Venture Capitalists and Doerge, rather than the interests of the Company.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 19.

20.     Talton was willing to sell the Company if the terms were right for all shareholders, but believed that the Company should also consider offers from investors interested in purchasing a portion of the Company. These investors' contributions would produce the cash infusion necessary to cure Unisource's chronic cash flow problems and would improve its marketability, a matter that would inure to the benefit of all of the Company's shareholders, not just the Venture Capitalists.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 20 and therefore deny those allegations.

21.     Talton also sought and obtained offers from potential investors, including John Bank. In November 1999, Bank indicated that he was willing to invest $500,000 in the Company on certain terms and conditions and raise an additional $1 million, including obtaining a seat on the Board.

**ANSWER:** The Shareholder Defendants admit that Talton sought and obtained offers from potential investors, including John Bank, and that, in November of 1999, Bank presented the Company with a proposal for an investment in the Company on certain terms and conditions, including obtaining a seat on the Board. The Shareholder Defendants deny the remaining allegations of Paragraph 21.

22.     Because the Venture Capitalists believed that the Company would be sold at a price which would yield them a significant return on their investment and because they wanted to improve their position in the Company in anticipation of such a sale, the Venture Capitalists made their own offer to provide the $500,000 that the Company needed to temporarily cure its cash flow problem.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 22.

23.     The Venture Capitalists' proposal called for them to invest $500,000 in exchange for convertible promissory notes totaling $500,000 and warrants in Class B, Series 2 preferred stock. The notes were to be due on March 31, 2000 because the Venture Capitalists believed that the Company would be sold by then. In addition, the Venture Capitalists demanded as a precondition to closing that Talton be required to vote with the majority on the issue of sale of the Company, regardless of the deal or its structure. Talton objected to this provision and to the Directors' attempts to force her to accept it.

**ANSWER:** The Shareholder Defendants admit that their proposal called for them to invest $500,000 in exchange for convertible promissory notes totaling $500,000 and warrants in Class B, Series 2 preferred stock. The Shareholder Defendants further admit that, as a precondition to

8

closing, Talton would be required to vote her shares for change of control of the company, if requested, and that Talton initially objected to this provision. The Shareholder Defendants deny the remaining allegations of Paragraph 23.

24. Rather than abstain from the decision between the competing offers, Collins, Doerer and Threadgill argued against and voted down Bank's proposal on November 29, 1999. After allowing the Venture Capitalists the opportunity to amend their offer, the entire Board, including Collins, Doerer and Threadgill, approved the Venture Capitalists' proposal on December 14, 1999. This was done with full knowledge that the Company had a $20 million offer from Eclipse Networks, Inc. ("Eclipse") to purchase the Company.

**ANSWER:** The Shareholder Defendants admit that, at the December 14, 1999 Board meeting, the Board approved Polestar Capital Partners' November 2, 1999 Proposed Term Sheet with certain amendments. The Shareholder Defendants deny the remaining allegations of Paragraph 24.

25. Talton wanted to participate in this financing with the same terms and conditions as the Venture Capitalists and told the Directors that she would exercise her pre-emptive rights. She also told the Directors that they would have to notify other shareholders of the proposal and provide them enough time to decide whether to invest. Doerer, Collins, Chamberlain and Threadgill balked at the idea of other shareholders participating in the bridge financing, wanting instead to increase their proportionate holdings of Unisource stock vis-a-vis the other shareholders. After much debate and legal counseling, all of the Directors reluctantly agreed that the Company would give the other shareholders notice, but against attempted to bar Talton from exercising her preemptive rights.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 25.

### C. The Directors Plan to Fire Talton.

26. During the wrangling between Talton and the Directors over the potential sale of the Company and Talton's insistence that the Directors adhere to the pre-emptive rights provisions in the previous financing documents, it became apparent to the Directors that Talton would thwart the Venture Capitalists' plan to increase their share in the Company at the expense of the current shareholders.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 26.

27.    At some time prior to the closing of the December/January Interim Financing, Doerer, Collins, Threadgill and Chamberlain decided that they would force Talton out of the Company. This would clear the way for Doerer, Collins, Threadgill and Chamberlain to operate the Company in a way that benefited the Venture Capitalists and Doerge, at the expense of the other shareholders.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 27.

28.    On information and belief, Doerer, Collins, Threadgill and Chamberlain discussed their plan to termination Talton's employment with Fields and Edgerton. Fields and Edgerton either agreed with or acquiesced in the plan and agreed not to reveal the decision to Talton.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 28.

**D.     The Directors Put Their Plan in Motion**

29.    The Directors took the first step in their plan to force Talton out of the Company and their scheme to defraud her on or about January 17, 2000 during the closing of the December/January Interim Financing. At the closing, , Collins and Doerer informed Talton that Polestar wanted to amend the closing documents to delete Polestar's put rights upon Talton's termination. When Talton questioned Doerer and Collins about change, they indicated the gesture was precautionary and that Talton would continue to serve as CEO and have an executive role with the Company.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 29.

30.    This representation was false, and Collins and Doerer knew the representation was false when they made it.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 30.

31.    At this time, Talton was the contact person on the Eclipse transaction. The Directors knew that Eclipse wanted Talton to remain with the Company in the event it purchased Unisource. Although the Directors wished to terminate Talton's employment immediately in retaliation for her actions to protect the Company and the other shareholders, they did not want to spoil the Eclipse deal. At the same time, they wanted to prepare someone to run the Company in the event the Eclipse deal fell through and they fired Talton.

**ANSWER:** The Shareholder Defendants admit that Talton was the contact person on the Eclipse transaction and that they knew Eclipse wanted Talton to remain with the Company as alleged in Paragraph 31. The Shareholder Defendants deny the remaining allegations of Paragraph 31.

32.     Talton expressed concern over the effect her removal from the Company's management would have on Unisource and asked the Directors to clarify her responsibilities. Talton specifically asked whether she would continue to be involved in operating the Company. The Directors assured her that she would be.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 32, except the allegation that the Directors assured Talton that she would continue to be involved in operating the Company, which allegation is denied.

33.     Talton, not Jordan, had the personal contacts with the Company's major clients. Talton, not Jordan, enjoyed a high profile in the industry and was extensively promoted by the Company as its leader. In addition, because Talton was an owner/operator of Unisource, the Company was able to qualify as a minority business enterprise with the City of Chicago and other government bodies and agencies. Finally, Talton believed that a significant change in management would send a bad signal to potential investors and Unisource's customers.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 33, except the allegation that the Company qualified as a minority business enterprise because Talton was an "operator", which allegation is denied, and except the allegation as to Talton's belief of which they are without sufficient knowledge to plead, and, therefore, deny.

34.     Based on the Collins and Doerer's assurances that she would continue to be the Company's CEO, Talton exercised her pre-emptive rights and invested $98,382 at the January 17, 2000 closing. Talton received convertible promissory notes totaling $98,422 and warrants to purchase 246,322 shares of Class B, Series 3 preferred stock (the "Series 3 Notes" and "Series 3 Warrants"). Copies of the Series 3 Notes are attached hereto as Exhibit A; copies of the Series 3 Warrants are attached hereto as Exhibit B.

**ANSWER:** The Shareholder Defendants deny that Collins and Doerer made assurances as alleged in Paragraph 34 and deny that Talton relied on any assurances. The remaining allegations of Paragraph 34 are admitted.

35.     At around this time, Eclipse sent a revised term sheet for its proposed purchase of Unisource. Included as a condition to the purchase of the Company was Talton's agreement to a three-year employment contract. No other information about the terms of Talton's employment were set forth in the term sheet. Talton indicated at the February 4,

2000 Board meeting that she could not agree to a three-year contract unless more specific terms were included. The Directors were outraged with Talton's reluctance to agree to an unqualified commitment to stay with the new entity for three years because it might impair the Eclipse deal.

**ANSWER:** The Shareholder Defendants admit that Eclipse sent a revised term sheet, that a three-year employment contract was a condition of the term sheet, that no other information concerning Talton's employment was set forth in the term sheet, and that, at the February 4, 2000 Board meeting, Talton reported that her personal attorney had instructed her not to sign the Letter of Intent without of understanding of the substantive components of her employment agreement. The remaining allegations of Paragraph 35 are denied.

36. In retaliation for Talton's refusal to instantly agree to the employment term of the Eclipse proposal, Collins and Doerer insisted that the Board be the point of contact for any future discussions with Eclipse or its financial backer Thoma Cressy ("Thoma") and instructed Talton that she was to have no communication with either entity unless another Board member was present.

**ANSWER:** The Shareholder Defendants admit that the Board of Directors, including Collins and Doerer, insisted that at least one other director attend all meetings between Eclipse or Thoma Cressy and Talton after learning that Talton had been placing her interests ahead of the interests of Unisource and its shareholders. The Shareholder Defendants deny the remaining allegations of Paragraph 36.

37. At a subsequent discussion of Eclipse's request that Talton agree to a three-year contract, Chamberlain angrily told Talton that she needed to make a "personal sacrifice" so that the other shareholders could benefit.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 37 and therefore deny those allegations.

38. When Talton again refused, the Directors set into motion the second part of their scheme to defraud and force Talton out of the Company and assured that she would make the "personal sacrifice" they demanded.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 38.

E. **The February 2000 Interim Financing**

39. The December/January financing package did not solve the Company's financial problems and by February 2000, Unisource was unable to meet its payroll.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 39.

40. Sometime after the January 17, 2000 closing, Talton met with Collins, Doerer and Bank at Polestar's offices to discuss additional capital into the Company. At the meeting, the group discussed the current management of the Company and Talton's continued role. Bank indicated that, in order for the Company to be viable, Talton would have to retain a role in executive management. Collins and Doerer agreed with Bank's comments and indicated that Talton's role and CEO was crucial to the success of Unisource.

**ANSWER:** The Shareholder Defendants admit that, sometime after the January 17, 2000 closing, Talton met with Collins and Bank at Polestar's offices, but deny that Doerer was present at the meeting. The remaining allegations of Paragraph 40 are denied.

41. Even though the Company was severely undercapitalized, after the initial meeting with Banks, the Venture Capitalists did not pursue obtaining funding from any outside source.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 41.

42. The Directors knew that, if backed into a corner, Talton would invest in the Company to keep it afloat. Doerer, Collins and Threadgill therefore told Talton that the Venture Capitalists would not make any further investment because they were out of capital.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 42.

43. Talton's employment was discussed at Board meetings and informally among Board members. For example, at a telephonic Board Meeting held on February 4, 2000, the Board discussed Talton's employment with Unisource in the context of the pending proposal from Eclipse. Collins, Doerer, Threadgill and Edgerton were present. Although they knew they intended to terminate Talton if the Eclipse deal did not close, none of the Directors revealed this fact to Talton.

13

**ANSWER:** The Shareholder Defendants admit that Talton's employment was discussed at Board meetings and informally among Board members, including Talton, and that Collins, Doerer, Threadgill and Edgerton participated in the February 4, 2000 telephonic Board meeting. The Shareholder Defendants deny the remaining allegations of Paragraph 43.

44. Each of the Directors also knew that Talton would not make any additional investment in the Company if she knew she were about to be fired.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 44.

45. As the Directors planned, Talton agreed to invest personally an additional $100,000 under the same terms as the previous interim financing agreement. Talton borrowed an additional $150,000 in cash from friends and invested their money in the February 22, 2000 Interim Financing pursuant to a Nominee Agreement executed between Talton and her lenders.

**ANSWER:** The Shareholder Defendants admit that Talton invested $100,000 under the same terms as the previous interim financing agreement, but deny that Talton did so in accordance with any plan of the Directors. The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 45 and therefore deny those allegations.

46. On or about February 22, 2000, Talton purchased 655,300 warrants in Class B, Series 4 preferred stock ("Series 4 Warrants") and was issued a convertible promissory note for $250,000 ("Series 4 Note"). A copy of the February 22, 2000 Interim Financing Agreement is attached hereto as Exhibit C; a copy of the Series 4 Warrants is attached hereto as Exhibit D; a copy of the Note is attached hereto as Exhibit E.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 46.

47. Both the Series 3 Notes and the Series 4 Note were due on March 31, 2000.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 47.

48. At no time prior to Talton's purchase of the Series 4 Warrants did any of the Directors indicate to Talton that her continued employment with Unisource was in jeopardy or contingent on the Eclipse deal closing.

**ANSWER:** The Shareholder Defendants have insufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in Paragraph 48 and therefore deny those allegations.

49. In fact, subsequent to January 17, 2000, the Directors each had assured her that she was of significant value as an employee of the Company because of her contacts in the industry and relationships with clients. Had Talton known of her precarious employment situation, she would not have invested in the Series 4 Warrants.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 49, except the allegations as to Talton's knowledge or motivation of which the Shareholder Defendants have insufficient knowledge or information to form a belief as to the truth or falsity and therefore deny those allegations.

F.     **The Subordination Agreement.**

50. Soon after Talton purchased the Series 4 Warrants, the deal with Eclipse collapsed and the Company again was unable to make payroll. This time, the Venture Capitalists, through Collins, Threadgill and Doerer, offered to invest $300,000 in the Company, in exchange for convertible promissory notes and additional Series 3 warrants.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 50.

51. On information and belief, the new notes were issued to the defendants Polestar Capital, Inc., Polestar Capital Fund II, L.P., Polestar Capital Fund III, L.P., Atlantic Coastal Investors, L.P.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 51 except they deny that notes were issued to Atlantic Coastal Investors, L.P.

52. As a condition of this investment, Collins, Threadgill and Doerer demanded that Talton agree to subordinate all of her Notes to all the notes issued to Venture Capitalists. They told her that, unless she agreed to the subordinate her Notes, they would make no additional investment and the Company would face bankruptcy.

**ANSWER:** The Shareholder Defendants deny that Collins, Threadgill and Doerer demanded that Talton agree to subordinate all of her Notes to all the notes issued to Venture Capitalists. Further

answering, the Shareholder Defendants state that, as a condition of the Shareholder Defendants'

additional investment, Talton was required to subordinate her Notes to the Notes newly-issued to

the Shareholder Defendants.  The Shareholder Defendants admit the remaining allegations of

Paragraph 52.

53.     They also assured her that she was valuable to the Company and gave no indication that
        she was about to be terminated.  In fact, on March 20, 2000 the Board discussed lay-offs
        the Company needed to make in order to cut costs.  At the meeting, Fields indicated that
        Unisource needed to get rid of some employees in the upper ranks of the Company.  In
        response to his concerns, Talton asked Fields whether her job was on the line, and he
        again stated it was not.  Again, none of the other Directors gave any indication to Talton
        that her employment was about to be terminated.

**ANSWER:**  The Shareholder Defendants admit that Collins, Threadgill and Doerer gave no

indication to Talton that she was about to be terminated, but deny that there was any plan to

terminate Talton at that time and deny that they assured Talton that she was valuable to the

Company.  The Shareholder Defendants admit that Fields stated that Unisource needed to

terminate some upper level employees.  The Shareholder Defendants deny that, at the March 20,

2000 meeting, Talton asked Fields whether her job was on the line, and that he stated that it was

not.  The Shareholder Defendants admit that, at the March 20, 2000 meeting, the other Directors

gave no indication to Talton that her employment was about to be terminated, but deny that there

was any plan to terminate Talton's employment at that time.

54.     Based on the Directors' representations that she would continue to run Company as its
        CEO, on March 22, 2000 Talton executed a Subordination Letter, a copy of which is
        attached hereto as Exhibit F.  The Directors knew that, if she were terminated, Talton
        would call her Note, which was due on March 31, 2000.  The Subordination Letter was
        therefore necessary in order to ensure that the Venture Capitalists March investment
        would not be used simply to pay Talton's debt.

16

**ANSWER:** The Shareholder Defendants admit that Talton executed a Subordination Letter, but deny that the document attached to the First Amended Complaint as Exhibit F is a subordination letter and deny the remaining allegations of Paragraph 54.

55.    The Subordination Letter purports to bar Talton from demanding payment on either the Series 3 Notes or the Series 4 Note, until the Venture Capitalists were paid on their notes.

**ANSWER:** The Shareholder Defendants deny that the Subordination Letter purports to bar Talton from demanding payment on either the Series 3 Notes or the Series 4 Note, until the Venture Capitalists were paid on their notes. Further answering, the Shareholder Defendants state that Talton was required to subordinate her Notes to the Notes newly-issued to the Shareholder Defendants.

56.    By inducing Talton to sign the Subordination Letter, the Directors took the final step in their plan to deprive Talton of the value of her $350,000 investment. If they had fired Talton without securing the Subordination Letter, Talton would have demanded payment on her notes and the Directors would have had to borrow $350,000 or face bankruptcy.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 56.

57.    Among other things, the Directors' scheme deprived Talton of her pre-emptive rights. The Venture Capitalists received valuable demand notes in exchange for their contribution. Talton received subordinated notes that were virtually worthless.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 57.

58.    On April 7, 2000, just two weeks after they demanded Talton subordinate her debt, the Directors informed Talton that her employment was terminated. The termination was "without cause" under Talton's Employment Agreement. As a result of her termination, Unisource lost most of its customers, business and status as a minority business enterprise and the value of the Company was greatly diminished.

**ANSWER:** The Shareholder Defendants admit that Talton's employment was terminated on April 7, 2000, that her termination was "without cause" under Talton's Employment Agreement, and that as a result of Talton's termination, the City of Chicago ruled that Unisource had lost its

17

status as a minority business enterprise. The Shareholder Defendants deny the remaining allegations of Paragraph 58.

### G. The Directors Breach Their Fiduciary Duties.

59. Most of Unisource's customers came to Unisource because of Talton. She had an excellent reputation in the industry and, for all intents and purposes, was the face of Unisource. None of the Directors had any experience in operating a computer network service provider and none had relationships with the Company's clients. At the time they fired her without cause, the Directors did not have a suitable replacement available to take over Talton's role, nor had they begun a search for one.

**ANSWER:** The Shareholder Defendants admit that none of the Directors had experience in operating a computer network service provider, and that none of the Directors had relationships with the Company's clients. The Shareholder Defendants deny the remaining allegations of Paragraph 59.

60. This was just one example of the Directors' proclivity for putting the interest of the Venture Capitalists over the interest of the Company.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 60.

61. Throughout the time that they were pursuing a sale of the Company, the Directors attempted to arrange a deal that would benefit the Venture Capitalists and Doerge over the other shareholders. For example, during the negotiations with Eclipse, Doerer and Collins flew to San Francisco to meet with John Bonnecore of Eclipse. Rather than talk about Unisource and the pending negotiations, Doerer and Collins told Bonnecore that Polestar was looking to open an office in Northern California and asked about participating in Thoma Cresse's (Eclipse's investor) other investments.

**ANSWER:** The Shareholder Defendants admit that Doerer and Collins met with John Bonnecore of Eclipse in San Francisco. The Shareholder Defendants deny the allegations of Paragraph 61.

62. Doerer and Collins' lack of professionalism in their dealings with Bonnecour injured the standing of Unisource with Eclipse and soon after the meeting with Bonnecour, Eclipse stopped taking calls from Unisource.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 62.

63.     Despite this set back, Talton continued to pursue potential purchasers for the Company. In March 2000, Talton had scheduled a meeting with Devine Investitures, a potential investor.  Prior to that meeting, the Directors demanded that Talton lay off employees in an attempt to improve the Company's financial position.  Talton asked the Directors to delay the RIF until after the meeting with Devine.  Talton believed that a reduction in force would weaken the Company's position with potential investors, because it was a strong signal that the Company was in significant financial trouble.  The Directors nonetheless insisted that the Company lay off approximately one-half of its technical staff immediately.

**ANSWER:**  The Shareholder Defendants admit that a meeting was scheduled with Divine Interventures, that, prior to that meeting, the Directors determined that a RIF was necessary given the Company's financial position, and that Talton opposed the RIF.  The Shareholder Defendants deny the remaining allegations of Paragraph 63, except those allegations as to Talton's beliefs about which the Shareholder Defendants have insufficient knowledge or information to admit or deny and therefore deny those allegations.

64.     In addition, Collins insisted upon accompanying Talton to the meeting with Devine. (sic) Rather than assist her in the presentation, Collins said nothing.  This sent a negative message concerning Talton's ability to represent the Board in negotiations and impacted on her effectiveness.  As a result, Unisource was not able to show a unified front to Devine. (sic)

**ANSWER:**  The Shareholder Defendants admit that Collins and Talton met with Divine Interventures.  The Shareholder Defendants deny the remaining allegations of Paragraph 64.

65.     Prior to the March meeting, Devine (sic) had been ready to fund a deal to purchase the Company.  As Talton anticipated, however, the RIF signaled to Devine (sic) that the Company was in trouble, and not worth purchasing.

**ANSWER:**  The Shareholder Defendants deny the allegations of Paragraph 65.

66.     During the period November 19, 1999 through the present, the other acts and omissions by the Directors constituting a breach of the duty of care and loyalty include the following:

        a.      Terminating Talton before finding a replacement and without allowing an orderly transition.  This unnecessarily endangered the Company's relationship with its clients and called into doubt Unisource's certification

as a minority business enterprise with the City of Chicago, one of its major customers;

b.  Refusing, without cause, to pay Talton the severance due under her Employment Contract;

c.  Retaining Jordan as the Company's President and Chief Executive Officer, although he had little operational experience, no relationships with the Company's clients and no contacts in the industry;

d.  Refusing to investigate employee complaints about Jordan being intoxicated while he was the Company's President;

e.  Structuring additional investments for the Venture Capitalists in a way that prevented other shareholders from exercising their preemptive rights. Talton repeatedly asked for information about the financial deals between the Company and the Venture Capitalists that followed her termination and no information was provided, other than to notify Talton that her position in the Company had somehow shrunk to around 20% while Polestar's increased to 44%;

f.  Refusing to accept an offer from Comdisco, a former customer, to perform a project that would have brought over $100,000 to the Company. The offer was rejected solely because Talton would have been associated with the project;

g.  Refusing to engage a broker to market the Company or make any other serious effort to sell immediately after terminating Talton's employment. The failure to act caused Unisource to lose a window of opportunity in which the Company could be sold after it lost its top officer;

h.  Refusing to have the Company valued after Talton's termination in order to determine its reasonable value. Instead, the Directors indicated that they would not consider an offer of less that $12 million;

i.  Instructing Jordan not to provide Talton with financial and other information about the Company, including information about the negotiations with the Company's bank over a loan the bank was asserting Talton had guaranteed;

j.  Operating the Company since Talton's termination through shadow, informal board meetings where the Company's business was discussed without Talton being present. Ms. Talton made repeated requests to be included in these meetings and for the directors to have formal board meetings;

20

k.  Ignoring inquiries from potential acquirers that Talton brought to the Company both before and after her termination, including Robert Blackwell;

l.  After hiring Jim Hill in August 2000 to sell new accounts, Unisource fired him in November 2000, costing the Company its relationship with MCI, one of its last significant clients;

m.  Setting a $1 million receivable with the VOLPE/Federal Aviation Administration for around $100,000 rather than allow Talton to assist in the collection of the accounts, although she had experience in negotiating settlement with FAA. The Directors permitted other receivables to be settled on the cheap, rather than permit Talton to assist in their collection;

n.  When the other shareholders were notified of the March financing in order to permit them to exercise their preemptive rights, they were not notified of the Subordination Letter;

o.  Refusing to provide Talton with information about loans or investments made by the Venture Capitalists after her termination, although she continued to be a director and a shareholder;

p.  Failing to communicate the Company's dire financial situation to the shareholders, until Talton threatened to send a letter on her own;

q.  Negotiating terms of a joint venture without sharing any information with Talton, although she remained on the Board; and

r.  Awarding management bonuses to Jordan and other management while the Company was insolvent; and

s.  Making additional investments or loans in the Company without Board approval, and the Directors who stood to benefit from those investments directed the drafting, terms and conditions of the deal.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 66.

67.  These acts and omissions injured Talton both directly as a shareholder and director and derivatively by negatively effecting (sic) the Company's operations and its marketability.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 67.

21

## COUNT I – VIOLATIONS OF SECTION 10-B OF THE
## SECURITIES EXCHANGE ACT AND RULE 10B-5
## (THE DIRECTORS AND COMPANY)

68.     Talton incorporates paragraphs 1 - 68 as paragraph 69 of Count I.

**ANSWER:** The Shareholder Defendants incorporate their responses to Paragraphs 1-68 as if

fully set forth herein.

69.     During the period November 1999 through March 2000, the Directors and the Company, in connection with the purchase or sale of securities, directly or indirectly, by the use of interstate commerce, of the mails, or the facilities of a national securities exchange, employed devices, schemes or artifices to defraud made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in acts or practices which operated as a fraud or deceit upon any person.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 69.

70.     During the period January 17, 2000 through March 22, 2000, the Directors continuously represented to Talton that she would continue to be employed as the CEO of Unisource.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 70.

71.     Specifically:

    a.     at the closing of the December 1999/January 2000 Financing, Collins and Doerer assured Talton that she would continue to be employed by the Company;

    b.     at the February 2000 meeting at Polestar, Collins and Doerer again assured Talton that she would remain with the Company in an executive role;

    c.     at the February 4, 2000 Board meeting, no Director told Talton that the Board intended to fire her if the Eclipse deal fell through; and

    d.     at the March 20, 2000, Board meeting, Fields (with the other Directors present) told Talton that, although other employees would be laid off, she would continue to serve as the Company's Chief Executive Officer.

**ANSWER:** The Shareholder Defendants admit that, at the February 4, 2000 Board meeting, no

Director told Talton that the Board intended to fire her if the Eclipse deal fell through, but deny

22

that the Board intended to fire Talton if the Eclipse deal fell through. The Shareholder

Defendants deny the remaining allegations of Paragraph 71.

72. Defendants knew or were reckless in not knowing that their representations and omissions to Talton regarding her continued and employment were false and misleading.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 72.

73. These representations and omissions were material because the removal of Talton from the Company's operations would have and did constitute a dramatic change in the management of the Company to the detriment of the Company. Talton had built Unisource and was the primary contact for most of its clients. Moreover, one of Unisource's major clients was the City of Chicago. Unisource was a certified minority business enterprise for the City of Chicago based on Talton's role as an operating shareholder. There were no other individuals associated with the Company who satisfied the criteria for minority business enterprise certification and no one else had the relationships with the customer. The decision to remove Talton from the Company endangered vital client relationships and the continued viability and operations of the Company.

**ANSWER:** The Shareholder Defendants admit that Talton started Unisource, that she was the

primary contact for most of its clients, that one of Unisource's major clients was the City of

Chicago, and that Unisource was a certified minority business enterprise for the City of Chicago

based on Talton's role as a shareholder. The Shareholder Defendants deny the remaining

allegations of Paragraph 73.

74. Talton relied on Defendants' representations that she would continue to be involved in the management of the Company when she made the decision to invest in the Warrants, the Notes and in agreeing to subordinate her Notes. Her reliance was reasonable, given her importance to the Company and the Directors' repeated assurances that she would not be terminated.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 74.

75. Talton would not have invested in the Series 3 and Series 4 Warrants and Notes or signed the Subordination Letter if she had known the true facts of the Director's intent to terminate her employment.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 75 and therefore deny those allegations.

76. Talton was injured by the Directors' misrepresentations and omissions of material facts regarding her continued employment as Chief Executive Officer.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 76.

77. Talton's injuries were caused by the Directors' misrepresentations and omissions in that Talton's continued employment with the Company was critical to its success. In the year following her termination, the Directors allowed the Company's fortune's to dissipate and, on or about September 17, 2001, determined to assign Unisource's assets to a trustee for the benefit of Unisource's creditors.

**ANSWER:** The Shareholder Defendants admit that on September 17, 2001 the Board of Directors voted to proceed to an Assignment for the Benefit of Creditors. The remaining allegations of Paragraph 77 are denied.

78. Communications concerning Talton's investments and change in investments were made through the instrumentalities of interstate commerce, including telephones, the Internet and the United States mail.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 78.

### COUNT II – COMMON LAW FRAUD
### (ALL DEFENDANTS)

79. Talton incorporates paragraphs 1 -68 as paragraph 80.

**ANSWER:** The Shareholder Defendants incorporate their responses to Paragraphs 1-68 as if fully set forth herein.

80. During the period January 17, 2000 through March 22, 2000, the Directors continuously represented to Talton that she would continue to be employed as the CEO of Unisource.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 80.

81. None of the Directors disclosed to Talton that they had decided to terminate her employment if the Eclipse deal fell through.

24

**ANSWER:** The Shareholder Defendants deny that the Directors had decided to terminate Talton's employment if the Eclipse deal fell through.

82. Defendants knew that their representations and omission to Talton regarding her continued employment were false and misleading.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 82.

83. In investing in the Warrants and Notes and in executing the Subordination Letter, Talton relied on the Directors' representations that she would continue to operate and manage Unisource. This reliance was reasonable because of, among other things, the Directors' prior assurances to her during the January 17, 2000 closing and subsequent thereto that she was a valuable employee.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 83.

84. The Directors intended for Talton to rely on their representations that she would remain with the Company and their concealment of their decision to terminate her if the Eclipse deal did not go through in investing in the Note and Warrants and in signing the Subordination Letter.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 84.

85. Had the Directors informed Talton that she was about to be fired, she would not have invested in the Notes and Warrants or agreed to subordinate her $350,000 debt to that of the entities who sought her termination.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 85 and therefore deny those allegations.

86. Talton was injured by the Directors' fraudulent misrepresentations and omissions.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 86.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (UNISOURCE AGAINST THE DIRECTORS)

87. Talton incorporates paragraphs 1 - 68 as paragraph 88.

**ANSWER:** The Shareholder Defendants incorporate their responses to Paragraphs 1-68 as if fully set forth herein.

88. Talton was a shareholder of Unisource at the time of the events alleged above.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 88.

89. The actions listed above constitute a breach of the Directors' fiduciary duty to the Company.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 89.

90. Demand on these Directors would be futile in that (a) they are not disinterested; (b) they are biased against Talton; and (c) they have failed to honor Talton's lawful request to inspect the Company's books and records under 805 ILCS 5/7.75.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 90.

91. The Company was injured by these breaches of duty in that it has been grossly mismanaged and its value and marketability has decreased.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 91.

## COUNT IV — BREACH OF FIDUCIARY DUTY
### (TALTON AGAINST THE DIRECTORS, POLESTAR AND ATLANTIC)

92. Talton incorporates paragraphs 1 - 68 as paragraph 93.

**ANSWER:** The Shareholder Defendants incorporate their responses to Paragraphs 1-68 as if fully set forth herein.

93. Unisource is a close corporation in that its stock is held in a few hands and the controlling shareholders operate the Company through their appointed directors Collins, Doerer, Chamberlain and Threadgill.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 93.

94. Polestar, Atlantic and the Directors, as principals of the controlling shareholders and as Directors, owed Talton a fiduciary duty which required them to treat her fairly and not to put their own interests above that of the other minority shareholders, including Talton.

**ANSWER:** The Shareholder Defendants deny that Polestar and Atlantic were controlling shareholders, that the Directors were principals of controlling shareholders, and that Polestar, Atlantic and the Directors owed Talton a fiduciary duty as alleged in Paragraph 94.

95.     Contrary to these fiduciary duties, Polestar and Atlantic engaged in actions designed to injure Talton and to promote their own interests.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 95.

96.     Talton was directly injured by these breaches of fiduciary duty in that she was induced to invest in the Company and subordinate her notes to those of the Venture Capitalists based on the Directors' representations that she would remain employed by the Company; was terminated from the Company she started in retaliation for her efforts to act in the best interest of the Company and all of its shareholders; she has been deprived of the value of her investment in the Company; has been prevented from exercising her preemptive rights in financial offerings made after her termination; the percentage of her investment in Unisource has been dissipated; and she is being deprived of the ability to participate in Board meetings and otherwise hindered from properly exercising her responsibilities as a director.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 96.

**COUNT IV – RELIEF UNDER 805 ILCS 5/12.56**
**(TALTON AGAINST THE DIRECTORS AND UNISOURCE)**

97.     Talton incorporates paragraphs 1 - 68 as paragraph 98.

**ANSWER:** The Shareholder Defendants incorporate their responses to Paragraphs 1-68 as if fully set forth herein.

98.     The Directors have and continue to act in a manner that is illegal, oppressive and fraudulent with respect to Talton. They have deprived her of financial information concerning the Company; refused to provide her with the details concerning the Venture Capitalists investments in the Company; they hold shadow, informal board meetings among themselves in order to prohibit Talton from participating in the management of the Company and have otherwise treated her as a shareholder and director in a heavy handed and oppressive manner.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 98.

99.     Talton has been injured by these breaches in that she has been unable to protect and improve the value of her shares in Unisource.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 99.

## COUNT VI – VIOLATION OF 805 ILCS 5/7.75
### (TALTON AGAINST UNISOURCE)

100.    Talton incorporates paragraphs 1 -68 as paragraph 101.

**ANSWER:** The Shareholder Defendants incorporate their responses to Paragraphs 1-68 as if

fully set forth herein.

101.    On November 30, 2000, Talton made a demand to inspect certain of the Company's books
and records under 805 ILCS 5/7.75. A copy of her request is attached hereto as Exhibit
G.

**ANSWER:** The Shareholder Defendants admit the allegations of Paragraph 101.

102.    Although Unisource indicated that it would provide some records, Talton has yet to be
granted access to the information to which she is entitled as a shareholder.

**ANSWER:** The Shareholder Defendants deny the allegations of Paragraph 102.

## COUNT VII – DEFAMATION
### (TALTON AGAINST JORDAN)

103.    Talton incorporates paragraphs 1 - 68 as paragraph 104.

**ANSWER:** The Shareholder Defendants incorporate their responses to Paragraphs 1-68 as if

fully set forth herein.

104.    Throughout the spring and summer of 2000, Jordan accused Talton of falsifying
information on about the Company on its application to be certified as a minority business
enterprise. Specifically, Jordan told various employees of Unisource that Talton listed
Sam Kumar, an Asian American, as a shareholder in order to obtain certification by the
City. Kumai was Chief Operating Officer, but was not a shareholder.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to

form a belief as to the truth or falsity of the allegations of Paragraph 104 and therefore deny same.

105.    Jordan made these remarks to Unisource employees, including Louise Tillman and Steven
John, and others who did not have any role or involvement in the Company's minority
business enterprise certification.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 105 and therefore deny same.

106. Jordan's statement was an untrue statement of fact. Talton never attempted to use Kumar in the Company's application for certification.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 106 and therefore deny same.

107. Jordan knew the statement to be untrue and made it for the sole purpose of harming Talton's professional reputation.

**ANSWER:** The Shareholder Defendants are without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 107 and therefore deny same.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Talton's claims are barred, in whole or in part, by the doctrine of unclean hands.

### Third Affirmative Defense

To the extent Talton was damaged as a result of matters alleged in the First Amended Complaint, her damages, if any, were caused by her own actions and breaches of fiduciary duty.

### Fourth Affirmative Defense

By virtue of her conduct, Talton's claims are barred by the doctrine of estoppel.

WHEREFORE, the Shareholder Defendants pray for the entry of judgment in their favor and for their costs.

## COUNTERCLAIM

Polestar Capital, Inc., Polestar Capital Fund II, L.P., Polestar Capital Fund III, L.P. and

29

Atlantic Coastal Ventures, L.P. (collectively "the Shareholders"), through their attorneys Butler Rubin Saltarelli & Boyd, for their Counterclaim against Sheila G. Talton ("Talton") state as follows:

1.     Polestar Capital, Inc., Polestar Capital Fund II, L.P., Polestar Capital Fund III, L.P. and Atlantic Coastal Ventures, L.P. became shareholders of Unisource Network Services, Inc. ("Unisource") in 1998. At that time, Talton was the Chairman of the Board of Directors, President and Chief Executive Officer of Unisource.

2.     From its inception, Unisource was consistently unprofitable and Unisource's Board of Directors was regularly forced to seek potential investors in order to save the company.

3.     As a director of Unisource, Talton had a fiduciary duty to act in the interests of all shareholders and to refrain from placing her own interests ahead of the interests of Unisource and its shareholders.

4.     Talton breached her fiduciary duty to the Shareholders by placing her own interests ahead of the interests of the Shareholders. Specifically, Talton imposed unreasonable conditions on potential investors by demanding, as a condition of her voting to approve the investments, that she personally profit by receiving large cash payments, either "up front" or in the form of guaranteed employment with unreasonably large compensation.

5.     The Shareholders have been injured by Talton's breaches of her fiduciary duty in that potential investors who would otherwise have been willing to infuse capital into Unisource were rebuffed by Talton's attempts to enrich herself as a condition of their investments and Unisource was unable to obtain the capital it required to stay in business. As a direct and proximate cause of Talton's breaches of duty, Unisource was forced to make an assignment for

the benefit of creditors and the value of the Shareholders' shares has become worthless.

WHEREFORE, the Shareholders request judgment in their favor and against Talton in an amount in excess of $6.8 million, punitive damages, interest and costs.

POLESTAR CAPITAL, INC.,
POLESTAR CAPITAL FUND II,
L.P.,POLESTAR CAPITAL FUND
III, L.P., and ATLANTIC
COASTAL VENTURES, L.P.


By: _____
        One of Their Attorneys

David I. Herbst
Catherine E. Lamsens
Butler, Rubin, Saltarelli & Boyd
1800 Three First National Plaza
70 West Madison Street
Chicago, Illinois 60602
(312) 444-9660

W:\F\Polestar\Talton\Pleadings\Answer First Amended Complaintv8.doc

31