# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7967 | **DATE** | 9/23/2004 |
| **CASE TITLE** | Sheila G. Talton vs. Unisource Network Services, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: the motions for summary judgment [84-1 & 86-1] are granted in part and denied in part. Status hearing set for 10/6/04 at 9:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | SEP 27 2004 | | 135 |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | JXM | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| TBK | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHEILA G. TALTON, on behalf of herself and derivatively on behalf of Unisource Network Services, Inc., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 00 C 7967 |
| UNISOURCE NETWORK SERVICES, INC., an Illinois corporation, POLESTAR CAPITAL, INC., a Delaware corporation, POLESTAR CAPITAL FUND II, L.P., POLESTAR CAPITAL FUND III, L.P., ATLANTIC COSTAL INVESTORS, L.P., MICHAEL FIELDS, JERRY EDGERTON, DERRICK COLLINS, JOHN DOERER, WALTER THREADGILL, WOODY CHAMBERLAIN and THURMAN JORDAN, | ) ) ) ) ) ) ) ) ) ) ) ) | Hon. Mark Filip |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sheila Talton ("Talton") brings this lawsuit on behalf of herself and derivatively on behalf of Unisource Network Services, Inc. ("Unisource" or the "Company"). Ms. Talton is suing Unisource; Polestar Capital, Inc., Polestar Capital Fund II, Polestar Capital Fund III, Atlantic Costal Investors (collectively, the "Venture Capitalists"); and Michael Fields, Jerry Edgerton, Derrick Collins, John Doerer, Walter Threadgill, Woody Chamberlin, and Thurman Jordan (collectively, the "Individual Defendants").[1] In her First Amended Complaint, Ms. Talton alleges violations of federal securities law (Count I), common law fraud (Count II), breaches of fiduciary duty (Counts III and IV), and defamation (Count VII). Ms. Talton also seeks to inspect

---

[1] The Company and the Individual Defendants are collectively referred to as the "Unisource Defendants" in this opinion.

Unisource's corporate books and records under the Illinois Business Corporation Act of 1983, 805 ILCS 5/7.75 (Count VI), and she also seeks certain shareholder remedies under 805 ILCS 5/12.56 (Count V).[2]

This case is before the Court on both the Unisource Defendants' and the Venture Capitalists' separately filed motions for summary judgment. (D.E. 84, 86, respectively.)[3] The Unisource Defendants seek summary judgment on all counts asserted against them, as do the Venture Capitalists. For the following reasons, the Court denies both of the summary judgment motions in part and grants them in part.

## BACKGROUND

It bears mention at the outset that the summary judgment briefing at times is overly devoted to personal attacks on the credibility of putative witnesses (including, in particular, Ms. Talton), as opposed to being focused on a thorough exploration of precedent and the record. It goes without saying that credibility determinations are not the province of summary judgment adjudication, and a handful of relevant caselaw citations goes a lot further than repeated assertions that "so-and-so is a liar" or "so-and-so cannot be believed." Similarly, at times the briefs seek summary adjudication on issues without any meaningful exploration of legal authority. While a central part of the summary judgment process is to resolve whether there are material factual disputes, the question of whether there are material factual disputes can only be evaluated in the context of applicable precedent. When parties proceed without meaningfully

---

[2]　On June 4, 2004, on Plaintiff's oral motion, the Court dismissed Counts VI and VII of Ms. Talton's First Amended Complaint with prejudice. (D.E. 130.) These counts are therefore not further addressed by this opinion.

[3]　The designation "D.E." refers to the docket entry number of the cited document.

2

canvassing that precedent, they, with all respect, do so at their peril, because notwithstanding a court's best efforts to ascertain applicable precedent, the adversarial process is supposed to best ensure a chance for the right answers to legal questions in the factual context of any given case. As a practical matter, uncertainty in this area falls particularly hard on the movant—who is seeking to dispose of the case short of trial. Finally, the Court notes that a substantial portion of the briefing is devoted to the general proposition that Judge Guzman (who had the case before it was reassigned to this Court) erred at the motion-to-dismiss stage in rejecting Defendants' attack on Plaintiff's Section 10b-5 claim, the sole federal law claim in the case.[4] Whatever the wisdom of effectively attempting to reargue Judge Guzman's prior ruling in the context of summary judgment when he was the presiding judge, Seventh Circuit precedent teaches that Defendants face an uphill battle trying to get that ruling reversed now that the case has been reassigned to this Court, as explained further below. And, as also explained further below, that effort was unsuccessful, as this Court declines any invitation to overrule Judge Guzman's prior ruling, at least certainly in the context of the presentation and treatment of the voluminous factual record set forth in the summary judgment papers.

I.      The Parties and Their Association with Unisource

A.      Ms. Talton and Unisource Network Services, Inc.

Plaintiff Sheila Talton is an African-American woman who was the founder of Unisource.[5] For at least much of its existence, Unisource was a minority-owned and operated

---

[4]     On March 3, 2004, this case was reassigned from the Calender of Judge Guzman to the Calendar of Judge Mark Filip.

[5]     The following facts are taken from the parties' Local Rule ("LR") 56.1 statements and responses, as well as other admissible evidence in the record. Where facts are in dispute, the

Illinois corporation that assisted its clients in establishing and maintaining computer network systems. (Pl.'s Resp. ¶¶ 1, 2 (Ind. Defs.).) Ms. Talton founded Unisource in 1986, becoming its President, Chief Executive Officer, and majority shareholder (*Id.* ¶ 1.) As President and CEO of Unisource, Ms. Talton supervised employees, sought potential customers, negotiated with existing customers, and exercised decision-making authority regarding Unisource's day-to-day expenses, although Ms. Talton denies that she had sole responsibility in these areas. (Pl.'s Resp. ¶ 4 (Vent Caps.).) Ms. Talton also was Chair of Unisource's board of directors (the "Board"). During Ms. Talton's tenure with Unisource, the Company had as many as 70 employees (Pl.'s Resp. ¶ 10 (Ind. Defs.)), had offices in Chicago, Illinois, New York, and Washington D.C. (Pl.'s Resp. ¶ 3. (Vent. Caps.)), and its clients included, among various other entities, McDonald's Corporation and the Chicago Public Schools. (Vent Caps.' Answer to First Am. Compl. ¶ 10.) As discussed below, Ms. Talton's tenure with Unisource ended on April 7, 2000.[6]

---

Court describes the version of the facts that is the most favorable to Ms. Talton, the non-movant. This opinion cites to the Venture Capitalists' LR 56.1(a)(3) statement as "Vent. Caps.' St. ¶ __" and to the Unisource Defendants' LR 56.1(a)(3) statement as "Ind. Defs.' St. ¶ __." Ms. Talton filed LR 56.1(b)(3)(B) statements of additional fact in response to both the Venture Capitalists' and the Unisource Defendants' LR 56.1(a)(3) statements. These LR 56.1(b)(3) statements are cited as "Pl.'s St. ¶ __," and are followed by a parenthetical indicating the respective association with either the Venture Capitalists' ("Vent. Caps.") or Unisource Defendants' ("Ind. Defs.") LR 56.1(a)(3) statement. The parties' responses are cited as "Vent. Caps.' Resp. ¶ __," "Ind. Defs.' Resp. ¶ __," or "Pl.'s Resp. ¶ __,"as appropriate. Citations to Ms. Talton's responses are similarly followed by a parenthetical that indicates an association with either the Venture Capitalists' or the Unisource Defendants' LR 56.1(a)(3) statement.

[6]     The two groups of Defendants have each adopted each other's Rule 56.1 statements. Unfortunately, at times, the respective Rule 56.1 statements and the inferences that one can reasonably draw from them conflict. The Court has attempted to resolve such conflicts consistent with its obligation to give the benefit of the doubt to the Plaintiff/non-movant on disputed factual questions and reasonable inferences related to such factual disputes.

B.   The Venture Capitalists

Polestar Capital, Inc. ("Polestar") is a Delaware investment corporation with its principal place of business in Chicago, Illinois (Pl.'s Resp. ¶ 3 (Ind. Defs.)), and Atlantic Costal Investors ("Atlantic") is a Delaware limited partnership (*id.* ¶ 4). Polestar makes equity investments in minority-owned companies. (Pl.'s Resp. ¶ 5 (Vent. Caps.).) Polestar Capital Fund II, L.P., and Polestar Capital Fund III, L.P., are Illinois limited partnerships that, according to the parties, are "associated with" Polestar. (Pl.'s Resp. ¶ 3 (Ind. Defs.).) Among other business activities, Atlantic makes equity investments in minority-owned technology companies. (Pl.'s Resp. ¶ 6 (Vent. Caps.).) Polestar and Atlantic share no corporate affiliation, no common employees or officers and, other than Unisource, no common investments. (*Id.* ¶ 7.) Polestar became a Unisource shareholder in 1997. (Vent. Caps.' Resp. ¶ 1.) Polestar Capital Fund II, L.P., and Polestar Capital Fund III, L.P, and Atlantic became Unisource shareholders in 1998. (*Id.* ¶ 2.)

C.   The Individual Defendants and the Unisource Board Structure

The six Individual Defendants are, with the exception of Thurman Jordan, all former members of Unisource's seven-member Board (two of whom were not Unisource shareholders).[7] Mr. Jordan was Unisource's CEO after Ms. Talton no longer held that position. (Pl.'s Resp. ¶ 7 (Ind. Defs.).) When Ms. Talton was President and CEO, Mr. Jordan was the Company's CFO. (*Id.*) The holders of Unisource preferred stock (the Venture Capitalists) and/or common stock (including, among others, Ms. Talton) elected each of the Individual Defendants to the Board, according to classes of stock ownership. (*Id.* ¶ 13.) Specifically, the holders of preferred and common stock (as classes) elected three directors each, with the seventh director being jointly

---

[7]   The director defendants are referred to as the "Directors" at various points in this opinion.

elected by the common and preferred shareholders. (*Id.*) The Board structure was created as a condition of the Venture Capitalists' 1998 investment, which is discussed below. (Vent. Caps.' Resp. ¶ 3.)

The appointments were as follows. Not including the joint appointment of Mr. Fields, Ms. Talton appointed (presumably on behalf of the common shareholders) defendants Messrs. Edgerton and Chamberlain to the Unisource Board. (Ms. Talton was also presumably technically elected to the Board, but this is not readily apparent from the record.) Mr. Edgerton was not a Unisource Shareholder. (Pl.'s Resp. ¶ 6 (Ind. Defs.).) Woody Chamberlain had a beneficial interest in the shares of Unisource through his investment in Doerge-Unisource, L.P., a shareholder of Unisource. (*Id.* ¶ 5.) Not including the joint appointment of Mr. Fields, the Venture Capitalists appointed Messrs. Collins, Doerer, and Threadgill to the Unisource Board. (Vent. Caps.' Answer ¶ 13.) Derrick Collins is an investor and principal of Polestar (Pl.'s Resp. ¶ 3 (Ind. Defs.)), as well as a partner of Polestar Fund II and Polestar Fund III (Vent. Caps.' Resp. ¶ 2). John Doerer is a partner of Polestar. (*Id.* ¶ 1.) Walter Threadgill is described by the parties as "a" general partner of Atlantic, and it is unclear whether there are other general partners in the corporate entity. (Pl.'s Resp. ¶ 4 (Ind. Defs.).) With respect to the joint appointment, Ms. Talton proposed and nominated Michael Fields to the Board, after having been acquainted with him through their mutual former employment at Applied Data Research. (Pl.'s Resp. ¶ 10. (Vent. Caps.).) Ms. Talton (presumably along with the other common stock holders), Polestar, and Atlantic jointly appointed Mr. Fields to the Board. (Pl.'s Resp. ¶ 6 (Ind. Defs.).) Mr. Fields, like Mr. Edgerton, was not a Unisource shareholder. (*Id.*)

II.     Private Stock Placements, Capital Infusions, and Ms. Talton's Employment Contract

As Unisource grew as a business, so did its need for capital; Unisource also apparently required certain capital infusions as temporary stopgaps for certain financial challenges the Company faced during the late nineties and in early 2000. (*See* Pl.'s Resp. ¶ 24. (Ind. Defs).) In an effort to raise that capital, Unisource sold its stock through several private placements. (*Id.* ¶ 11.) The first such stock sale occurred in July 1996, when Unisource sold Doerge and CI & Associates Software Consulting, Inc. 10% and 15% of the Company's authorized shares, respectively. (*Id.*) In January 1998, the Company executed a major financing transaction, at which time the Venture Capitalists invested a total of $3,050,001 in Unisource (*id.* ¶ 12) in exchange for Unisource preferred stock (*id.* ¶ 13). As a condition of the Venture Capitalists' January 1998 investment, the Venture Capitalists required Ms. Talton to enter into an employment agreement with Unisource. (Vent. Caps.' Resp. ¶ 4.) Ms. Talton had not had an employment agreement prior to 1998. (*Id.*) The employment agreement provided that Ms. Talton would be employed as the Company's President and CEO until December 31, 2000. (Pl.'s Resp. ¶ 15 (Ind. Defs.).) The employment agreement also provided that Ms. Talton could be terminated by the Company with or without cause. (*Id.*) The Venture Capitalists bought additional stock in a February 1999 private placement, although the details of this transaction are unclear from the record. (*Id.* ¶ 16.) In December 1999, the Venture Capitalists exchanged $500,000 for convertible promissory notes and additional Unisource preferred stock. (*Id.* ¶ 18.) Those notes became due on March 31, 2000. (*Id.*) The December 1999 financing, however, did not solve the Company's financial issues, and by February 2000, Unisource was unable to meet its payroll. (*Id.* ¶ 24.) The Unisource shareholders who participated in these transactions

(including Ms. Talton) were awarded pre-emptive rights with their stock. (*Id.* ¶ 14.) (The briefs do not meaningfully cite to the record concerning what specific "pre-emptive rights" accompanied the stock, but as best the Court can tell from the papers, the shareholders were protected through anti-dilution option-rights that are commonly seen in corporate arrangements, often in closely-held corporations and/or corporations in which there are only a relatively limited number of shareholders).

After these sales, and prior to the acts giving rise to this suit, Ms. Talton owned approximately 26% of Unisource stock, the Venture Capitalists combined owned approximately 31-33%, Doerge owned 10%, an ESOP held 14%, and various other shareholders held the remaining stock. (*Id.* ¶ 16; Vent. Caps.' Resp. ¶ 36.).)[8] In addition, the following entities and individuals were shareholders of Unisource at various times: Ghyslain Rivand, HC Partners, Larry and Fern Kane, Natalie Nesbitt, Milestone Growth Fund, Pacific Venture Capital, and Saskatchewan Telecommunications International, Inc. (Pl.'s Resp. ¶ 9 (Vent. Cap.).)

III.     Ms. Talton's January Investment and the January 13, 2000 Letter

On or about January 13, 2000, Mr. Collins presented Ms. Talton with a letter to execute as part of the closing of the Venture Capitalists' December 1999 investment. (The closing took place on January 17, 2000.) The letter gave the Board the authority to request Ms. Talton to relinquish her title as the Company's President. Ms. Talton executed the letter, and it is

---

[8]     The parties disagree regarding the exact percentage of Unisource ownership rights that Atlantic and Polestar held individually. The Venture Capitalists contend that Polestar owned approximately 20.75% and that Atlantic owned approximately 12.42% of the Unisource stock. (Vent Caps.' St. ¶ 23.) Ms. Talton contends that, when warrants are taken into consideration, Polestar owned approximately 23.75% and Atlantic owned approximately 13.42% of stock and warrants. (Pl.'s Resp. ¶ 23. (Vent. Caps.).)

undisputed that Ms. Talton questioned Mr. Collins about the significance of the letter prior to executing it. (Pl.'s Resp. ¶ 22. (Ind. Defs.).) The parties disagree over the substance of Mr. Collins's response (a disagreement the parties' summary judgment papers complicates (*see* note nine, *infra*)). Indeed, as discussed further below, the import of Mr. Collins's statement (or statements) regarding Ms. Talton's continued employ with Unisource, among other things, has since become the subject of Ms. Talton's 10b-5 claim. Although it is not entirely clear from the summary judgment papers, it appears that the parties do not dispute that they memorialized in writing—in connection with Ms. Talton's agreement that she would relinquish her title as President of Unisource if so requested by the Board—Collins and the Board's representation that such relinquishment by Talton would "not deprive . . . [Talton] of any of [her] duties, responsibilities and authorities as set forth in Section 3" of Talton's employment agreement. (Pl.'s St. ¶ 14 (Ind. Defs.).) Section 3 of that employment agreement, in turn, provided that "Executive [Talton] shall have the titles of Chairman of the Board of Directors, President and Chief Executive Officer of the Company . . . and Executive shall have full responsibility for managing the Company, including bottom-line profit and loss responsibility and accountability." (Ind. Defs.' St., Ex. 5, ¶ 3.) In addition, it appears undisputed that Talton did not seek to amend her employment contract to delete the Board's legal right to remove her.

The Venture Capitalists' December 1999 investment triggered certain preemptive stock rights held by Unisource shareholders, including rights held by Ms. Talton. After executing the January 13, 2000 letter, Ms. Talton exercised her preemptive rights and invested $98,382 at the January 17, 2000 closing. (Pl.'s Resp. ¶ 23 (Ind. Defs.).) In return for this investment, Ms. Talton received convertible promissory notes totaling $98,422 and warrants to purchase 246,322

shares of Class B, Series 3 preferred stock. (*Id.*)

IV.     The Eclipse Deal and Ms. Talton's February 2000 Investment

At some point (the parties disagree over exactly when), the Board decided to try to sell

the Company. In February 2000, it looked like Unisource had found a buyer. At that time,

Eclipse Networks, Inc. ("Eclipse"), submitted a non-binding letter of intent to purchase the

Company (Pl.'s Resp. ¶ 25 (Ind. Defs.)), which letter Unisource accepted on or about February 7,

2000. (*Id.*) On or about February 22, 2000, Ms. Talton purchased an additional 655,300

warrants in preferred stock, and she was issued a convertible promissory note for $250,000 in

return. (*Id.* ¶ 26.) Both the Series 3 Notes (which Ms. Talton purchased in January) and the

Series 4 Notes were due on March 31, 2000. (*Id.*)

Soon after Ms. Talton purchased the Series 4 warrants, however, the deal with Eclipse

collapsed (*id.* ¶ 27), and the Company was again unable to make payroll. The Venture

Capitalists offered to invest an additional $300,000 in the Company (which they eventually did

invest), in exchange for convertible promissory notes and additional Series 3 warrants. (*Id.* ¶ 28.)

As a condition of their investment, the Venture Capitalists (specifically Polestar) required that

both Ms. Talton and Atlantic subordinate their securities. On or about March 23, 2000, both

Atlantic and Ms. Talton executed subordination letters, which subordinated their securities to any

new investors. (*Id.* ¶ 29.)

V.      Ms. Talton's Termination

Shortly after Ms. Talton made her February investment, Mr. Fields asked Ms. Talton to

meet him for breakfast before an upcoming board meeting. (Ind. Defs.' Resp. ¶ 17.) At the

breakfast, Mr. Fields told Ms. Talton that the other Directors wanted her to step down as

10

president and that, if she did not, the Board would remove her. (*Id.*) Mr. Fields was asked to do this by the Board. (*Id.* ¶ 18.) Mr. Fields told Ms. Talton that she would continue to be employed by Unisource and would be involved in marketing, sales, and attempts to raise capital for the Company. (*Id.*) On March 24, 2000, Ms. Talton resigned from her positions as the Company's President and CEO, pursuant to Board vote, although she remained employed with the Company. (Pl.'s Resp. ¶ 30 (Ind. Defs.).) The Board terminated Ms. Talton as Chairman and as an employee on April 7, 2000. (*Id.* ¶ 31.) The Company subsequently shut its doors and declared bankruptcy. (Pl.'s Resp. ¶¶ 21, 22. (Vent. Caps.).) As a result of Unisource's bankruptcy, Polestar suffered losses of $4.5 million dollars (*id.* ¶ 21) and Atlantic suffered losses of $2.3 million dollars (*id.* ¶ 22). It is unclear how much Ms. Talton lost. This lawsuit followed.

VI.     Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court's function in ruling on a motion for summary judgment is not to weigh the evidence or make credibility assessments, but rather to determine if there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Id.* at 255. Where factual matters are in dispute, the Court is required to credit the nonmovant's version of the facts. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 802 (7th Cir. 2000). The moving party has the initial burden to prove that no genuine issue of material fact exists.

*Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Once the

moving party shows that there is no genuine issue of material fact, the burden shifts to the

nonmovant party to designate specific facts showing that there is a genuine issue for trial. *See*

*Celotex*, 477 U.S. at 324.

VII.     Count I: Rule 10b-5 Claim (Talton v. the Unisource Defendants)

"SEC Rule 10b-5, promulgated under Section 10(b) of the Securities Exchange Act of

1934, prohibits the making of any untrue statement of material fact or the omission of a material

fact that would render statements made misleading in connection with the purchase or sale of any

security." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996) (citing

17 C.F.R. § 240.10b-5). To prevail on her Rule 10b-5 claim, Ms. Talton must prove that the

Unisource Defendants: (1) made a misstatement or omission; (2) of material fact; (3) with

scienter; (4) in connection with the purchase or sale of securities; (5) upon which Ms. Talton

relied; and (6) that reliance proximately caused her injuries. *See id.* Seventh Circuit precedent

also suggests that Ms. Talton may also need to establish that her reliance upon the Unisource

Defendants' representation was reasonable or justified. *See Harrison v. Dean Witter Reynolds,*

*Inc.*, 79 F.3d 609, 618 (7th Cir. 1996).[9]

---

[9]      The parties have briefed the summary judgment issues assuming that justifiable or
reasonable reliance is an independent element of Ms. Talton's Rule 10b-5 claim. While some
Seventh Circuit precedent suggests that it is an independent element, *see Harrison v. Dean Witter*
*Reynolds, Inc.*, 79 F.3d 609, 618 (7th Cir. 1996) (citing *Teamsters Local 282 Pension Trust Fund*
*v. Angelos*, 762 F.2d 522, 530 (7th Cir. 1985)), other Seventh Circuit precedent indicates
otherwise. *See Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 191 (7th Cir. 1993) (noting
that federal securities law does not contain a reasonable reliance requirement except to the extent
that it bears on the determination of materiality) (citing *Teamsters Local 282*, 762 F.2d at 528-
531); *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1546 (7th Cir.
1990) ("[W]e concluded in *Rowe* that justifiable reliance is not an *independent* element in
securities litigation.") (collecting cases; citation omitted; emphasis in original); *Rowe v.*

Ms. Talton's 10b-5 claim, at least as things have shaped up after discovery, is based on at least two statements made by Mr. Collins, a Unisource Director and a partner in the Polestar entities, to Ms. Talton at some point prior to her January and February investments. For example, Mr. Collins admits that at some point after a January 17, 2000 meeting, Ms. Talton was informed that she "would retain a management role in the Company" going forward. (*See* Unisource Defendants' Answer ¶ 40). The Unisource Defendants also apparently concede that Ms. Talton was told, at the time she executed the January 13, 2000 letter, that she would have "a continued role in Unisource." (Corrected Defs.' Reply Br. in Supp. of Summ. J. (D.E. 103) at 3.) As previously indicated, the parties also apparently do not dispute that, around the time of Ms. Talton's January 2000 investment, the parties memorialized in writing a representation made to Ms. Talton in connection with her agreement that she would relinquish her title as President of the Company if requested by the Board. This representation was that such relinquishment by Talton would "not deprive . . . [Talton] of any of [her] duties, responsibilities and authorities as set forth in Section 3" of Talton's employment agreement (Pl.'s St. ¶ 14 (Ind. Defs.)), which in turn provided that Talton would "have the titles of Chairman of the Board of Directors, President and Chief Executive Officer of the Company . . . and . . . have full responsibility for managing the Company, including bottom-line profit and loss responsibility and accountability" (Ind. Defs.' St., Ex. 5, ¶ 3).

These statements also must been viewed against the backdrop of another theme in

---

*Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988) ("[M]ateriality subsumes justfiability; if a plaintiff relies on a material misstatement, his reliance is justifiable."). The parties are respectfully requested to address this subject in their pre-trial preparation—*e.g.*, draft jury instructions.

Talton's briefs and summary judgment papers—namely, that the statements highlighted immediately above were materially misleading because prior to their making, the Individual Defendants and Venture Capitalists were actively exploring and perhaps even planning to terminate Talton but never told her of their plans. In this regard, Talton asserts that the Defendant "Directors each admit that, throughout the first quarter of 2000, they continued to assure Talton that her management role with the Company was secure and never told her of their plans to terminate her." (Pl.'s St. ¶ 12 (Ind. Defs.) (citations omitted).) In response, the defendant Directors deny this assertion on what appears to be more of a legal than factual ground—namely, that Talton "[i]n fact . . . did continue in her management role throughout the first quarter of 2000." (Ind. Defs.' Resp. ¶ 12.) Similarly, in the context of the omissions issue, there is a factual dispute between the parties (with enough evidence to create a triable issue) as to whether Defendant Collins was engaging in discussions with specific potential investors in the Company concerning whether they would be more interested in investing if Talton were removed from ongoing operations. (Pl.'s St. ¶ 8 (Ind. Defs.).) Likewise, there is a letter from the fourth quarter of 1999 from Walter Threadgill, the general partner of Defendant Atlantic, to Derrick Collins, the general partner of Defendant Polestar, which letter could be read to indicate that there were plans to relieve Ms. Talton of her position as President of Unisource. (Pl.'s St., Ex. A (Ind. Defs.).)[10] The Venture Capitalists also had conference calls (the record is unclear as to an exact time frame, but it appears that they took place in the fourth quarter of 1999 and the first quarter of 2000) in which they discussed removing Talton from her operating role and replacing

---

[10]     The various defendants have their own interpretation of the inferences that one should draw from this letter, but which of those inferences is appropriate is a jury question.

her with Thurman Jordan. (Pl.'s St. ¶ 15 (Vent. Caps.).) Mr. Lennox, who was never a Board member, participated on these calls along with Messrs. Collins, Fields, Doerer, and Threadgill. (Vent. Caps.' Resp. ¶ 15.)

Significantly, there is a factual dispute (at a minimum) concerning whether Talton was informed of any of these plans and discussions. Ms. Talton contends that, in her view of the evidence at least, the failure of the Defendants to inform her of their discussions and plans to remove her, in face of what she would view as misleading, lulling assurances, constitutes a material omission and basis for a fraud charge.

With this backdrop now stated, the Court turns to the Defendants' arguments. The Unisource Defendants argue that Ms. Talton cannot establish the fifth and first elements of her 10b-5 claim. Specifically, the Unisource Defendants argue that Ms. Talton's Rule 10b-5 claim fails as a matter of law because Ms. Talton cannot prove that her reliance on any alleged statement or omission regarding her continued employment as CEO was justified or reasonable and that there was no misrepresentation or omission because she actually did have a continued role at Unisource from January through April when she was removed.

A.    Justifiable Reliance, to the Extent It Is an Element of Ms. Talton's 10b-5 Claim, Is a Question for the Trier of Fact

With respect to their reliance argument, the Unisource Defendants direct the Court's attention to three cases which they contend "line up precisely with the facts of this case" (Corrected Mem. in Supp. of Moving Defs.' Mot. for Summ. J. (D.E. 88) at 5) and "compel that this Court enter summary judgment" (*id.* at 3) in their favor on Count I. These cases are: (1) *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000); (2) *Niki Development Corp. v. HOB Hotel*

15

*Chicago Partners, L.P.*, No. 00-2558, 2003 WL 1712563 (N.D. Ill. Mar. 31, 2003); and (3) *Tirapelli v. Advanced Equities, Inc.*, 215 F. Supp. 2d 964 (N.D. Ill. 2002). According to the Unisource Defendants, these cases demonstrate that, as a matter of law, Ms. Talton could not have reasonably relied on any alleged statements or omissions regarding her continued employment.

The Court begins its reliance analysis—and will assume that justifiable or reasonable reliance is an element, consistent with the parties' assumptions in the briefing, notwithstanding that it may not be under Seventh Circuit law (*see* note nine, *supra*)—by noting that "[n]ormally, whether reliance is justifiable is a question of fact that is unsuited for resolution on summary judgment." *Am. Nat'l Bank and Trust Co. of Chicago ex rel Emerald Invs. L.P. v. Axa Client Solutions*, No. 00-6786, 2004 WL 438505, at *4 (N.D. Ill. Mar. 5, 2004) (citing *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001)); *see also Vigortone AG Prod., Inc. v. PM AG Prod., Inc.*, 217 F. Supp. 2d 858, 865 (N.D. Ill. 2001).[11] Case law cited by the Unisource Defendants recognizes as much in the specific context of a Rule 10b-5 claim. *See Tirapelli*, 215 F. Supp. 2d at 970 ("[R]easonable reliance is normally a question of fact . . . ."). Seventh Circuit precedent teaches, however, that reliance "can be determined as a matter of law when no trier of fact could find it reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Cozzi*, 250 F.3d at 574. In determining whether Ms Talton's reliance was justified, the Court "must consider all of the facts that [Ms. Talton] knew, as well as those

[11]  Precedent also teaches that materiality is also a question frequently suited for a trier of fact. *See, e.g., Rowe v. Maremont Corp.*, 850 F.2d 1226, 1234 (7th Cir. 1988) (collecting cases). Thus, to the extent that the proper focus of a "reliance"-type of analysis is actually focused on materiality, *see id.* at 1235 (collecting cases), that analysis also is one that at least would tend to disfavor summary adjudication.

16

facts [that she] could have discovered through the exercise of ordinary prudence." *Id.* The Court's task, then, is to review all of the information known to Ms. Talton (or discoverable to her through the exercise of ordinary prudence) at the time of her investments and to determine whether, given that pool of information, no trier of fact could find that her purported reliance on the statements and omissions at issue was reasonable or justified.

Citing, among others, *Rissman*, the Unisource Defendants contend the Ms. Talton's employment contract, which was executed in 1998 and provided for her termination with or without cause, makes her reliance on any statement regarding her continued employment in connection with her purchase of her securities in 2000 unreasonable as a matter of law. This is not the first time that the Unisource Defendants have pressed this argument in this case. Specifically, Judge Guzman rejected what appears to be a substantially similar reliance argument (also premised on *Rissman*) made in a motion to dismiss Ms. Talton's First Amended Complaint. *See Talton v. Unisource Network Servs., Inc.*, No. 00-7967, 2002 WL 31018297, at *7 (N.D. Ill. Sept. 9, 2002). As discussed further below, Judge Guzman rejected this argument based on a factual distinction of *Rissman* that does not appear to have been resolved in Defendants' favor (at least in a manner that would justify summary judgment) during the discovery process.

The fact that Judge Guzman previously rejected Defendants' argument is material. Defendants request effectively to reverse Judge Guzman's prior assessment implicates a "variant of the law of the case doctrine that relates to the re-examination of a prior ruling by a different member of the same court." *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). Precedent teaches that "the presumption [in such cases] is that earlier rulings will stand." *Id.* The "doctrine in these circumstances reflects the rightful expectation of litigants that a change of judges mid-

17

way through a case will not mean" revisiting decisions made in the case—upon which the case has proceeded (and the parties have made any number of tactical and other judgments). *Id.*

Defendants have not presented a sufficient basis to depart from Judge Guzman's prior ruling concerning the reliance/materiality issue. In this regard, when rejecting the Defendants' *Rissman* argument, Judge Guzman noted that the Unisource Defendants "admit that none of the written documentation pertaining to the purchase and sale of securities makes any representation about Talton's employment." *Talton*, 2002 WL 31018297, at *7. Based on this undisputed fact (which, as best the Court can tell, remains undisputed to this day—it was not revisited in the parties' summary judgment papers), Judge Guzman held that the issue of justifiable reliance in this case "is not reached by the *Rissman* holding." *Id.* The Court agrees with Judge Guzman's result. Nonetheless, the Court addresses *Rissman* (and related cases relying on *Rissman*) in detail based on the Defendants' representation that it constitutes on-point, compelling authority.

In *Rissman*, the Seventh Circuit addressed the issue of reasonable reliance in the context of a Rule 10b-5 claim, holding that a seller of securities could not reasonably rely upon prior oral statements by a buyer where a stock purchase agreement included an express non-reliance clause. *See Rissman*, 213 F.3d at 383-84. The plaintiff in *Rissman* sold his shares in a family-owned business to his brother, after his brother had led him to believe (through their conversations) that he would not sell the company. The stock purchase agreement executed by the brothers subsequent to the oral representations expressly contemplated the potential for a sale, in that it *specifically provided* for the acceleration of payments if the business was sold prior to the plaintiff receiving all of the installment payments toward the purchase price. *Id.* at 383.

Moreover (and this was the court's focus), the stock purchase agreement contained a

18

clause representing that the parties had "*not* relied on any prior oral statement." *Id.* (emphasis in original). Despite this non-reliance clause, the plaintiff sued the defendant after the defendant sold the stock, claiming, among other things, that the defendant's prior oral statements were material misstatements that violated Rule 10b-5. The Seventh Circuit affirmed a grant of summary judgment in favor of the defendant on the plaintiff's Rule 10b-5 claim, explaining that a non-reliance clause "ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." *Id.* at 384. The Court went on to hold that "a written anti-reliance clause precludes any claim of deceit by prior representation." *Id.*; *see also id.* at 387-88 (Rovner, J., concurring) (stating that "all circumstances surrounding the transaction are relevant in determining whether reliance on prior oral statements can be deemed reasonable" and that although a non-reliance clause may frequently be determinative, even "the existence of a non-reliance clause will not automatically preclude damages for prior oral statements").

In *Tirapelli* (another case Defendants cite, and a case that relies heavily on *Rissman*), the plaintiffs asserted, among other claims, a Rule 10b-5 claim. The plaintiffs argued that the defendants made oral false representations of material fact to induce the plaintiffs to invest in one of the defendant companies. *See Tirapelli*, 215 F. Supp. 2d at 965. That company, however, had required each plaintiff to review and sign a set of subscription documents before investing. *Id.* at 967. The subscription documents, like the stock purchase agreement in *Rissman*, contained a non-reliance clause. *Id.* The court noted that "in signing the [s]ubscription [d]ocuments, [the plaintiffs] represented that they each had relied only on the terms of the [s]ubscription [d]ocuments" in deciding to invest in the defendant company, and that they had not relied upon

19

any other representation. *Id.* The subscription document also contained an integration clause, which stated that the subscription documents contained the entire agreement between the parties. *Id.* at 968. The court summarized the defendants' argument as follows:

> Defendants point out that the alleged representations do not appear in the Subscription Documents and argue that they are entitled to summary judgment because, due to the Non-Reliance clause and the Integration Clause, plaintiffs could not, as a matter of law, have reasonably relied upon representations that did not appear in the Subscription Documents.

*Id.* at 970. The court found this argument persuasive, holding, as a matter of law, that the plaintiffs could not establish that their reliance was reasonable. *Id.* at 971.

Finally, in *Niki* (which also relied on *Rissman*), the plaintiffs claimed fraud in the inducement and equitable fraud, arising from a commercial venture involving a limited partnership. *Niki,* 2003 WL 1712563, at \*8. Under a limited partnership agreement, plaintiffs had certain put rights with respect to their limited partnership interests. *Id.*, at \*2. Those put rights could be triggered on the happening of certain events, one of which was a change of voting control with regard to the limited partnership's parent company, HOB Entertainment, Inc. ("HOB"). *Id.* Plaintiffs subsequently surrendered those put rights under an amendment to the limited partnership agreement, to help facilitate a financing agreement with a potential lender. *Id.* A few years later, HOB transferred voting control to an unrelated third party, which change of control would have triggered the plaintiffs' put rights. *Id.*, at \*8. Plaintiffs sought recision of the amendment to the limited partnership, alleging that HOB's then CEO, Isaac Tigrett, materially misrepresented to plaintiffs in October of 1996 that Mr. Tigrett was a "valued 'partner'" in HOB and that HOB would "soon be going public, thereby increasing the value of

[plaintiff's] investment."[12] *Id.*, at *8. (HOB had previously agreed to sell a substantial number of shares to one of the plaintiffs.)

The defendant argued that the plaintiffs could not show any fraud in the inducement of the amendment to the limited partnership agreement because there was no false representation of an existing fact and that plaintiffs could not establish reliance. *Id.* at *9. The court agreed. Specifically, the court held that Mr. Tigrett's representation that he was a "valued partner" did not create a material issue of disputed fact regarding fraudulent inducement because Mr. Tigrett was not voted out as chairman of HOB's board until "September 27, 1997—ten months after the [amended limited partnership agreement] was executed by" the plaintiff. *Id.* at *10. The court also found it "undisputed that HOB never guaranteed that an IPO would be completed by the end of 1997," and the court held that statements regarding planning an IPO "cannot be concluded to be a misrepresentation of an existing fact" because an IPO is inherently speculative. *Id.* The Court also held that the plaintiffs' "alleged reliance on statements that an IPO would occur . . . is unreasonable as a matter of law to support a material misrepresentation of fact because [plaintiff] received documents specifically telling him that no such guarantee could be made." *Id.* at *11.

The cases cited by the Defendants to support their reliance argument are distinguishable in material respects. *Rissman* holds that a plaintiff cannot allege reliance on prior oral representations where the contract entered into for the sale of securities contains an anti-reliance

---

[12]     Ms. Talton and the Unisource Defendants disagree over the proper reading of *Niki*. The Court believes this dispute is attributable to vague pronoun reference in the court's statement that Mr. Tigrett "continued to assure Plaintiff Marks that *he* was a valued partner in HOB . . . ." *Niki*, 2003 WL 1712563, at *8 (emphasis added). The Court agrees with Ms. Talton that the "he" refers to Mr. Tigrett, not the plaintiff. *See id.*, at *10 ("As to the false misrepresentation of Tigrett's participation in HOB[,] we find that Plaintiff has failed to raise a genuine issues [sic] of material fact as to HOB's fraudulent inducement.").

clause. *See Rissman*, 213 F.3d at 383 ("Securities law does not permit a party . . . to disavow [anti-reliance] representations—to say, in effect, 'I lied when I told you I wasn't relying on your prior representations . . . .'"). The *Tirapelli* court simply applied this rule, supplementing its analysis with the recognition that the operative documents also contained integration clauses. Furthermore, the Defendants appear to misread *Niki* (*see* note twelve, *supra*). And, in any event, the Court finds *Niki* similarly distinguishable in that the plaintiffs received documents in connection with the relinquishment of their rights that put them on notice that an IPO was not guaranteed, and the *Niki* court specifically relied on precedent involving the inherently speculative nature of IPOs.

Ms. Talton points out that there is no integration or non-reliance clause is this case. The Defendants respond that Ms. Talton's "attempt to distinguish . . . [this] case law is unavailing. . . . [because the presence of integration and non-reliance clauses] was not the sole basis for the courts' ruling." (D.E. 103 at 9.) The Defendants, however, declined to expand on this conclusory assertion beyond stating that "the fact that there is no integration or non-reliance clause is irrelevant because Talton's Employment Agreement governed her relationship." (*Id.*) The Court finds this statement, which is unsupported by case law, unavailing. Here there is no operative document executed in connection with Ms. Talton's purchase of securities which disclaims reliance on prior representations regarding Ms. Talton's continued employment. It is easy enough to include such clauses—they are available as boilerplate to sophisticated business people like the Defendants. For whatever reason, the Defendants chose not to use them in this case. Consequently, the Court finds that Judge Guzman's holding regarding *Rissman* applies as equally today as it did when it first issued: *Rissman* (and the related cases cited by Defendants

relying on *Rissman*) does not reach the issue, to the extent one exists, of justifiable reliance in the context of the alleged misrepresentations and omissions at issue in this case.

Because the Defendants cases are distinguishable, the Defendants have left the Court with only the general guidance of *Cozzi* (which is a reliance clause case as well) to resolve the reliance issue *sub judice*. Accordingly, the Court considers "all of the facts that [Ms. Talton] knew, as well as those facts [that she] could have discovered through the exercise of ordinary prudence" at the time she invested, to determine whether the reliance issue can be determined as a matter of law. *Cozzi*, 250 F.3d at 574. It is undisputed that, at the time Ms. Talton made her January and February 2000 investments, Unisource employed her under an employment agreement. That agreement provided that she could be terminated with or without cause.

But the fact that Ms. Talton could be terminated without cause does not seem dispositive, and Defendants certainly have not cited any authority involving employment contracts which holds that such a factor is a game-over trump card for Defendants. Ms. Talton may, in some sense, have been an at-will employee; many if not most employees in Illinois are at-will employees. Nonetheless, Defendants cite no precedent to suggest that an employee could literally be told that "you will be kept in your position"; could thereby be induced to write a check for $100,000 in a securities transaction that did not include any integration or non-reliance clause in operative transaction documents; and could then be fired shortly after the check was cashed—if the person assuring the Plaintiff that he or she would be retained in his or her job actually was planning on firing the person after the check had cleared. The Court is not saying that a factfinder will find that this scenario applies in this case, or even that the Plaintiff necessarily is alleging that events unfolded exactly as sketched in the hypothetical above, but the

Court *is* saying that Defendants' absolutist legal argument that reliance is *per se* impossible in this case because of Plaintiff's employment agreement is unsupported by any proffered precedent and seems to lead to absurd results. Or, put differently, Defendants cite no authority for the proposition that a putative securities fraud defendant *never* could be found to have committed fraud in connection with a scenario where that defendant represented that he or she would not invoke or might waive a right that might otherwise be available. Perhaps precedent supports such a result, but if so, Defendants have not identified it.[13]

At trial, Defendants will be able to argue that the existence of Ms. Talton's employment agreement is a factor, doubtless compelling in their view, that militates against a finding of reasonable or justifiable reliance (assuming, again, that it is appropriate under the applicable law). But, on the record before the Court, the employment agreement does not mandate such a finding as a matter of law, at least not under the authority cited by the Defendants. In sum, the Court is not persuaded that it should depart from the "normal rule" regarding reasonable reliance in this case; the issue should be decided by a jury, not the Court.

> B.     Ms. Talton Has Provided Enough Evidence Regarding
>         Misrepresentations/Omissions to Survive Summary Judgment

Ms. Talton proffers the following evidence, among other evidence, in support of her claim that the Defendants' statements and alleged material omissions regarding her continued

---

[13]     Defendants also contend that Ms. Talton never could have relied on any alleged misstatements or omissions because, in their view at least, the possibility of Ms. Talton's removal was discussed at a Board meeting in the fall of 1999. But that fact (assuming it is true) could cut the other way as well. From Plaintiff's perspective, the fact that the possibility of her removal was discussed in the past, and that she thereafter only heard positive statements and signals and never heard of continuing alleged plans to remove her, would tend to exacerbate the misleading drift of what Plaintiff would deem to be lulling statements and material omissions.

employment were false, which evidence the Court finds creates a material issue of disputed fact. For example, Ms. Talton identifies an October 15, 1999, letter from Walter Threadgill (Atlantic's general partner, or at least one of them) to Mr. Collins (general partner of Polestar, or at least one of them). This letter indicates, at least from Plaintiff's perspective, that the resignation of Ms. Talton, "[t]o bring about more effective leadership," "will be required" as a likely condition precedent to an investment by Atlantic in Unisource. (Pl.'s Resp., Ex A. (Ind. Defs.).) The Defendants admit that, at the time of this letter, the Venture Capitalists were contemplating the transaction in which Ms. Talton made her January investment. (Ind. Defs.' Resp. ¶ 4.) Ms. Talton further contends, with citation to Board minutes, that this condition precedent was not disclosed at a December 14, 1999, Board meeting (which presumably, although it is unclear from the record, was the only Board meeting prior to Ms. Talton's January investment). (Pl.'s St. ¶ 5 (Ind. Defs.).) Defendants deny that this condition was not disclosed at the December 14, 1999, Board meeting; however, they do not support the denial with a citation to the record. (Ind. Defs.' Resp. ¶ 5.)

By way of another example, Ms. Talton contends that Mr. Collins had discussed with Messrs. Doerer and Fields in December 1999 whether specific investors would be more interested in buying Unisource if Ms. Talton were not a part of ongoing operations. (Pl.'s St. ¶ 8 (Ind. Defs.).) The Venture Capitalists also discussed through conference calls—apparently during the fourth quarter of 1999 and the first quarter of 2000—removing Ms. Talton from her operating role and replacing her with Thurman Jordan. (Pl.'s St. ¶ 15 (Vent. Cap.).) These calls included Messrs. Collins, Fields, Doerer, and Threadgill, as well as Mr. Lennox, who was not a Unisource Board member. (Vent. Caps.' Resp. ¶ 15.)

There also is a factual dispute concerning whether Ms. Talton was informed of any of these discussions. This evidentiary dispute, especially when coupled with the confusion and evidentiary disputes surrounding exactly what and when it was said to Ms. Talton in connection with her securities investment, makes summary judgment on Count I inappropriate.[14]

VIII. Count II: Common Law Fraud Claim (Ms. Talton v. All Defendants)

In Count II, Ms. Talton asserts a Illinois common law fraud claim against both the Unisource Defendants and the Venture Capitalists. To prevail on this claim, Ms. Talton must show (1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by her in reliance on the statement; (4) action by her in reliance on the truthfulness of the statement; and (5) injury resulting from that reliance. *See Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 434 (7th Cir.1996) (collecting cases); *see also TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998). Justifiable reliance is an element of common law fraud in Illinois. *See Ryan v. Wersi Elecs.*

---

[14]    Defendants also contend that it is impossible for there to have been any false assurance about continued employment because Ms. Talton was in fact employed with the Company through late March or early April of 2000. This argument does not work. A jury might reasonably find that if the Defendants were planning to remove Ms. Talton in only a couple of months, and if Ms. Talton were not told of such plans but instead was given misleading, lulling statements, that she was the victim of a material omission and/or a fraudulent statement. The assessment concerning whether a fraud was committed, which likely will turn on witness credibility and an exploration of factual specifics and nuances that cannot be evaluated in the context of the summary judgment record as presented, will be one for the jury, not this Court via summary adjudication. Defendants also contend that it would be impossible for the Defendants to have made any false assurance about Ms. Talton's future because the employment agreement provided that she could be terminated without cause. As previously stated, Defendants have cited no authority for the proposition that Ms. Talton could not be fraudulently induced to enter into the securities transaction at issue (which transaction had no non-reliance or integration clauses in the operative deal documents) by an express or implied representation that the Defendants would not or were not then planning to invoke a right to terminate.

26

*GmbH and Co.*, 3 F.3d 174, 182-83 (7th Cir. 1993) (collecting cases).

Defendants' arguments regarding Ms. Talton's common law fraud claim track their arguments directed at Ms. Talton's 10b-5 claim. Summary judgment is therefore denied on Count II, for the reasons set forth in the Court's opinion addressing Count I.

IX.    Breach of Fiduciary Duty Claims: Count III (Unisource v. Directors) and Count IV (Ms. Talton v. Directors and the Venture Capitalists)

Counts III and IV of Ms. Talton's First Amended Complaint allege breaches of fiduciary duty. (First Am. Compl. ¶¶ 87-96.) Count III alleges, derivatively on behalf of Unisource, that the Directors breached their fiduciary duty owed to Unisource. (*Id.* ¶¶ 87-91.) Count IV alleges that the Directors and the Venture Capitalists breached fiduciary duties owed to Ms. Talton. (*Id.* ¶¶ 92-96.) To prove a claim for breach of fiduciary duty under Illinois law, Ms. Talton must establish: (1) the existence of a fiduciary duty on a defendant's part; (2) the defendant's breach of that duty; and (3) damages resulting from the breach of that duty. *See Lucini Italia Co. v. Grappolini*, 231 F. Supp. 2d 764, 770 (N.D. Ill. 2002) (citing *Romanek v. Connelly*, 753 N.E.2d 1062, 1072 (Ill. App. Ct. 2001)); *accord Calvin v. Leitner Thomas Group*, No. 00-8055, 2003 WL 1720008, at *4 (N.D. Ill. Mar. 31, 2003). The Directors argue that Counts III and IV are barred by the business judgment rule. (*See* D.E. 88 at 9-11; D.E. 103 at 12-13.) The Venture Capitalists argue that, as a threshold matter challenging the first element of Ms. Talton's claim, they owed no fiduciary duty to Ms. Talton and that, even if they did owe such a duty, Ms. Talton's claims against them are similarly barred by the business judgment rule. (*See, e.g.*, Vent. Caps.' Mem. in Supp. of Their Mot. for Summ. J. (D.E. 86) at 1-2.)

Illinois precedent teaches that a fiduciary duty can arise from either control of a

corporation or by virtue of the nature of the corporation. In Illinois, "[t]he law is uncontroverted that the individuals who control corporations owe fiduciary duties to their corporation and its shareholders." *Jaffe Commercial Fin. Co. v. Harris*, 456 N.E.2d 224, 230 (Ill. App. Ct. 1983). In this regard, "[d]irectors owe a fiduciary duty to their corporations and to its shareholders." *Stamp v. Touche Ross & Co.*, 636 N.E.2d 616, 620 (Ill. App. Ct. 1993); *see also Brown v. Tenney*, 532 N.E.2d 230, 235 (Ill. 1988). Moreover, under Illinois law, shareholders in a close corporation owe fiduciary duties to other shareholders, at least where they are involved at something more than the level of a mere shareholder. *See Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218-19 (7th Cir. 1995); *Dowell v. Binter*, 652 N.E.2d 1372, 1379 (Ill. App. Ct. 1995); *Hagshenas v. Gaylord*, 557 N.E.2d 316, 321-22 (Ill. App. Ct. 1990); *accord* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 844.20 (2002) ("[C]lose corporation shareholders, as such, stand in a fiduciary relationship to each other."). Although precedent teaches that the duties must be evaluated in a case-specific manner, *Rexford* states that shareholders in a close corporation "must 'deal with the utmost good faith, fairly, honestly, and openly with their fellow stockholders.'" *Rexford*, 58 F.3d at 1218-19 (quoting *In re Dearborn Process Serv., Inc.*, 149 B.R. 872, 880 (Bankr. N.D. Ill. 1993)); *see also Rexford*, 58 F.3d at 1219 n.7 (teaching that duties must be evaluated in a case-specific manner).

A.     The Business Judgment Rule

The Illinois business judgment rule "is a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interest of the corporation." *Ferris Elevator Co., Inc. v. Neffco, Inc.*, 674 N.E.2d 449, 552 (Ill. App. Ct. 1996); *see* also *Stamp*, 636 N.E.2d at 621. The rule "applies to

protect directors who have performed diligently and carefully and have not acted fraudulently, illegally, or otherwise in bad faith." *Treco, Inc. v. Land of Lincoln Sav. and Loan*, 749 F.2d 374, 377 (7th Cir. 1984). Under this rule, "'corporate directors, acting without corrupt motive and in good faith, will not be held liable for honest errors or mistakes of judgment, and a complaining shareholder's judgment shall not be substituted for that of the directors." *Id.* (quoting *Lower v. Lanark Mut. Fire Ins. Co.*, 448 N.E.2d 940, 944 (Ill. App. Ct. 1983)). The rule does not shield "directors who fail to exercise due care in their management of the corporation." *Stamp*, 636 N.E.2d at 621. It has "no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Silver v. Allard*, 16 F. Supp. 2d 966, 970 (N.D. Ill. 1998) (internal quotation marks and citation omitted).[15] Moreover, the "business judgment rule operates only in the context of director action." *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984), overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 1998); *see also Silver*, 16 F. Supp. 2d at 970.

The burden of proof is on the party challenging a corporate decision made by a director to present facts that rebut the presumption created by the business judgment rule. *See In re II. King & Assoc.*, 295 B.R. 246, 275 (Bankr. N.D. Ill. 2003) (citing *Ferris*, 674 N.E.2d at 453). This presumption may be rebutted by "presenting evidence that the director acted fraudulently, illegally, or without becoming sufficiently informed to make an independent business decision."

---

[15]    With respect to the duty of loyalty (as opposed to the duty of care), directors have a "duty to administer the corporate affairs for the common benefit of all the stockholders and exercise their best care, skill and judgment in the management of the corporate business *solely in the interest of the corporation. . . .* It is a breach of duty for the directors to place themselves in a position where their personal interests would prevent them from acting for the best interests of those they represent." *Stamp v. Touche Ross & Co.*, 636 N.E.2d 616, 620 (Ill. App. Ct.1993) (collecting cases; emphasis in original; internal quotation marks and citations omitted).

*Ferris*, 674 N.E.2d at 452 (citing *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985). A plaintiff must rebut this presumption with respect to each of the decisions that the plaintiff challenges. *See, e.g., McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000) ("[I]f the shareholder plaintiff fails to meet the evidentiary burden, the business judgment rule attaches and operates to protect the individual director-defendants from personal liability for making *the board decision at issue*.") (internal quotations omitted) (emphasis added).

With respect to her derivative breach of fiduciary duty claim against the Directors, Ms. Talton argues (without citation to evidentiary support in the record) that the protection of the business judgment rule is unavailable to the Directors because the Directors did not exercise due care with respect to several decisions. First, Ms. Talton argues that the Directors (1) demanded Talton's resignation without having a viable replacement in mind; (2) endangered the core of the business by terminating its minority-owner without having a viable replacement; (3) failed to hold board meetings while the Company was in dire financial trouble; (4) failed to inform shareholders who held preemptive rights of additional stock offerings made to the Venture Capitalists; and (5) hid information from Talton, who was, at the time, the Chairman of Unisource's Board. (Talton's Resp. to the Individual Defs.' Mot. for Summ. J. (D.E. 94) at 12-13.) The Directors respond to these assertions by arguing (again, without meaningfully citing to the record or, for that matter, case law) that "[e]verything the Directors did is covered by the business judgment rule." (D.E. 103 at 12.)

As best the Court can tell from its own research, Ms. Talton's arguments regarding her resignation and termination are insufficient to survive summary judgment. These particular allegations of breach of fiduciary duty "pertain to actual decisions or determinations of judgment

30

made by the [Directors]." *Stamp*, 636 N.E.2d at 621. This is apparent from Ms. Talton's taking issue with whether her replacement was "viable." *See id.* (discussing a plaintiff's allegations challenging the "adequacy" of certain underwriting procedures and controls). And upon review of the record, the Court can find no evidence to support Ms. Talton's contentions that the *Directors* were insufficiently informed or otherwise lacked due care with respect to these decisions. (The Court notes, again, that Ms. Talton cited to no evidentiary support in the record in making these arguments, and does not appear to dispute the fact that she too voted for Mr. Jordan as her replacement.[16]) While it is true that the Venture Capitalists admitted that they did not research or investigate whether Ms. Talton's removal "from her role as president or CEO would affect Unisource's minority owned and operated status" (Vent Caps.' Resp. ¶ 24), that admission has no bearing on what information the seven-member Board (one of whom was Ms. Talton, at least at the time of her resignation) did or did not consider with respect to these decisions. In addition, Ms. Talton has not proffered evidence (or even argued) that her resignation and termination were procured fraudulently or illegally. Accordingly, these allegations standing alone, unsupported by evidence sufficient to rebut the presumption of the

---

[16]     Moreover, while the parties appear to agree that the act of replacing Ms. Talton with Mr. Jordan impaired Unisource's ability to get *new* contracts under certain minority-business programs of the City of Chicago, this allegation does not on its face appear to implicate an act of such potential negligence that it would undermine the applicability of the duty of care—principally because Mr. Jordan also apparently is an African-American individual. In addition, there is no evidence cited for the proposition that impairing the ability to get new contracts with one potential client, the City of Chicago, materially changed the prognosis for the Company's future. The City of Chicago is a potentially large client, of course, but one would need evidence that it was a client that actually mattered to the fate of Unisource (no evidence is cited in this regard), as opposed to simply being one of many potential clients in the business world, some or all of whom might have minority-business initiatives or would otherwise use the services of Unisource in any event.

business judgment rule, are not enough to withstand summary judgment, particularly in light of Seventh Circuit precedent instructing that, with respect to the termination of employees, "[t]he business judgment rule gives managers wide latitude to decide what is in the best interest of a company—without the judiciary peeking over their collective shoulders." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 270 (7th Cir. 1995).

Ms. Talton's allegation that the Directors failed to hold board meetings while the company was in dire financial trouble, unlike her allegations related to her resignation and termination, presents a threshold question of whether the business judgment rule is applicable. With respect to this issue, the Court cannot determine, on the record presently before it, whether a decision by the Directors was made to either have or not have Board meetings as opposed to an abdication of the Directors' role. For example, it is undisputed that on September 17, 2001, the Board voted to assign Unisource's assets for the benefit of its creditors (Vent. Caps.' Resp. ¶ 31), which certainly suggests that Unisource was in financial trouble at—and for some period before—this time. And although the Directors contend in their Reply (without citation to evidentiary support in the record) that "the Directors did have [Board] meetings," (D.E. 103 at 12), the Venture Capitalists admit that Unisource held no Board meetings between October 31, 2000, and September 17, 2001 (Vent. Caps.' Resp. ¶ 30). Moreover, Plaintiff alleges that during at least part of this period, the Board members stepped back from efforts to look for investors or potential acquirers for the Company, and instead allowed the Venture Capitalists to take over this responsibility, and there is evidence that this did, in fact, happen. (*See* Vent Caps.' Resp. ¶ 26.) It is undisputed that, during the period of time that Unisource ceased to have Board meetings, Polestar was putting money into the Company, and there is no evidence that the Board approved

these financings. (Pl.'s St. ¶¶ 30, 32-33 (Vent. Caps.).) All of these open factual issues create factual disputes that make summary judgment inappropriate. As stated above, the business judgment rule operates only in the context of director action, and "it has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Aronson*, 473 A.2d at 813. The Court takes no position on whether such a failure, under the particular circumstances of this case, constitutes a breach of fiduciary duty. The Court simply notes that the Unisource Defendants have advanced the business judgment rule as the sole basis for granting summary judgment in their favor on this count. Given the issues set forth above, however, the Court cannot hold, as a matter of law, that the business judgment rule shields the Directors from liability. Summary judgment is therefore denied on Count III.[17]

B.    The Venture Capitalists

In Count IV of Ms. Talton's First Amended Complaint, she also claims that the Venture Capitalists, as fellow shareholders in a closely held corporation, breached certain fiduciary duties that they owed to her. The Venture Capitalists respond, as a threshold matter, that they do not owe a fiduciary duty to Ms. Talton because neither Polestar nor Atlantic controlled Unisource and because Unisource was not, and did not operate as, a close corporation. (D.E. 86 at 2.) The Venture Capitalists also argue that, even if they did owe Ms. Talton a fiduciary duty, the Venture Capitalists did not breach any such duty. As explained below, the Court grants the Venture Capitalists' summary judgment motion in part and denies it in part.

---

[17]    Plaintiff also alleges that the Board failed to fulfill its duties to shareholders and to Talton to keep them informed about corporate affairs. (*See, e.g.*, D.E. 94 at 12-13; Pl.'s St. ¶¶ 27-29 (Vent. Caps.).) This topic has not been the subject of meaningful briefing, and summary judgment on it is also therefore inappropriate. *See generally Hagshenas v. Gaylord*, 557 N.E.2d 316, 325 (Ill. App. Ct. 1990) (duty to inform can be duty of corporate fiduciary).

1.  Unisource Meets the Minimum Requirements of the Illinois Common Law
    Definition of a Close Corporation

Under Illinois law, shareholders in a close corporation owe fiduciary duties to other

shareholders, at least if they engage in activities beyond those of a mere shareholder. *See*

*Rexford*, 58 F.3d at 1218. It is undisputed that Unisource was not incorporated under the Illinois

Close Corporation Act. (Vent. Caps.' St. ¶ 2.) An Illinois corporation may, however, qualify as

a close corporation under common law principles even if it is not incorporated under the Close

Corporation Act. *See Rexford*, 58 F.3d at 1217-18 & n.1 (citing, among other cases, *Hagshenas*,

557 N.E.2d at 321-22). The Illinois Supreme Court has defined a close corporation as "one

which the stock is held in few hands, or in a few families, and wherein it is not at all, or rarely,

dealt in by buying or selling." *Galler v. Galler*, 203 N.E.2d 577, 583 (Ill. 1964). Unisource

meets this test.[18] Unisource was not a publicly traded company and (although the exact number

of shareholders it had during the time period relevant to Ms. Talton's breach of fiduciary duty

claim is unclear) it had less than twelve shareholders during its entire existence. Given that the

fiduciary duty arises from the nature of the corporation of which the Venture Capitalists were

shareholders, it is not determinative that Polestar and Atlantic only held between %20.75-%23.75

and %12.42-%13.42 of the shares of Unisource stock respectively. *See Ruca Hardware, Ltd. v.*

---

[18]     The Venture Capitalists argue that, in order to qualify as a close corporation, the
corporation at issue must be operated like a partnership. (*See* D.E. 86 at 4.) The Court does not
believe that this is a necessary element of a common law close corporation in Illinois. Illinois
case law recognizes that the nature of a close corporation (few shares and no open market for
those shares) effectively creates an exit barrier for a shareholder and an operational dynamic that
is sometimes likened to a partnership. *See Grandon v. Amcore Trust Co.*, 588 N.E.2d 311, 314
(Ill. App. Ct. 1992) ("With no open market in which to sell his shares and only a small number of
shares issued, the shareholders of the close corporation, in effect, become partners with the other
shareholders.").

*Ruca Chien*, No. 94-3635, 1994 WL 548196, at *8 (N.D. Ill. Oct. 4, 1994) ("Defendants argue that because plaintiffs allege that Chien owns only 25 percent of RHL's shares, he owes no fiduciary duty to Lincoln. . . . This argument misapprehends shareholders' fiduciary duties under Illinois law. Holders of public stock do not generally owe fiduciary duties to one another. However, Illinois courts do not apply this rule to close corporations in which the stock is held by only a few shareholders and is not publicly traded."). Moreover, the Venture Capitalists engaged in activity (or at least there is evidence in the record that creates a triable issue) beyond those of "mere shareholders." For example, there is evidentiary support for the proposition that the Board stepped back from engaging in activities concerning major corporate affairs such as seeking investors or acquirers and turned this task over to the Venture Capitalists. (Vent. Caps.' Resp. ¶ 26.) In addition, there is evidence that the Venture Capitalists had meetings and calls, in which Board members appointed by the Venture Capitalists and a non-Board-member, Wally Lennox, who was a partner of Defendant Polestar, discussed removing Talton from her operating role and replacing her with Thurman Jordan. (Pl.'s St. ¶ 15 (Vent. Cap.).) This evidence, if believed, would seem to contradict the Venture Capitalists' proffered factual assertion in support of summary judgment that their "participation in Unisource was limited to . . . [their] vote for directors." (D.E. 86 at 5.) For all of these reasons, the Venture Capitalists have not forestalled trial on the basis that they could never be held to owe any fiduciary duties under the evidentiary record assembled.

      2.     Some But Not All of Ms. Talton's Fiduciary Breach Allegations Against the Venture Capitalists Are Dismissed

Some but not all of Ms. Talton's claimed grounds for fiduciary breach against the

Venture Capitalists are without sufficient evidentiary foundation to warrant a trial. For instance, Ms. Talton argues (without citation of any authority) that the Venture Capitalists' conditioning of their 1998 investment on Ms. Talton signing a letter of resignation and their subsequent request that she subordinate her securities to an additional investment on the Venture Capitalists' part were breaches of fiduciary duty. The Court's research uncovered no precedent in support of these arguments. These conditions were merely designed to protect the Venture Capitalists' investments—investments that they were not obligated to make in the first instance. At least as Ms. Talton has framed her argument, these conditions cannot be deemed a breach of fiduciary duty by one shareholder to another shareholder, even in the context of a close corporation. Similarly, with respect to Ms. Talton's claim that the Venture Capitalists breached their fiduciary duty to Ms. Talton by putting Unisource out of business rather than paying an arbitration award to Ms. Talton out of their own pockets, Illinois precedent teaches that, even on the part of majority shareholders, there is no fiduciary duty "to use individual pecuniary means to assist the corporation in its money difficulties or by use of such means to shield it from financial destruction." *Kelly v. Fahrney*, 145 Ill. App. 80, 1908 WL 2154, at *5 (Ill. App. Ct. 1908), *aff'd*, 89 N.E. 984 (Ill. 1909); *accord CLT Telecomm. Corp. v. Colonial Data Tech. Corp.*, No. 96-2490, 1999 WL 200700, at *9 n.5 (D. Conn. Mar. 21, 1999) (rejecting the argument that a majority shareholder breaches a fiduciary duty by not continuing "to pour capital into a company that it no longer considers a sound investment"); *see also* 12B William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 5810 (2000) (citing *Kelly*, 1908 WL 2154, at *5). The Venture Capitalists also correctly argue (*see* D.E. 86 at 8-9) that two alleged breaches discussed in the First Amended Complaint—that the Defendants improperly refused a business

opportunity for Unisource with a third-party solely because Talton would have been associated with the project, and that the Defendants ignored other corporate opportunities that Talton was presenting (*id.*)—should be rejected via summary judgment because Talton identifies no admissible evidence in support of these allegations. As the Venture Capitalists explain, and as Talton does not dispute, these allegations are supported only by inadmissible hearsay. For that reason, and also, independently, because Talton has waived the claims by failing to respond to the Venture Capitalists' arguments, these allegations will not be at issue at trial.

Nonetheless, there still are some allegations that survive summary resolution. Plaintiff alleges that after she was removed, the Venture Capitalists were in charge of trying to seek investors and/or acquirers for the Company, and that they did not do so in a sensible manner. She also alleges that the Venture Capitalists were not providing information to fellow shareholders about those efforts and were investing in the Company, including investing after Ms. Talton was removed, without informing fellow shareholders of those investments. (Pl.'s St. ¶¶ 26-30, 32-33 (Vent. Caps.).) Although the parties do not meaningfully discuss the fiduciary duty law related to these allegations, as previously stated, precedent appears to suggest that failure to inform those owed a fiduciary duty of relevant corporate information can be a breach. *See Hagshenas*, 557 N.E.2d at 325.[19] Accordingly, the Court denies the Venture Capitalists'

---

[19]    The Venture Capitalists also assert that at least some of Plaintiff's claims against them should, as a matter of the Court's discretion, be deemed collaterally estopped. (D.E. 86 at 9-10.) This argument is premised on the apparent fact that at least some Individual Defendants may have been found not to be personally liable to Plaintiff in an arbitration proceeding in which Unisource was found to have breached its contractual duties to pay Plaintiff some $170,000 in severance benefits. (*Id.*) This argument has several flaws. To begin, the Venture Capitalists do not appear to have alleged the affirmative defense of collateral estoppel in their answer, as they must, *see* Fed. R. Civ. P. 8(c)), but rather appear to have asserted equitable estoppel. *See* D.E. 66 at 29 ("Fourth Affirmative Defense: By virtue of her conduct, Talton's claims are barred by the

summary judgment motion in part.

X.     Count V: (Talton v. the Unisource Defendants)

Count V of Ms. Talton's First Amended Complaint seeks relief under Section 12.56 of the Illinois Business Corporation Act of 1983. This section provides for certain remedies to non-public corporate shareholders. *See Schirmer v. Bear*, 672 N.E.2d 1171, 1174 n.1 (Ill. 1996). Specifically, Section 12.56 provides that, in an action by a shareholder in a corporation that has no shares listed on a national securities exchange or regularly traded in a market maintained by one or more members of a national securities association, a court may order certain remedies if it is established that, among other things, "[t]he directors of . . . the corporation have acted . . . in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder . . . ." 805 ILCS 5/12.56(a)(3). Ms. Talton seeks an order from this Court (1) removing the Directors;

---

doctrine of estoppel."); *see also, e.g., Fields v. Gen. Motors Corp.*, 121 F.3d 271, 275-276 (7th Cir. 1997) (discussing fundamental role in Illinois law of party's conduct in equitable estoppel setting). Perhaps one arguably might read the Venture Capitalists' Answer as not asserting equitable estoppel—because it is almost certainly a loser of a defense for them, as it typically relates to statute of limitations issues—on the theory that a party is less likely to have asserted a losing defense than to have ambiguously asserted a potentially relevant one. (Such an approach, however, would require ignoring the fact that answers routinely include obvious unavailing defenses, all in the name of "nothing to lose" and "protecting the record.") But even if one reads the answer as asserting collateral estoppel as a potential defense, that still does not help the Venture Capitalists for three additional reasons. First, the Venture Capitalists themselves contend that application of collateral estoppel would be a discretionary matter for the Court (D.E. 86 at 10), and they have not provided any guidance as to whether this Court would be justified in exercising its discretion in their favor. The Court would not preclude Plaintiff's claim without such direction. Second, it is clear that the gravamen of Plaintiff's fiduciary duty claim that the Venture Capitalists would seek to estop does not relate to any failure to pay severance benefits. Third, and relatedly, as a practical matter, any estoppel issue relating to the prior arbitration is likely of no practical significance now that the Court has dismissed out any breach of fiduciary duty claim based on the Venture Capitalists' alleged failure to fund the Company so that it could pay Ms. Talton's severance benefits. (The Unisource Defendants have a pending motion to amend their answer regarding, *inter alia*, collateral estoppel, that was filed well after summary judgment briefing was completed. It will be the subject of a separate ruling in due course.)

(2) requiring an accounting of all transactions between Unisource and any shareholder that occurred after her termination; (3) canceling any loan, stock sale, warrant sale, or other transaction between Unisource and a shareholder of which Talton did not receive notice prior to the consummation of the transaction; and (4) awarding damages in an amount in excess of one million dollars, as well as prejudgment interest and costs. The Court notes that much of the relief Ms. Talton seeks in this Count V may well be unavailable, given Unisource's bankruptcy and subsequent assignment of its assets for the benefit of its creditors (which occurred after Ms. Talton filed this suit). However, Ms. Talton does seek damages under Count V, a remedy that is expressly identified as available under Section 12.56. *See* 805 ILCS 5/12.56(b)(10) (stating that court may order an "award of damages to an aggrieved party").

The parties' briefing on Count V is sparse. For example, to the extent anyone addresses the Count at all, no one cites a single case relating to any standards under which the claim should be evaluated. One of the Defendants' contentions apparently is that at least some relief requested by the Count may be moot—either because of the Company's subsequent demise or perhaps because Ms. Talton has been provided with information she seeks via the claim. While these contentions may be correct, at least in part (it is difficult to evaluate the second contention because no record citation is provided), Count V also provides Plaintiff a potential damages remedy. At a minimum, that request for relief is not moot. Given the fact that the claim does not appear to be moot in its entirety, the request for summary dismissal of the count is denied.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment are granted in part and denied in part.

So ordered.

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Dated: _9-23-04_